UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: VROOM, INC. SECURITIES
LITIGATION

21 Civ. 2477 (PGG)

**CONSOLIDATED CLASS ACTION COMPLAINT OF LEAD PLAINTIFF
RHONDDA CYNON TAF PENSION FUND**

**BARRACK RODOS & BACINE**
Michael A. Toomey
Eleven Times Square
640 8th Avenue, 10th Floor
New York, NY 10036
Telephone:  212.688.0782
Facsimile:  212.688.0783

**BARRACK RODOS & BACINE**
Robert A. Hoffman
Mark R. Rosen
Jeffrey B. Gittleman
Chad A. Carder
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone:  215.963.0600
Facsimile: 215.963.0838

*Attorneys for Rhondda Cynon Taf Pension Fund
and Lead Counsel for the Putative Class*

**Table of Contents**

**Page**

I.     NATURE OF THE ACTION ...........................................................................1

    A.     Preliminary Statement ......................................................................... 1

    B.     The Claims Asserted in the Complaint ................................................ 9

II.    JURISDICTION AND VENUE ...................................................................9

III.   PARTIES ...................................................................................................10

IV.   OVERVIEW OF THE COMPANY ...........................................................14

V.    FACTUAL BACKGROUND .....................................................................15

    A.     Pre-Class Period Events .................................................................... 15

         1.     Vroom's "Asset-Light" Business Strategy ............................... 15

         2.     Vroom's Customer Service Contract With Prominent Investor Dan Gilbert's Rock Connections LLC ........................................... 17

         3.     Events Leading Up To Vroom's IPO ....................................... 22

    B.     In Closing the IPO, Vroom Tells Investors It Is Well-Positioned To Capitalize On Soaring Used Car Demand With Its "Exceptional" Customer Support Driving Increased Conversion And Its Asset-Light Business Model Mitigating Risk ........................................................ 24

    C.     Defendants Close An "Opportunistic" September 2020 SPO While Continuing To Tout Vroom's Ability To Capitalize On A Booming Market For Online Used Car Sales ...................................................... 27

    D.     Unbeknownst To Vroom's Investors, Vroom Had A Broken Customer Experience Spoke On Its Growth Flywheel ....................... 33

         1.     An Exponential Increase In Complaints About Vroom's Customer Experience In 2020 Leads BBB's Board Of Directors To Revoke Vroom's Accreditation .......................... 34

         2.     Vroom Remains Unaccredited By The BBB, Which Maintains an "F" Rating of the Company ............................................. 36

i

3.    Vroom's Customer Experience Issues Directly Impact Vroom's Financial Prospects ................................................................ 44

E.    The Truth Concerning Vroom's Customer Experience And Its Negative Impact On Vroom's Financial Results Is Gradually Revealed ......................................... 45

VI.    CLASS ACTION ALLEGATIONS .................................................................48

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS PERTAINING TO LEAD PLAINTIFF'S CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT ..................................................................49

A.    Vroom's IPO Offering Materials ........................................... 50

B.    Defendant Hennessy's Post-IPO Interviews ......................................... 55

C.    Vroom Reports Its Second Quarter 2020 Financial Results ................................ 56

D.    Vroom's September 2020 SPO Offering Materials .............................. 58

E.    Vroom's September 8, 2020 Form 8-K .......................................... 59

VIII.    PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD ........................61

IX.    SUMMARY OF SCIENTER ALLEGATIONS ................................................64

X.    LOSS CAUSATION ..................................................................................69

A.    November 11, 2020 Disclosures ........................................... 69

B.    March 3, 2021 Disclosures .......................................... 71

XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ...............................................73

XII.    PRESUMPTION OF RELIANCE ..................................................................74

XIII.    CLAIMS BROUGHT PURSUANT TO SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT .................................................................................75

FIRST CLAIM FOR RELIEF .......................................................... 77

SECOND CLAIM FOR RELIEF ....................................................... 79

XIV.    ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT ........................................80

A.      The SPO Offering Materials .............................................................. 80

B.      The SPO Offering Materials Contained Untrue Statements and Material
        Omissions............................................................................................ 81

C.      The SPO Offering Materials Failed to Disclose the Information Required by
        Items 303 and 105 of Regulation S-K, and Did Not Otherwise Disclose
        Information Concerning Trends, Uncertainties, Events or Risks ...................... 86

XV.    CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2), AND 15 OF
       THE SECURITIES ACT .......................................................................87

       THIRD CLAIM FOR RELIEF .............................................................. 88

       FOURTH CLAIM FOR RELIEF ............................................................ 90

       FIFTH CLAIM FOR RELIEF ................................................................ 91

XVI.   PRAYER FOR RELIEF .........................................................................92

XVII.  JURY DEMAND ...................................................................................93

Lead Plaintiff, Rhondda Cynon Taf Pension Fund ("Lead Plaintiff"), by and through its counsel, brings this action for violations of the federal securities laws on behalf of itself and all other similarly situated persons or entities (the "Class") who: (1) purchased or otherwise acquired the common stock of Vroom, Inc. ("Vroom" or the "Company") between June 9, 2020 and March 3, 2021, both dates inclusive (the "Class Period"); and/or (2) acquired shares of the common stock of Vroom in connection with Vroom's September 2020 follow-on stock offering, in which the Company sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds (the "September 2020 SPO"), and were injured thereby.

The allegations in this Complaint are based on Lead Plaintiff's personal knowledge as to itself, and on information and belief, including the investigation of counsel, as to all other matters. The investigation of counsel is predicated upon, among other things, review and analysis of public filings made by Vroom with the United States Securities and Exchange Commission ("SEC"), including Forms 10-K, 10-Q, and 8-K, registration statements and prospectuses; press releases issued and disseminated by the Company; media reports about the Company; reports issued by securities analysts who followed the Company; and transcripts of Vroom's investor conference calls and presentation materials.  Lead Plaintiff believes that substantial, additional evidentiary support for the allegations set forth in this Complaint will be obtained after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

### A.    Preliminary Statement

1.    This case arises from the failure of Vroom – an ecommerce platform for buying and selling used vehicles – and its most senior officers and directors to disclose to the market the Company's true financial prospects and operating condition, which was plagued by a lack of

adequate sales and support staff resulting in degraded customer experiences, lost sales opportunities, and liquidation of inventory at fire sale prices.

2.      Vroom became a public company through an initial public offering on June 9, 2020 wherein it sold 24,437,500 shares of common stock for $22.00 per share, reaping proceeds of approximately $504 million, net of underwriting discounts and before deducting offering expenses (the "IPO").[1]  Prior to the IPO, and as a result of the COVID-19 pandemic, Vroom significantly reduced its inventory and furloughed approximately one-third of its workforce to account for an expected drop in demand. When those demand trends sharply reversed, Vroom consistently represented to investors (beginning at the time of its IPO and continuing through the September 2020 SPO and, indeed, throughout the Class Period) that it was well-positioned to take advantage of extraordinarily high consumer demand for online used car purchases.

3.      For example, in Vroom's IPO Offering Materials, the Company claimed that it was "currently building [its] inventory to take advantage of [its] position and value proposition in the used automotive market" and was positioned to take advantage of "enhanced opportunities arising from greater consumer acceptance of [its] business model as a result of the COVID-19 disruptions."  Vroom stated that in April 2020 it "began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that [it] believe[d] w[ould] convert at target margins" and that it "intend[ed] to strategically build [its] inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels."

4.      The IPO Offering Materials also discussed how Vroom's business had "grown significantly as [it had] scaled [its] operations…," and that this "growth [was] not attributable to a

---

[1] On June 9, 2020, Vroom filed a prospectus for the IPO with the SEC on Form 424B4, which incorporated and formed part of the Registration Statement for the offering (the "IPO Offering Materials").

single innovation or breakthrough" but was instead due to "multiple strategies that serve as points" on the Company's "Growth Flywheel," shown below:



As Vroom explained in its public filings, "*[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel*."

5.       Vroom also touted the purported advantages of what it called its "asset-light" business strategy, whereby Vroom eschewed its need for ownership of assets in favor of a business model that relied heavily on contracts with third-party service providers to assist in facilitating functions that would typically be controlled in-house.  Vroom claimed to investors that outsourcing these critical functions of its business reduced both risk and capital investment, thus improving Vroom's ability to scale its business while simultaneously reducing risk.

6.       In accordance with its asset-light business strategy, Vroom outsourced, among other things, its "Customer Experience" function, the spoke on the Company's Growth Flywheel that operated Vroom's primary call center and performed nearly every necessary function required in the process of converting a potential Vroom customer into an actual Vroom customer.  Vroom's

Customer Experience function was outsourced to prominent investor Dan Gilbert's Rock Connections LLC ("Rock Connections"), under an agreement signed by Defendant Hennessy.

7.    Despite outsourcing the Customer Experience function, Defendants ensured that the agreement between Vroom and Rock Connections gave the Company and its executives unfettered access to monitor the customer service being provided by Rock Connections to Vroom's customers.  Specifically, Vroom's agreement with Rock Connections, among other things, (a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's customer relationship management ("CRM") system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom's senior executives and management unfettered access to monitor the customer support being provided to potential Vroom customers, including monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom management, and a requirement for weekly meetings between representatives of Rock Connections and Vroom.  As a result, Defendants were fully aware of the Customer Experience being provided at Vroom.

8.    Throughout the Class Period, Defendants asserted that the spokes on Vroom's Growth Flywheel were driving increased sales, touting Vroom's "***[e]normous inventory selection***" and "***[e]xceptional customer support***" while flatly asserting on multiple occasions that the Company offered "***an exceptional ecommerce experience for [its] customers***."[2]  Defendants also told investors that, consistent with Vroom's Growth Flywheel, "customer experience" was

---

[2] Throughout this complaint, all emphasis in bold and italics added unless otherwise indicated.

"fundamental to the growth of [its] business" and that Vroom maintained a "***deep[] commit[ment] to creating an exceptional experience for [its] customers***."

9.      Analysts and investors were keenly aware of Vroom's asset-light strategy and outsourcing of critical functions, and they monitored any developments with respect to those third party relationships given their importance to Vroom's Growth Flywheel and ability to convert customers and increase sales.   With no sign of any impediment in the Company's path to capitalizing on extraordinary demand for online used car sales, Vroom's stock price skyrocketed from its June 2020 IPO price of $22 per share to a close of $73.87 per share on September 1, 2020. Exactly one week later, ***and only a few weeks from the end of the third quarter of 2020***, Vroom would take advantage of its rapidly escalating share price by announcing the September 2020 SPO. In doing so, Vroom also provided an update to investors on Vroom's operational and financial results, ***raising the Company's third quarter financial guidance and telling investors that the Company was performing "better than expected***."   Specifically, Defendants portrayed the Company's Growth Flywheel to be spinning faster than ever without any impediments, stating: "***[a]s higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold***."

10.     Vroom filed with the SEC a registration statement on Form S-1 for the September 2020 SPO on September 8, 2020 (the "SPO Registration Statement"), followed by the filing of the prospectus for the September 2020 SPO on September 11, 2020 (the "SPO Prospectus") (together with the SPO Registration Statement, the "SPO Offering Materials").   The SPO Offering Materials made many of the same representations to investors that were made in connection with the IPO, including attributing the Company's growth to the spokes on Vroom's Growth Flywheel, again touting the Company's "[e]normous inventory selection" and "[e]xceptional customer support,"

and counting Vroom's purported ability to offer a superior Customer Experience as a key factor differentiating Vroom from "traditional auto dealers and the peer-to-peer market."

11. **As with the IPO Offering Materials, the SPO Offering Materials made detailed representations about the Customer Experience offered by Vroom**, stating that the Company had "partnered with a leading customer experience management provider to operate [its] primary call center" which enabled it "**to centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies.**"  Vroom also represented to investors that its "**professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed.**"  Based on these representations and others, the Company sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds in the September 2020 SPO.

12. **The truth was far different from what Defendants openly claimed.  In fact, the Company's touted Customer Experience spoke on its Growth Flywheel was broken**, which not only prevented Vroom from capitalizing on a robust market for online used car sales, but also forced Vroom to sell off the excess inventory it had amassed at fire sale prices.  Indeed, far from offering the "[e]xceptional customer support" that Vroom touted to investors from the time of its IPO, and doubled down on to successfully orchestrate its September 2020 SPO, Vroom's Customer Experience had been in a free-fall since as early as January 2020, **over five months before the Company's IPO and over eight months before the September 2020 SPO**.

13. The Better Business Bureau of Greater Houston and South Texas (the "BBB"), which is the centralized location for Vroom's business, has found that, "**[b]eginning in January 2020, BBB began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns**" including complaints from Vroom customers asserting that: (a) "the

vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were left in a parking lot or driveway at night with the keys left in them."  Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns," "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in."  The BBB has also stated that, rather than improving, "*[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased*," with "new patterns of complaints" in June 2020 focused on "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."

14.     Based on the overwhelming multitude and type of customer service issues being reported to it, the BBB initiated proceedings to revoke Vroom's BBB accreditation.  *On September 2, 2020, just before Vroom announced the September 2020 SPO, the BBB Board of Directors revoked Vroom's accreditation due to its failures to adhere to and abide by BBB standards and duly notified Vroom of its action.*  The September 2020 SPO Offering Materials made no mention of the BBB proceedings to revoke Vroom's accreditation or the BBB Board's vote to do so. Instead, Defendants chose to mention the BBB only in the context of a generic statement that consumer complaints posted on "consumer platforms such as the Better Business Bureau" "*could*" diminish consumer confidence in the Company, "*irrespective of the[ ] validity*" of any such complaints.  As of the filing of this complaint, more than a year after Vroom's BBB accreditation was initially revoked, Vroom remains unaccredited and the BBB has assigned Vroom a rating of "F," the lowest possible letter rating it can assign to a business.

15.     Contrary to Vroom's representation that "***higher inventory levels lead to higher***
***conversion***," Vroom's disastrous Customer Experience constituted a massive undisclosed
roadblock to sales conversion on the Company's Growth Flywheel that was having a materially
negative impact on the Company's bottom line.  ***The representations made by Defendants***
***concerning Vroom's Customer Experience and the importance of its increased inventory levels***
***during the Class Period, and specifically in the Company's SPO Offering Materials, directly***
***conflicted with the true state of affairs they knew existed within Vroom at the time those***
***statements were made***.

16.     Investors learned about the true state of Vroom's calamitous Customer Experience
and its negative effect on Vroom's ability to maximize sales conversion through two corrective
disclosures on November 11, 2020 and March 3, 2021 that revealed that (a) Vroom's inventory
growth had far outpaced the capabilities of its existing sales and support personnel, creating a
logistical bottleneck that threatened the Company's profits, the value of its existing inventory and
its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had
resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a)-(b)
above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and
logistics networks, materially impairing the Company's short-term profitability; and (d) as a result
of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows,
despite a robust online used car market.  Indeed, contrary to specific representations Defendants
made to Vroom's investors, the Company was never "well positioned to navigate the challenges
presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling
patterns in favor of ecommerce."

17.     All told, following the disclosures of the fraud, Vroom's stock price declined **over 42%** from the price at which it sold shares in the September 2020 SPO and **over 57%** from its Class Period high.

### B.     The Claims Asserted in the Complaint

18.     Lead Plaintiff asserts two sets of claims in this Complaint.  The first set are fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Defendants who made materially false and misleading statements that caused the price of Vroom stock to be artificially inflated during the Class Period and/or were control persons with respect to such material misstatements and omissions.  These claims are made on behalf of all persons, other than Defendants or their affiliates, who purchased the common stock of Vroom on the open market throughout the Class Period, and were damaged as a result.

19.     The second set of claims are strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against those Defendants who are statutorily liable for materially untrue statements and misleading omissions made in connection with the September 2020 SPO.  These claims are made on behalf of all persons, other than Defendants and their affiliates, who acquired the common stock of Vroom in the Company's September 2020 SPO.

## II.     JURISDICTION AND VENUE

20.     The claims asserted in this Complaint arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §§ 240.10b-5), and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

21.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because Vroom maintains offices in this District and many of the acts giving rise to the violations complained of herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

24.     Lead Plaintiff Rhondda Cynon Taf Pension Fund ("Rhondda") is one of the biggest occupational pension funds in Wales, providing benefits for over 60,000 people.   Rhondda purchased or otherwise acquired 125,027 shares of Vroom stock during the Class Period, including 3,294 shares in Vroom's September 2020 SPO, as reflected in the Certification filed by Rhondda on May 21, 2021, in this case.   Rhondda suffered damages as a result of the violations of the federal securities laws alleged herein.

25.     Defendant Vroom, a Delaware corporation headquartered in New York, New York, is an ecommerce platform that buys and sells used vehicles.   Through the Company's online platform, consumers can research and select from thousands of reconditioned vehicles.   Vroom's common stock trades on the NASDAQ exchange under the symbol "VRM."

26.     Defendant Paul J. Hennessy ("Hennessy") was, at all relevant times, Vroom's Chief Executive Officer and a director of the Company, and signed or authorized the signing and dissemination of the Company's IPO Offering Materials, SPO Offering Materials, and Forms 10-Q and 8-K filed with the SEC during the Class Period.

27.     Defendant David K. Jones ("Jones") was, at all relevant times, Vroom's Chief Financial Officer, and signed or authorized the signing and dissemination of the Company's IPO Offering Materials, SPO Offering Materials, and Forms 10-Q and 8-K filed with the SEC during the Class Period.  Jones was replaced as Vroom's CFO effective September 13, 2021.

28.     Defendants Hennessy and Jones are collectively referred to as the "Officer Defendants."  The Officer Defendants, because of their positions with Company, possessed the power and authority to control the contents of Vroom's reports to the SEC, press releases, and presentations to securities analysts, investment managers and investors.  The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this Complaint to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

29.     Defendants Robert J. Mylod, Jr., Scott A. Dahnke, Michael J. Farello, Laura W. Lang, Laura G. O'Shaughnessy, and Adam Valkin were members of the Vroom board of directors who signed or authorized signing and dissemination of the SPO Offering Materials filed with the SEC, and, together with Defendant Hennessy, are collectively referred to herein as the "Director Defendants."

30.     The Officer Defendants and the Director Defendants identified in paragraphs 26-29 above are collectively referred to as the "Individual Defendants."   Each of the Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. The Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations and financial reporting of Vroom.   By virtue of such duties, these officers and directors were required to supervise the preparation of and dissemination of the SPO Offering Materials.

31.     All of the Individual Defendants were control persons of Vroom by reason of their own involvement in the daily business of Vroom and/or as senior executives and/or directors of Vroom. The Individual Defendants, at the time they held positions with Vroom, were able to, and did, exercise substantial control over the operations of Vroom, including control of the materially false and misleading statements, omissions and course of conduct complained of herein.

32.     It is appropriate to treat all of the Individual Defendants as a group for pleading purposes and to presume that the false and misleading information conveyed in the SPO Offering Materials, as alleged herein, is the collective action of the narrowly defined group of Defendants identified above.

33.     As officers, directors and/or controlling persons of a publicly held company and under the federal securities laws, the Individual Defendants had a duty to (a) promptly disseminate complete, accurate and truthful information with respect to Vroom; (b) correct any previously issued statements from any source that had become materially misleading or untrue; and (c) disclose any trends that would materially affect earnings and the present and future operating results of Vroom, so that the market price of Vroom's publicly traded securities would be based upon truthful and accurate information.

34.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for Vroom's September 2020 SPO and was identified as a joint lead book-running manager and representative for other underwriters for the September 2020 SPO.  Goldman Sachs served in the same role for Vroom's June 2020 IPO.  As an underwriter, Goldman Sachs assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Vroom common stock during the Class Period.

35.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for Vroom's September 2020 SPO and was identified as a joint lead book-running manager and representative for other underwriters for the September 2020 SPO.  BofA served in the same role for Vroom's June 2020 IPO.  As an underwriter, BofA assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Vroom common stock during the Class Period.

36.     Defendant Allen & Company LLC ("Allen & Co.") served as an underwriter for Vroom's September 2020 SPO and was identified as a joint lead book-running manager and representative for other underwriters for the September 2020 SPO.  Allen & Co. served in the same role for Vroom's June 2020 IPO.  As an underwriter, Allen & Co. assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Vroom common stock during the Class Period.

37.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter for Vroom's September 2020 SPO and was identified as a joint lead book-running manager and representative for other underwriters for the September 2020 SPO.  Wells Fargo served in the same

role for Vroom's June 2020 IPO.  As an underwriter, Wells Fargo assisted in the preparation and drafting of the registration statements and prospectuses filed with the SEC for the offerings and first created a public market and then facilitated in making additional public sales of Vroom common stock during the Class Period.

38.     Defendants Goldman Sachs, BofA, Allen & Co., and Wells Fargo are collectively referred to hereinafter as the "Underwriter Defendants."

## IV.     OVERVIEW OF THE COMPANY

39.     While Vroom is relatively new to the public markets, the Company has been in existence since 2013 when it was launched with Kevin Westfall and Marshall Chesrown as "Auto America."  In 2014, the Company hired Allon Bloch, the prior co-CEO of wix.com, as CEO and Elie Wurtman as its executive chairman, and the Company transitioned into a technological platform and changed its name to Vroom.  In December 2015, Vroom acquired Stafford, Texas-based Texas Direct Auto Inc.

40.     Defendant Hennessy was appointed as Vroom's CEO effective June 8, 2016, replacing Allon Bloch.  Hennessy had served as the CEO of priceline.com, an operating business of The Priceline Group, after previously holding various positions within the Priceline organization.  At the same time that Vroom announced Hennessy's appointment as CEO, it also announced that Defendant Robert J. Mylod, Jr., former CFO and Vice Chairman of The Priceline Group and a then-current Vroom board member, had been named Non-Executive Chairman of the Vroom Board of Directors.  Defendants Hennessy and Mylod had previously worked together at The Priceline Group for over a decade.

41.     Vroom operates in three business segments: (i) Ecommerce, which represents retail

sales of used vehicles through Vroom's ecommerce platform; (ii) Texas Direct Auto ("TDA"), which represents retail sales of used vehicles from the Company's physical location located in Stafford, Texas, which is near Houston; and (iii) Wholesale, which represents sales of used vehicles through wholesale auctions.   For the year ended December 31, 2020, Vroom's Ecommerce segment accounted for 67.4% of the Company's revenues, while its Wholesale and TDA segments represented 18.1% and 14.5% of its total revenues, respectively.

## V.   FACTUAL BACKGROUND

### A.   Pre-Class Period Events

#### 1.   Vroom's "Asset-Light" Business Strategy

42.   Leading up to its IPO, Vroom touted the purported advantages of what it called its "asset-light" business strategy.  As a company heavily invested in technology, Vroom eschewed its need for ownership of assets in favor of a business model that relied heavily on contracts with third-party service providers to assist in facilitating functions that would typically be controlled in-house.

43.   In the IPO Offering Materials, Vroom asserted its "asset-light strategy" was "fundamental to [its] business model" and noted that the Company's "future growth strategies [were] focused on developing [its] ecommerce business without the need for capital investment in physical retail locations."

44.   Vroom described its asset-light strategy as a "combination of ownership and operation of assets by us with strategic third-party partnerships."  Vroom claimed that this approach provided "flexibility, agility and speed…without taking on…unnecessary risk and capital investment," while also driving "improved unit economics and operating leverage."  Vroom also claimed that it applied this asset-light approach "to the third-party value-added products [it sold] to customers, which enable[d] [it] to generate additional revenue streams without taking on the risk

associated with underwriting vehicle financing or protection products."   In other words, by outsourcing portions of these critical functions of its business, Vroom asserted to investors that its asset-light business model reduced both risk and capital investment, thus improving Vroom's bottom line while simultaneously reducing risk.

45.     Pursuant to this asset-light business strategy, Vroom outsourced portions of its critical functions, including its: (a) reconditioning facilities, which performed reconditioning of vehicles in Vroom's inventory to prepare them for sale; (b) logistics operations, which handled delivery of Vroom's cars in inventory to customers throughout the United States; (c) customer financing, which provided vehicle financing to Vroom's customers; and (d) Customer Experience team, which operated Vroom's primary call center and performed most every action necessary to consummate the sale of a car to a Vroom customer.   Vroom has represented that its "third-party customer experience center" handles "the substantial majority of inquiries, sales, purchases and financings of [its] vehicles in [its] ecommerce business," and even customers who wish to trade in a vehicle have to "interact with [Vroom's] customer experience team in order to complete their transaction."

46.     With respect to its outsourced "Customer Experience Team," Vroom told investors that it had partnered with "a leading customer experience management provider" enabling Vroom to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies."   While Vroom represented that its Customer Experience was "partially dependent" on this third-party Customer Experience management provider over which it had "limited control," Vroom's contract with that third-party provider told a different story.

2.     **Vroom's Customer Service Contract With Prominent Investor Dan Gilbert's Rock Connections LLC**

47.     In an August 22, 2017, press release titled "Vroom Partners with Rock Connections to Drive Growth and Customer Experience," Vroom announced that it had partnered with a Detroit-based company called Rock Connections to handle Vroom's Customer Experience function.   In the press release, Vroom described Rock Connections as a "strategic sales and marketing agency focused on outbound and inbound client service," and Defendant Hennessy asserted that "[b]y partnering with Rock Connections, [Vroom could] ensure that [its] clients receive[d] *immediate responses, while also providing the expert advice that Vroom customers demand*."   The press release continued:

> *Car buyers and resellers no longer need to put their lives on hold to purchase or sell their cars. They can quickly and easily purchase a vehicle online and have it delivered anywhere in the United States*. Conversely, sellers can have their car appraised online and arrange free pickup of their vehicle at a time that works for them. Rock Connections will provide sales and customer service support to both online and offline customers.

48.     The founder and chairman of Rock Connections was Dan Gilbert, also founder and chairman of Quicken Loans and majority owner of the NBA's Cleveland Cavaliers, who had been one of Vroom's most high-profile investors since 2015.   Vroom's press release noted that Gilbert had, at the time of the press release, recently invested in Vroom's 2017 $76 million Series F round of funding that had raised Vroom's total equity funding to $295 million since inception, and leveraged Gilbert's prominence by including quotes from Gilbert himself in the press release. Gilbert asserted, among other things, that "[p]artnering with Vroom to help grow and support its exciting and unique model of purchasing cars online, with an experience that clearly feels much better than existing car purchasing methods, couldn't be a more perfect fit" for Rock Connections. Rock Connections was a wholly owned subsidiary of Rocket Companies, Inc.

49.     Vroom entered into a new "Customer Experience Management Agreement" for Rock Connections to handle Vroom's Customer Experience function in April 2020 (the "2020 Customer Experience Agreement"), just two months before Vroom's IPO.  The terms of that Agreement show that Vroom had much more than "limited control" over the customer service provided to Vroom customers by Rock Connections.  Rather, the Agreement between Vroom and Rock Connections, among other things, (a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's CRM system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom, its senior executives, and management unfettered access to monitor the customer support being provided to potential Vroom customers, including but not limited to monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom, and a requirement for weekly meetings between representatives of Rock Connections and Vroom.

50.     Both Vroom and Rock Connections acknowledged that the purpose of the 2020 Customer Experience Agreement was "to maximize sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, and Direct Buys of vehicles from Customers, while providing to Customers the highest quality customer service and support." And to that end, under the terms of the Agreement, Rock Connections was tasked with providing a litany of "customer sales and support services," virtually all of which were to be conducted in accordance with policies and procedures provided by Vroom.  Specifically, in addition to operating Vroom's customer service call center, Rock Connections agreed to:

- Transfer calls to other operational teams at Vroom *in accordance with Vroom's policies and procedures…*;

- Send emails to Customers who have consented to receiving email communications from Vroom or in response to Leads *in accordance with Vroom's Policies and Procedures*;

- *When and if implemented by Vroom pursuant to written instruction*, send text messages to Customers to facilitate completion of a Transaction or in response to Leads, provided that the Customer has consented to receiving text messages from Vroom and Rock sends such texts *only in accordance with Vroom's Policies and Procedures*;

- *When and if implemented by Vroom pursuant to written instruction*, provide support via online chat messages to Customers to facilitate completion of a Transaction or in response to Leads *in accordance with Vroom's Policies and Procedures*;

- Assist Customers in selecting a Vehicle, understanding Vehicle features, obtaining credit pre-approval, completing a credit application, obtaining trade-in appraisals, *understanding Vroom's limited warranty*, understanding Value-Added Products … and *understanding Vroom's transaction terms*, in each case, as may be requested by the Customer;

- Assist Customers who wish to sell their Vehicle to Vroom and are not trading in such Vehicle in connection with a Vehicle purchase ("Direct Buy") in obtaining an appraisal from Vroom. Any such Direct Buy Services shall be conducted by the Client Communication Specialist ("CCS") team at Rock *in accordance with Vroom Policies and Procedures*;

- For each Customer who chooses to purchase a Vehicle and has or obtains the requisite financing to do so, complete and email to such Customer a summary of the terms of the proposed transaction, including Vehicle price, financing terms, fees and taxes, Value-Added Products and trade-in value, in each case, as applicable ("Deal Summary") *in a form mutually agreed by Vroom and Rock*;

- *Enter and save all required information in Vroom's customer relationship management ("CRM") system in accordance with Vroom's Policies and Procedures*;

- Collect documentation from Customers that is needed to complete a Transaction, such as a driver's license, proof of insurance, and any requested loan stipulations;

- Ensure that the Deal Summary and documents collected from each Customer *are saved appropriately in Vroom's CRM, change the stage of the Transaction in the CRM to "finalizing deal" for Quality Assurance Team review and, following such review, change the status of the Transaction in the CRM to "Contracting" so it can be picked up by the Vroom documentation team (or such other designations as Vroom may determine and communicate to Rock pursuant to written instruction)*; and

- Provide such other assistance and guidance to Customers as may be reasonably necessary to assist them in a Transaction.

51.    Importantly, as set forth above, the Agreement required that Rock Connections "enter and save all required information" in Vroom's CRM system, including the ability to save documents in the system, edit the stage of each transaction in the system, and change the status of each transaction in the system.  As such, Vroom's CRM system, which it maintained during the Class Period, contained detailed information concerning each consumer transaction with Vroom and any related customer service issues that were related thereto.

52.    The information contained in Vroom's CRM system was incredibly granular, as evidenced by the fact that the 2020 Customer Experience Agreement also required that Rock Connections "record 100% of the audio calls made in connection with the Services and ensure that all email and other written communications between Rock and a Customer are tracked and saved in Vroom's CRM database."[3]   The Agreement also mandated that Rock Connections *"notify Vroom promptly in writing upon its receipt or knowledge of any complaint from any person, including a Customer, or entity regarding any Services provided [under the Agreement], and … provide reasonable assistance in researching, investigating and responding to such complaints."*

---

[3] Additionally, the 2020 Customer Experience Agreement mandated that Rock Connections "provide Vroom with the ability to access the recording system remotely vis Secure Internet access (https), as well as search for, listen to, and download contacts."

53.     As is evident from the 2020 Customer Experience Agreement, Vroom management had access to Vroom's CRM system and all of the granular information it contained for each Vroom transaction and customer service interaction, by customer, during the Class Period.

54.     The 2020 Customer Experience Agreement also evidenced Vroom's control over Rock Connections' provision of customer service in other ways, including with respect to staffing. For example, the Agreement provided that Rock Connections and Vroom would "create, mutually agree upon and maintain a staffing plan … to adjust staffing levels for [customer service] Agents from time to time as needed."  As part of this staffing plan, Rock Connections and Vroom would both "review hiring levels and needs on a rolling three-month basis…and otherwise ensure adequate staffing of [customer service] Agents to provide the Services throughout the Term," with the parties also working together to develop a training program for these customer service agents. Vroom had the right to monitor this training program, and the scripts developed and used by the customer service agents were to be "mutually develop[ed]" by Vroom and Rock Connections, with Vroom being "responsible for the compliance of all Scripts with applicable law and regulation."

55.     Vroom also had virtually unfettered access to monitor Rock Connections' communications and the customer service being provided to Vroom's customers.  In addition to storing the recordings of all calls between Rock Connections and Vroom customers in Vroom's CRM system, as set forth above, the 2020 Customer Experience Agreement provided that Rock Connections would "provide Vroom with monitoring capabilities for both voice and data concerning Calls" and that Vroom had "the right, as often as it desires, to monitor, without Rock's knowledge, the calls being performed by Rock on behalf of Vroom."  Vroom was also authorized under the Agreement to "log into Rock's Five9 system (or any replacement system)" which allowed Vroom "to view the current status of the team working on Vroom's account, run reports specific to the Services, or listen to recorded or real-time calls."  Rock Connections further agreed

to provide access to Vroom representatives to be on site at the Rock Connections facility from

time to time.

56.     The 2020 Customer Experience Agreement also mandated that

> *representatives of Rock and Vroom shall meet on a weekly basis*, at times and
> locations to be agreed upon, *to review reports and matters relevant to the
> transactions contemplated by this Agreement*, including, without limitation,
> *Rock's performance of the Services, sales by Vroom of Vehicles, trade-ins of
> Vehicles by Customers, sales by Vroom of Value-Added Products, the Staffing
> Plan, Cohort training and scripts*.

And finally, Rock Connections was required to "transmit to Vroom weekly data and reports

relating to the provision of the Services" under the Agreement "in a form to be mutually agreed

by the Parties...."[4]

### 3.     Events Leading Up To Vroom's IPO

57.     Beginning in March 2020 and continuing in the three months leading up to Vroom's

June 2020 IPO, which marks the start of the Class Period, Vroom significantly reduced its used

vehicle inventory in an effort to limit its exposure to an expected drop in demand as a result of the

COVID-19 pandemic.  As Defendant Hennessy would later explain:

> [W]hen the COVID pandemic came to the United States, it was a very sobering
> time for us, as we have been in this game long enough to understand that aging
> inventory can be the death of a car retailer. And yet in the early days of COVID,
> we saw a significant contraction in retail demand, which had ripple effects into the
> wholesale markets. *Given the severity of the contraction and the extreme lack of
> visibility, we made the difficult decision to dramatically reduce our exposure to
> these alarming trends*.

*        *        *

---

[4] In August 2020, Rock Connections assigned its responsibilities under the 2020 Customer Experience Agreement to
Rocket Auto LLC ("Rocket Auto"), another wholly owned subsidiary of Rocket Companies, Inc., through an
assignment again signed by Defendant Hennessy.  The substance of the Agreement was unchanged, and Rocket Auto
agreed to provide the services to Vroom under the same terms as expressed in the Agreement, which was attached as
an exhibit to the assignment.  Given the close relationship between Rock Connections and Rocket Auto as wholly
owned subsidiaries of Rocket Companies, Inc., and given that the terms of the Agreement remained unchanged, for
ease of clarity Lead Plaintiff continues to refer to Rock Connections as the provider of services to Vroom under the
2020 Customer Experience Agreement despite this assignment.

…in late March and into the first half of the second quarter…[w]e not only stopped buying new inventory, we methodically, dynamically and carefully price[d] our inventory to move very quickly.

*       *       *

At our peak in March, we were carrying over $200 million in inventory. At our low point in Q2, our inventory hit a low watermark of approximately $70 million….

58.     Vroom similarly reduced its employee headcount.  Defendant Hennessy has stated that because "[t]he wholesale markets underwent an alarming bout of instability and illiquidity, …we had to institute emergency furloughs and salary reductions."  Specifically, Vroom has disclosed that, "[e]ffective May 3, 2020, approximately one-third of [its] workforce was placed on furlough. The majority of employees furloughed were in reconditioning, logistics, acquisitions and TDA sales, which were the positions most affected by the reduction in unit volume."

59.     But any fears concerning an initial drop in used vehicle sales at the beginning of the pandemic dissipated quickly moving into the summer of 2020, when the market for used car sales began to boom due to a confluence of factors, including dealer shortages of new vehicles and a changing consumer sentiment favoring ownership of a car over riding mass transit or use of a ride-share company.

60.     Vroom sought to capitalize on this soaring consumer demand for used vehicles beginning in May 2020 by building back inventory and taking steps to close its IPO.  An analyst report issued by Benchmark on June 9, 2020, noted that the timing could not have been better for Vroom, observing that:

> ***Timing is everything and the initial public offering of Vroom seems to have hit the target***….  Used vehicle sales in the US have recovered at a faster than expected pace, industry feedback suggests used vehicle prices have stabilized, and the virus-related shutdown resulted in an expansion of selling vehicles on-line.

23

**B.** **In Closing the IPO, Vroom Tells Investors It Is Well-Positioned To Capitalize On Soaring Used Car Demand With Its "Exceptional" Customer Support Driving Increased Conversion And Its Asset-Light Business Model Mitigating Risk**

61.     In the offering materials for Vroom's IPO, Defendants portrayed the Company as extraordinarily well-positioned to capitalize on the booming market for used car sales and the consumer shift in favor of ecommerce because its Growth Flywheel would generate sales growth and its asset-light business approach would simultaneously reduce risk.   To that end, the IPO Offering Materials represented that Vroom had been "strategically" building inventory for over a month that would "convert at target margins" and allow the Company to "ultimately exceed pre-COVID-19 levels":

> On April 20, 2020, we began to acquire new inventory, with a primary focus on high-demand models that we believe will convert at target margins. We intend to strategically build our inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels.

62.     The IPO Offering Materials noted that this increase in inventory was the first step in Vroom's generation of increased sales growth through the use of Vroom's Growth Flywheel, shown below:



63.     Vroom touted its purportedly robust growth trajectory as being due to the various points on its Growth Flywheel.  As explained in the IPO Offering Materials:

> Our business has grown significantly as we have scaled our operations. ***Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion.*** This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage.

As Vroom further stated, "[s]ales conversion drives revenue growth and ***is an output of the acceleration of every point on the growth flywheel***."

64.     With respect to the Customer Experience spoke on its Growth Flywheel, Vroom told investors that Customer Experience was "fundamental to the growth of [its] business" and that the Company offered "[e]xceptional customer support," an "exceptional customer experience," and an "exceptional ecommerce experience."   This, it contended, was a primary consideration differentiating its offerings from those of "traditional auto dealers and the peer-to-peer market," representing that "***[o]ur professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed***" and that "***[i]n all of our customer interactions, our goal is to ensure that every customer is a delighted customer***."  Similarly, Vroom stated that "***[o]ur on-demand shopping and contact-free, convenient delivery*** not only saves our customers a trip to the dealership, ***it provides the ultimate driveway experience***."

65.     Seeking to allay any concerns investors may have had about the inclination of consumers to purchase a used vehicle through a remote, rather than in-person, process, the IPO Offering Materials assured investors that:

[A]t any point in the buying or selling process, our customers may encounter questions or challenges they are not equipped to or comfortable with resolving online. ***Our customer experience team provides human support to our customers in these situations. Our customer experience team handles customer questions about vehicle selection, financing, and the purchase or sale process. The team has been trained on our sale process and our core values of transparency and high customer satisfaction.***

66.     The IPO Offering Materials also contained the following chart illustrating Vroom's robust "Ecommerce Revenue" growth purportedly attributable to the Company's Growth Flywheel and the "[e]xceptional" Customer Experience it offered:



67.     With its "[e]xceptional" Customer Experience leading to increased conversion, sales growth and ecommerce revenue on the Company's Growth Flywheel, Vroom told investors that it was simultaneously reducing risk through its "asset-light" business model whereby it outsourced portions of its critical business functions, such as its Customer Experience function through the 2020 Customer Experience Agreement.

68.     Vroom told investors in the IPO Offering Materials that its asset-light strategy was "fundamental to [its] business model," that it provided "flexibility, agility and speed…without taking on…unnecessary risk and capital investment" while also driving "improved unit economics and operating leverage," and that, given what it represented to be the benefits of this approach, ***this asset-light strategy was one of Vroom's "Competitive Strengths."*** With respect to the outsourcing of Vroom's Customer Experience team, the IPO Offering Materials represented that Vroom had "***partnered with a leading customer experience management provider to operate our***

*primary call center*," which enabled the Company to "*centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies*."

69.     The IPO Offering Materials included as an exhibit the 2020 Customer Experience Agreement between Vroom and Rock Connections that was signed by Defendant Hennessy. *Vroom did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the IPO Offering Materials*.  In fact, in its enumerated risk factors, Defendants sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm Vroom's business *in the future*:

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, *irrespective of their validity*. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. *If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations*.

**C.     Defendants Close An "Opportunistic" September 2020 SPO While Continuing To Tout Vroom's Ability To Capitalize On A Booming Market For Online Used Car Sales**

70.     Following Vroom's IPO, Defendants continued to represent to investors that Vroom was supremely positioned to capitalize on a booming market for online used car sales.  For example, on June 10, 2020 (with less than three weeks left in Vroom's second fiscal quarter), Defendant Hennessy conducted an interview with investor news site *TheStreet* in which he claimed

that Vroom was experiencing a surge in customer demand that created an "opportunity" to take Vroom public earlier than previously anticipated.  Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to consider purchasing a used vehicle online compared to three months previously, ***"so we really see the markets coming our way."***

71.     On June 11, 2020, Defendant Hennessy conducted another interview with investor news site *TheStreet* in which he highlighted the purportedly massive market opportunity for Vroom's products.  Hennessy represented that a shift to individual car ownership had been a "positive tailwind" for Vroom's business.  He further claimed that with the ***"growth that we've had and now the continued tailwinds that we're seeing in our business, …all I can say is that Vroom is in excellent position to…enter…the public markets…."***  Hennessy also sought to downplay any concerns surrounding potential lingering adverse effects of the pandemic on Vroom's business, representing that the Company's recent employee furloughs were ***"just about in our rearview window, and now we're back to work and scaling the business."***

72.     Defendants also used Vroom's 2020 second quarter earnings release and conference call with analysts and investors to tout Vroom's market position and the Company's purported ability to capitalize on increasing demand for online used car sales.  Specifically, in Vroom's August 12, 2020 press release announcing its financial results for the second quarter of 2020 (the "2Q20 Release"), Defendant Hennessy misleadingly represented that it was lower inventory levels, rather than any issue with Vroom's Customer Experience function, that kept the Company from fulfilling increased consumer demand, and that Vroom's increasing inventory levels would solve that problem.  Specifically, Defendant Hennessy stated:

> I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough

environment. During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. *These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce*.

73.     The same day, on Vroom's earnings call with analysts and investors to discuss Vroom's second quarter 2020 results, Defendants Hennessy and Jones continued to represent to the market that more inventory, or capacity, for Vroom would lead directly to more sales, and that any capacity restraints as a result of Vroom's earlier sell-down of inventory in response to the pandemic had been resolved moving into the Company's third quarter.  Specifically, Defendant Hennessy stated that "[c]ontent begets [sales] conversion," and that Vroom was in the midst of a "V-shaped recovery" where, after selling down its inventory in April 2020, the Company "[s]pent every day since May trying to build back [its] inventory" and had experienced "strong monthly sequential increases in unit sales in June and July."  Defendant Jones similarly stated that "despite lower average selling prices, we believe we will have ascending e-commerce gross profit per unit in the low to mid-single digits."  And later, in response to an analyst question, Hennessy stated:

> *[W]e've got capacity. . . lined up not only in Q3 to match our guidance*, but now and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. *So we believe that we're almost out of this capacity constraint issue in this quarter.*

Defendant Jones similarly responded to an analyst question: "[Y]ou had mentioned bottleneck [for vehicle reconditioning]. *I think we're not currently experiencing any significant capacity constraints in any of those.*"

29

74.     Defendants' representations to the market that any capacity bottleneck limiting Vroom's inventory originating from the early days of the pandemic had been resolved, and no other impediment would stop Vroom from maximizing its ability to generate increased conversion on the Company's Growth Flywheel, had its intended effect as Vroom's stock price skyrocketed in the wake of these disclosures.  As shown in the chart below, Vroom's stock climbed from its IPO price of $22.00 per share on June 9, 2020, to close at a class period high of $73.87 on September 1, 2020, *a staggering 235% price increase in less than three months*:



75.     Only one week later, on September 8, 2020, Defendants, seeking to capitalize on Vroom's soaring stock price, formally announced the September 2020 SPO and filed the SPO Registration Statement with the SEC.[5]  J.P.Morgan noted in a September 9, 2020 analyst report that Defendants acknowledged the September 2020 SPO was "opportunistic," stating: "[Vroom] [m]anagement noted that the equity raise was opportunistic given the outperformance in [Vroom] shares since the IPO…."  Three days later, Vroom filed the SPO Prospectus with the SEC.  The SPO Offering Materials, signed by the Individual Defendants, repeated many of the same

---

[5] Defendants filed a draft registration statement for what would become the September 2020 SPO confidentially with the SEC on September 1, 2020, the same day that Vroom stock reached its class period high.

misrepresentations made by Vroom in the IPO Offering Materials concerning the use of its Growth Flywheel to generate sales growth and its asset-light business approach to simultaneously reduce risk.

76.     Specifically, in the SPO Offering Materials, Defendants again touted the Company's growth attributable to its Growth Flywheel as well as its "[e]xceptional customer support," "exceptional customer experience," and "exceptional ecommerce experience" that Vroom purportedly provided.[6]  And, as in the IPO Offering Materials, Vroom represented that its "***professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed***" and that "[i]n all of our customer interactions, our goal is to ensure that every customer is a delighted customer." Similarly, Vroom once again stated that "[o]ur on-demand shopping and contact-free, convenient delivery not only saves our customers a trip to the dealership, ***it provides the ultimate driveway experience***."

77.     In the SPO Offering Materials, Vroom also once again told investors that it was simultaneously reducing risk through its "asset-light" business model wherein it outsourced portions of critical business functions, such as its Customer Experience function through its 2020 Customer Experience Agreement.  ***Vroom once again characterized its asset-light strategy as "fundamental to [its] business model" and as one of Vroom's "Competitive Strengths."***  With respect to the outsourcing of Vroom's Customer Experience team, the SPO Offering Materials again represented that Vroom had "***partnered with a leading customer experience management provider to operate our primary call center***," which enabled the Company to "***centralize [its]***

---

[6] In fact, Vroom made reference to its "exceptional" customer support and experience, in various iterations, ***no less than 30 times throughout the SPO Offering Materials***.

*contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies*."

78.     Notably, in contrast to the IPO Offering Materials, *the SPO Offering Materials specifically referenced the BBB in the context of a purported risk disclosure about the possible impact of consumer complaints on the Company's business*.  Vroom, however, *did not disclose that its BBB accreditation had been revoked or any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the SPO Offering Materials*.  Rather, Defendants once again sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm Vroom's business *in the future*:

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, customer service, delivery experience, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, *including on consumer platforms such as the Better Business Bureau*, consumer facing blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, *irrespective of their validity*. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. *If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations*.

79.     On September 8, 2020, in conjunction with the filing of the SPO Registration Statement, Vroom filed with the SEC a current report on Form 8-K providing an update on Vroom's operational and financial results intended to spur purchases of shares in the September 2020 SPO closing only a few days later (the "September 8, 2020 Form 8-K").  In the Form 8-K, Defendants told Vroom investors, *only three weeks from the close of its third quarter*, that the Company's post-pandemic build-up of inventory was translating to continued growth in

ecommerce units sold, portraying the Company's Growth Flywheel as churning out higher sales conversion than ever, and as such that Vroom was making substantial positive adjustments to the third quarter 2020 guidance it had issued only a month earlier.  Specifically, the Form 8-K stated:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and *we have continued to scale our inventory levels in the third quarter of 2020*. *As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold*. As well, *the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit*. *As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic. Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows*:

> - Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).
>
> *       *       *
>
> - Total revenue of $290 million – $310 million (from $268 million – $290 million).
>
> - Total gross profit of $21 million – $23 million (from $16 million – $18 million).
>
> - Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).

80.     Given Defendants' representations concerning Vroom's Growth Flywheel and increased sales conversion, and Defendants' positive adjustments to Vroom's third quarter financial guidance only three weeks from the end of that quarter, the Company's admittedly "opportunistic" September 2020 SPO was a rousing success.  Vroom sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds in the September 2020 SPO.

### D.     Unbeknownst To Vroom's Investors, Vroom Had A Broken Customer Experience Spoke On Its Growth Flywheel

81.     Contrary to all of Defendants' statements, Vroom's touted Customer Experience

spoke on its Growth Flywheel was broken, and had been for some time leading up to the Company's IPO.  And far from getting better over time, Vroom's Customer Experience had been in a downward spiral beginning as early as January 2020, over five months before the Company's IPO and over eight months before the September 2020 SPO.

> 1.   **An Exponential Increase In Complaints About Vroom's Customer Experience In 2020 Leads BBB's Board Of Directors To Revoke Vroom's Accreditation**

82.   The BBB has stated that, "***[b]eginning in January 2020, [it] began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns***," including complaints from Vroom customers asserting that: (a) "the vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were left in a parking lot or driveway at night with the keys left in them."[7]   Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns" and "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in."[8]

83.   The BBB has further found that, "***[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased***," with "new patterns of complaints" in June 2020 focused on "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."[9]  More recent complaints in 2021 focus on Vroom's third-party delivery drivers being "rude

---

[7] https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633, accessed September 30, 2021.

[8] *Id.*

[9] *Id.*

and threatening," consumers "being switched around to different [customer service] departments but…not receiving any assistance," and consumers' "insurance companies…dropping coverage" due to "delays in getting their registration documents" from Vroom.[10]

84.     Based on the overwhelming multitude and type of customer service issues being reported to the BBB, the BBB initiated proceedings to revoke Vroom's BBB accreditation.  The BBB notified Vroom that its accreditation was suspended and was undergoing review for possible revocation.  The BBB has a process by which a business may appeal an impending revocation to the BBB Membership Committee.  The Membership Committee then votes on any appeal, and its decision is then sent to the BBB Board of Directors for a final vote.  ***On September 2, 2020, just before Vroom announced its Secondary Offering, the BBB Board of Directors revoked Vroom's accreditation due to its failures to adhere to and abide by BBB standards***, including but not limited to Vroom's failure to (a) "honestly represent products and services, including clear and prominent disclosures of all material terms;" (b) "[a]ddress disputes forwarded by BBB quickly and in good faith;" (c) "[a]pproach all business dealings, marketplace transactions and commitments with integrity, good faith and intent to do what is reasonably expected;" and (d) "[c]ooperate with BBB in efforts to eliminate the underlying cause of patterns of customer complaints that are identified by BBB."[11]

85.     Despite this trend of increasing consumer complaints about Vroom's Customer Experience, Vroom did not disclose in the IPO Offering Materials or the SPO Offering Materials any then-occurring adverse issues or trends related to either its Customer Experience function or its outsourcing of that function pursuant to the 2020 Customer Experience Agreement.  Nor did

---

[10] *Id.*

[11] https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633, accessed July 15, 2021.

Vroom disclose the revocation of its BBB accreditation in the SPO Offering Materials.  Further, during the Class Period as Vroom increased its inventory, Defendants misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market.

> **2.    Vroom Remains Unaccredited By The BBB, Which Maintains an "F"
>         Rating of the Company**

86.    At the time of the filing of this complaint, Vroom's BBB report states that the Company remains unaccredited by the BBB more than a year after its accreditation was revoked.[12] The BBB also lists Vroom as having an "F" BBB rating,[13] the lowest rating given by the BBB, as shown below:

---

[12] https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633, accessed September 30, 2021.

[13] *Id.*



87.   *Importantly, the BBB's letter rating of "F" for Vroom is not based on customer reviews but is instead based on information independently gathered by the BBB about the business, including information from Vroom itself*.[14]   Specifically, the BBB states that its letter ratings are "***based on information BBB is able to obtain about the business***, including complaints

---

[14] https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633/overview-of-bbb-ratings, accessed September 30, 2021.  The BBB stresses on its website that "**Customer Reviews are not used in the calculation of the BBB Letter Grade Rating**." [Emphasis in original]

received from the public," considered in conjunction with "***information directly from businesses and from public data sources***" that the BBB seeks and obtains.[15]   In Vroom's case, as shown below, its "F" letter rating is based on the Company's "[f]ailure to respond to 542 complaint(s) filed against business," 422 complaints filed against Vroom that were "not resolved," and the fact that Vroom "has failed to resolve underlying cause(s) of a pattern of complaints":



88.     The BBB has taken the information it has compiled about Vroom and evaluated it in the context of seven different factors to arrive at Vroom's "F" letter rating.  Those factors include

---

[15] *Id.*

a company's (1) "complaint history with BBB;"[16] (2) "[t]ype of business;"[17] (3) "[t]ime in business;" (4) "Transparent Business Practices;"[18] (5) "[f]ailure to honor commitments to BBB;"[19] (6) "[l]icensing and government actions known to BBB;"[20] and (7) "[a]dvertising issues known to BBB."[21]   Rating points corresponding to these factors are assigned with a point range assigned to various elements, with each business's total score based on a 100-point scale, as follows:

---

[16] https://www.bbb.org/overview-of-bbb-ratings, accessed September 30, 2021.   Under this first factor, the BBB evaluates a variety of factors regarding complaints about the business, including the number of complaints made about the business, the company's responses to those complaints, whether those complaints have been resolved, and whether the business has resolved the underlying cause(s) of a pattern of complaints.

[17] *Id*.   Under this factor, "[a] business's BBB rating is lowered if, in BBB's opinion, the business is a type of business that raises marketplace concerns or is believed to operate in violation of the law."

[18] *Id*.   Under this factor, "[a] business's BBB rating is lowered if BBB determines that the business is not being transparent about its marketplace conduct" including "situations where…[a] business does not provide complete information about products and services offered, and/or ownership" and "[a] business uses false addresses or an address cannot be determined."

[19] *Id*.   Under this factor, "[a] business's BBB rating is lowered if a business does not honor its commitments to BBB, including commitments to abide by a mediation settlement or an arbitration award."

[20] *Id*.   Under this factor, "[a] business's BBB rating is lowered when BBB has knowledge of…[f]ailure of the business to have required competency licensing (i.e., licensing that requires a competency assessment or can be taken away based on misconduct by business)" and/or "[f]inalized government actions against the business that relate to its marketplace activities and, in BBB's opinion, raise questions about the business's ethics or its reliability in providing products/services."

[21] *Id*.   Under this factor, "[a] business's BBB rating is lowered when the business does not, in BBB's opinion, appropriately respond to BBB advertising challenges that relate to…[m]isuse of the BBB name or BBB marks" and/or "[q]uestions about the truthfulness, accuracy or substantiation of advertising claims or compliance with the BBB Code of Advertising."



89.     Once the BBB has devised a particular company's total score (out of 100 possible points), the BBB then assigns a letter rating to that business, as follows:



90.     An evaluation of all of the factors above has led the BBB to assign an "F" letter rating for Vroom, its lowest possible rating.  According to the BBB scale above, this means that Vroom's total rating points score with the BBB is below 59.99 points out of 100 possible points. Vroom continues to maintain this abysmal letter rating more than a year after the BBB initially revoked Vroom's accreditation.

91.     In fact, on August 30, 2021, nearly a year after the BBB initially revoked Vroom's accreditation, the BBB issued a consumer warning titled "**BBB Warning: Vroom, an online car retailer, receives an influx of consumer complaints**."[22]  That warning attributed Vroom's "F" letter rating to "the number of unanswered and unresolved complaints filed against the business and the company's failure to address the underlying cause of its recent pattern of complaints," and

---

[22] https://www.bbb.org/article/news-releases/24809-bbb-warning-vroom-an-online-car-retailer-receives-an-influx-of-consumer-complaints, accessed September 30, 2021.

detailed how the number of BBB complaints against Vroom had accelerated since the beginning

of 2020, as follows:

> Given the stress often involved in buying a car, many businesses are figuring out ways to simplify the process by moving it online.  Buying a car online can be convenient, especially during the pandemic, *but many customers of one online used car retailer, Vroom, have complained about their experience*.
>
> *Customers have submitted well over a thousand complaints to the Better Business Bureau of Greater Houston and South Texas, where Vroom is based*.  *During the past year, BBB received 1,696 complaints, a significant uptick in complaint volume over previous years*. Vroom has received 1,817 complaints in the past three years.
>
> According to complaints made to BBB, some consumers alleged the vehicles were misrepresented in online photos.  When the vehicle was delivered, in many instances, it had issues not always clearly shown in the photos, including body damage, the interior was dirty, discolored, damaged or all of the above. Other issues alleged in the complaints indicate consumers were not receiving the necessary paperwork to get their car registered, delayed delivery in receiving their cars and issues concerning their trade-ins.  Some complaints also allege warranty issues, deceptive Carfax issues and/or wrecked cars being sold.  Consumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns.  They then turned to BBB for assistance.
>
> Currently, *Vroom's BBB Business Profile displays an F rating due to the number of unanswered and unresolved complaints filed against the business and the company's failure to address the underlying cause of its recent pattern of complaints*.  *The business' BBB accreditation was revoked in 2020 due to its complaint issues*.

92.    Media outlets have now reported on Vroom's disastrous Customer Experience

issues, including NBC affiliate KPRC 2 in Houston, Texas, where Vroom holds a significant

presence.  On September 13, 2021, KPRC 2 published a report titled "KRPC 2 Investigates online

car buying nightmares," focusing on Vroom complaints and corroborating the problems noted by

the BBB.[23]  For example, in the KPRC 2 report, one Vroom customer stated that, over six months

---

[23] https://www.click2houston.com/news/local/2021/09/13/kprc-2-investigates-online-car-buying-nightmares/,
accessed September 30, 2021.

after she purchased a car from Vroom in February 2021, she was still unable to drive the car she purchased because "a lack of paperwork" inhibited her from "register[ing] the car or get[ting] insurance."  That customer also said that when she contacted Vroom to try to get a resolution of her issues, ***Vroom's customer service representatives laughed at her***.

93.    "Other common complaints" referenced in the KPRC 2 report also mirror those referenced by the BBB, and "include vehicles misrepresented in photos, customers not receiving necessary paperwork to get their car registered, delayed deliveries, and communication problems - like sending customers in circles."  The report notes that KPRC 2 met with Dan Parsons, identified as President of the BBB of Greater Houston and South Texas, who read some of the complaints the BBB had received.  The article also makes the point that while "[t]here are a few complaints about other online car buying sites," the number of those complaints are "nowhere near the number from Vroom customers."

94.    Similarly, on February 22, 2021, automotive news provider *Torque News* published an article, with embedded videos, titled "Used Car Purchased Online From Vroom Goes Horribly Wrong," detailing one consumer's failed attempt to purchase a $63,000 BMW i8 from Vroom.[24] Ultimately, the consumer was unable to consummate the transaction with Vroom because ***Vroom misplaced the cashier's check that the consumer sent to pay for the car***.  The article and videos included therein additionally detail the deficient customer service provided by Vroom once the Company had misplaced the consumer's cashier's check, and the severe difficulties faced by the consumer in interacting with Vroom's Customer Experience team to resolve these issues.  The *Torque News* article goes on to reference the abysmal reputation that Vroom has with consumers as evidenced by its BBB rating and the revocation of its BBB accreditation.

---

[24] https://www.torquenews.com/1083/used-car-purchased-online-vroom-goes-horribly-wrong, accessed September 30, 2021.

### 3.   Vroom's Customer Experience Issues Directly Impact Vroom's Financial Prospects

95.     With respect to revenue recognition, Vroom stated in its SEC Form 10-K for the year-ended December 31, 2020, filed with the SEC on March 3, 2021 (the "2020 Form 10-K"), that it "recognizes revenue upon transfer of control of goods or services to customers, in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services."   Specifically, with respect to its retail vehicle revenue (vehicles sold to customers through its ecommerce platform and TDA retail location), Vroom contends that it "satisfies its performance obligation and recognizes revenue for used vehicle sales generally at a point in time when the vehicles are delivered to the customer for ecommerce sales or picked up by the customer for TDA sales."   As such, ***Vroom is unable to recognize revenue from sales where consumers do not receive the car they purchased[25] or are experiencing "delayed delivery in receiving their car," and could also be unable to recognize revenue where consumers are experiencing "issues concerning their trade-in," which are all issues identified by the BBB as subjects of increased complaints beginning in January 2020***.

96.     While Vroom's undisclosed inability to consummate transactions and deliver cars to consumers throughout 2020 and its need to process returns for damaged and otherwise defective cars during the same period directly impacted Vroom's bottom line, as explained above, another area of its disastrous Customer Experience was exacerbating these issues.   Specifically, when consumers contacted Vroom to attempt to rectify issues with their purchase, they fell into a black hole of customer service, with the BBB finding that consumers were "having customer service and communication issues when trying to reach out to the company to address their concerns" and were

---

[25] This would also include instances similar to what occurred with the consumer that was the subject of the *Torque News* article above, where Vroom literally lost a $63,000 sale by misplacing the consumer's payment for the purchased vehicle.

"switched around to different [customer service] departments" without "receiving any assistance." As such, even if consumers were willing to attempt to rectify problems with their purchase from Vroom, Vroom's Customer Experience team was often unable to respond in any meaningful way to these overtures, thus aggravating the harm to Vroom's bottom line.

97.     Finally, because Customer Experience issues at Vroom were leading to a degraded Customer Experience and missed sales opportunities, Vroom began to experience a bloated, aging surplus of used cars in inventory, as evidenced in the Company's 2020 Form 10-K.  Specifically, Vroom's inventory line item on its balance sheet increased nearly 106% from year-end 2019 to year-end 2020 (from $205.746 million to $423.647 million).  While Vroom told investors that it intended to strategically build inventory levels to return to and ultimately exceed pre-Covid-19 levels, this bloated, aging surplus inventory forced Vroom to liquidate used vehicles at fire sale prices rather than converting "at target margins" as Defendants previously stated.  As such, contrary to Defendants' representations that "higher inventory levels lead to higher conversion," Vroom's broken Customer Experience spoke constituted a massive undisclosed roadblock to sales conversion on the Company's Growth Flywheel and had a material negative impact on the Company's revenue, margins, and earnings.

**E.      The Truth Concerning Vroom's Customer Experience And Its Negative Impact On Vroom's Financial Results Is Gradually Revealed**

98.     After the close of trading on November 11, 2020, Vroom issued a release announcing its third quarter 2020 financial results (the "3Q20 Release").  The 3Q20 Release included a "Financial Outlook" for Vroom's fourth quarter of 2020 making it clear that Vroom expected to suffer sharply higher losses moving forward.  Specifically, Vroom told investors that its adjusted EBITDA losses were projected to increase from $36 million in the third quarter of 2020 to a loss range of $44 million to $52 million for the Company's fourth quarter, a 33%

sequential increase at the midpoint.  During Vroom's accompanying earnings call held the same day, Defendants revealed that Vroom was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks in order to avoid constrained growth, despite the favorable market environment.

99.     Defendants, however, insisted that Vroom was well-positioned to achieve fourth quarter guidance metrics contained in the 3Q20 Release,[26] which was issued in the middle of the fourth quarter.  As Defendant Hennessy stated on Vroom's third quarter 2020 earnings call:

> As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that [CFO Jones] talked about in terms of e-commerce growth on a year-over-year basis. It's just -- it's strong. So we're feeling really good.

Defendant Hennessy also again told investors that the Company's Growth Flywheel continued to spin based on "increased inventory driv[ing] increased demand and increased conversion."  And with respect to the "bottleneck" in the Customer Experience spoke of Vroom's Growth Flywheel, CEO Hennessy assured the market that Defendants were "working through the backlogs of things," were "very-very focused on getting the customer experience right," and would have the issue "rectified in Q4."

100.     On this news the price of Vroom stock fell $5.31 per share, or 13%, from a close of $40.80 per share on November 11, 2020 to a close of $35.49 per share on November 12, 2020, on abnormally heavy volume of over 9.2 million shares traded.  However, because Defendants failed to disclose the full truth about the adverse events, trends and uncertainties negatively impacting

---

[26] The 3Q20 Release stated that Vroom was on track to achieve the following financial results during the fourth quarter: (i) "average ecommerce gross profit per unit of $2,050 to $2,150"; (ii) "Total gross profit of $24 to $28 million"; (iii) "EBITDA of ($52) to ($44) million"; and (iv) "Net loss per share of ($0.41) to ($0.35)."

Vroom's Customer Experience, its asset-light strategy and its overall business, the price of Vroom stock remained artificially inflated.

101.    Then, after the close of trading on March 3, 2021, Vroom issued a release announcing its fourth quarter and full year financial results (the "4Q20 Release").  The 4Q20 Release revealed operational issues and financial results far worse than previously disclosed to investors.  Vroom's fourth quarter financial results disappointed in a number of areas, with Vroom suffering a net loss of $60.7 million, a 42% year-over-year increase, representing a loss per share 20% worse than the midpoint of Defendants' prior guidance.  Vroom's fourth quarter EBITDA loss and total gross profit per unit also missed the range provided by Defendants in November,[27] when Defendant Hennessy stated that they were "feeling really good" and provided guidance to give investors "really good insight."

102.    During Vroom's accompanying earnings call held the same day, Defendant Hennessy stated that Vroom was suffering from severe sales backlogs due to inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. These backlogs, along with a degraded Customer Experience, had operationally constrained Vroom's business and forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable market for online used car sales.  Even worse, Defendant Hennessy admitted that these deficiencies would continue to constrain the Company's profits into the first quarter of 2021, stating: "*we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1.*"

---

[27] Specifically, the 4Q20 Release stated that (1) Vroom suffered a $55.9 million adjusted EBITDA loss during the quarter, outside the range provided by Defendants in the 3Q20 Release and $8 million worse than the midpoint; and (2) Vroom had achieved only $1,821 total gross profit per unit, again outside the range previously provided by Defendants and 13% below the midpoint, and generated only $878 gross profit per vehicle, which represented a 13% decline year-over-year.

103.    A March 4, 2021 analyst report by J.P. Morgan summarized market sentiment regarding the news: "[W]e see a longer road to re-establishment of execution credibility after the company has missed forward profit expectations for the first three quarters as a growth-oriented public company."

104.    On this news, the price of Vroom stock plummeted $12.29 per share, or 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021, on abnormally heavy trading volume of 19.6 million shares traded.  This represented a 42% decline from the price at which Vroom shares were sold in the September 2020 SPO less than six months earlier and a decline of over 57% from Vroom's class period high.

## VI.    CLASS ACTION ALLEGATIONS

105.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons that (1) purchased or otherwise acquired the common stock of Vroom during the Class Period and were damaged thereby; and/or (2) acquired shares of the common stock of Vroom in connection with Vroom's September 2020 SPO and were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Vroom and their families and affiliates.

106.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 1, 2021, Vroom had over 135 million shares of common stock outstanding, owned by many thousands of investors, including the over 10 million shares of Vroom common stock sold in the September 2020 SPO.

107.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Vroom common stock was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

108.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

109.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS PERTAINING TO LEAD PLAINTIFF'S CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

111.    Throughout the Class Period, Defendants portrayed Vroom as a growth company that was well-positioned to take advantage of a thriving market for online used car sales thanks to the ever-increasing momentum of its Growth Flywheel.  Specifically, Vroom represented to

investors that it was building its inventory to take advantage of historically high demand for online used car sales, and that this higher inventory combined with the "exceptional" Customer Experience it offered would translate directly to increased sales conversion on the Growth Flywheel.  Further, Vroom touted the purported advantages of its "asset-light" business strategy, whereby Vroom largely outsourced many critical business functions of the Company, including its Customer Experience function, as a means for the Company to generate larger financial results while reducing both risk and capital investment.

### A.    Vroom's IPO Offering Materials

112.    The Class Period begins on June 9, 2020, when Vroom filed a prospectus that incorporated and formed part of the registration statement for its IPO.  With respect to Vroom's ability to drive growth, Defendants touted Vroom's Growth Flywheel in the IPO Offering Materials, stating:

> Our business has grown significantly as we have scaled our operations. ***Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage***.

**Growth Flywheel**



As Defendants explained, "*[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel*."

113.   In the IPO Offering Materials, Defendants stated that "[t]he quality of the customer experience on [Vroom's] ecommerce platform is critical to [its] ability to attract new visitors to [its] platform, convert such visitors into customers and increase repeat customers."  To that end, Defendants stated in the IPO Offering Materials that they were "*deeply committed to creating an exceptional experience for our customers*."  To emphasize this commitment, Defendants repeatedly represented throughout the IPO Offering Materials that Vroom provided "*[e]xceptional customer support*," an "*exceptional customer experience*," and an "*exceptional ecommerce experience*."  As part of the exceptional Customer Experience it offered, Vroom stated that "*[o]ur professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed.  In all of our customer interactions, our goal is to ensure that every customer is a delighted customer*."

114.   Defendants stated that this high-quality Customer Experience purportedly set Vroom apart from "traditional auto dealers and the peer-to-peer market," asserting in the IPO Offering Materials that Vroom was able to bring "*together all phases of the vehicle buying and*

*selling process in a seamless, intuitive and convenient way*" and "***create a climate of trust***"
through "***an exceptional experience with complete transparency" that eliminates "friction and
sales pressure.***"  Based on the "exceptional" Customer Experience it purportedly provided as a
key component of its Growth Flywheel, Vroom stated that in April 2020 it had begun "to acquire
new inventory from both auctions and consumers, with a primary focus on high-demand models
that ***we believe will convert at target margins***."  Vroom stated that ***this increase in inventory
would enable the Company "to take advantage of [its] position and value proposition in the used
automotive market."***

115.    With respect to Vroom's "asset-light" business approach, Vroom stated in the IPO
Offering Materials that it took "a vertically integrated, asset-light approach that is reinventing all
phases of the vehicle buying and selling process, from discovery to delivery and everything in
between."  Vroom described this asset-light approach as "a hybrid approach across [its] business
combining ownership and operation of assets…with strategic third-party partnerships" that
provided "***flexibility, agility and speed as [Vroom] scale[d] [its] business…without taking on the
unnecessary risk and capital investment inherent in direct investment.***"  Vroom characterized its
asset-light business strategy as "***fundamental to [its] business model***" and as one of its
"***Competitive Strengths.***"

116.    In the IPO Offering Materials, Vroom stated that it employed this hybrid asset-light
approach across several areas of its business, including with respect to "customer experience."
Vroom represented that its asset-light approach to its "Customer Experience Team" allowed it to
"ensure consistency in customer interactions, increase conversion and maximize operating
efficiencies," as follows:

> [i]n addition to our in-house customer support personnel, ***we have partnered with
> a leading customer experience management provider to operate our primary call
> center. This strategy enables us to centralize our contact center services, ensure***

*consistency in customer interactions, increase conversion and maximize operating efficiencies*.

Vroom further represented that, where "customers…encounter questions or challenges they are not equipped to or comfortable with resolving online," *Vroom's Customer Experience team "provides human support to [its] customers in these situations," handling "customer questions about vehicle selection, financing, and the purchase or sale process."* Vroom told investors that its Customer Experience team "*has been trained on our sale process and our core values of transparency and high customer satisfaction.*" The IPO Offering Materials included as an exhibit the 2020 Customer Experience Agreement between Vroom and Rock Connections that was signed by Defendant Hennessy.

117. In the IPO Offering Materials, *Vroom did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function as part of its asset-light business strategy*. Rather, as part of the "Risk Factors" included in the IPO Offering Materials, Vroom portrayed any potential problems with its Customer Experience function as purely theoretical, and in any event *as issues that could only harm Vroom's business in the future*. For example, with respect to the outsourcing of its Customer Experience function to Rock Connections (which Vroom described as a "third party"), Vroom stated:

> Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit, Michigan, and customers who wish to trade in a vehicle currently must interact with our customer experience team in order to complete their transaction. Thus, *the customer experience center is fundamental to the success of our business*. As a result, the success of our business and our customer experience is partially dependent on a third party over which we have limited control. *If* the third party's systems and operations fail or *if* the third party is otherwise unable to perform its sales function, *we may be* unable to complete customer transactions, which *would* prevent us from selling vehicles and value-added products through our platform. In addition, *if* such third party is unable to perform to our standards or to provide the level of service required or expected

by our customers, or we are unable to renegotiate the agreement with the third party on attractive terms or at all, or *if* we are unable to contract with an alternative third-party provider, our business, financial condition and results of operations *may be* harmed and we *may be* forced to pursue alternatives to provide these services, which *could result* in delays, interruptions, additional expenses and loss of potential and existing customers and related revenues.

118.    With respect to the quality of Customer Experience provided, Vroom similarly characterized any issues as theoretical at the time of the IPO, and *as issues that could only harm Vroom's business in the future*.    Additionally, rather than acknowledge the validity of any complaints about Vroom's Customer Experience, *Vroom portrayed any negative complaints about the Company's Customer Experience as "misinformation" that needed to be "correct[ed]" or "mitigate[d],"* as follows:

Our business model is primarily based on our ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction. *If* consumers fail to perceive us as a trusted brand with a strong reputation and high standards, or *if* an event occurs that damages our reputation, it *could* adversely affect customer demand and have a material adverse effect on our business, revenues and results of operations. Even the perception of a decrease in the quality of our customer experience or brand *could* impact results. Our high rate of growth makes maintaining the quality of our customer experience more difficult.

Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, *could* diminish consumer confidence in our platform and adversely affect our brand, *irrespective of their validity*. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. *If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels*, it *could* materially and adversely affect our business, financial condition and results of operations.

119.    Defendants' representations in Vroom's IPO Offering Materials were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (a) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost

sales opportunities, as set forth herein; (b) as a result of this degraded Customer Experience and lost sales opportunities, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (c) as a result of (a)-(b) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

### B.      Defendant Hennessy's Post-IPO Interviews

120.    Immediately following Vroom's IPO, Defendant Hennessy conducted two interviews with investor news site *TheStreet*, wherein he emphasized that Vroom was supremely positioned to capitalize on the booming market for online used car sales.  In the first interview, conducted on June 10, 2020 (with less than three weeks left in Vroom's second fiscal quarter), Defendant Hennessy claimed that Vroom was experiencing a surge in customer demand that created an "opportunity" to take Vroom public earlier than previously anticipated.  Specifically, Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to consider purchasing a used vehicle online compared to three months previously.  As such, Defendant Hennessy told investors that "we really see the markets coming [Vroom's] way."

121.    Then, on June 11, 2020, Defendant Hennessy conducted another interview with *TheStreet*, highlighting the purported massive market opportunity for Vroom's products. Defendant Hennessy told investors that a shift to individual car ownership had been a "positive tailwind" for Vroom's business, and represented that with the "growth that we've had and now the continued tailwinds that we're seeing in our business, …all I can say is that Vroom is in excellent position to…enter…the public markets…."  In this June 11, 2020 interview, Defendant Hennessy

also sought to downplay any concerns surrounding potential lingering adverse effects of the pandemic on Vroom's business, representing that the Company's recent employee furloughs were "just about in our rearview window, and now we're back to work and scaling the business."

122.    Defendant Hennessy's representations in his June 10 and June 11, 2020 interviews with *TheStreet* were materially false and misleading because he misrepresented and/or failed to disclose that: (a) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (b) as a result of this degraded Customer Experience and lost sales opportunities, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (c) as a result of (a)-(b) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendant Hennessy's representations in the interviews, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

### C.    Vroom Reports Its Second Quarter 2020 Financial Results

123.    On August 12, 2020, Vroom filed a Form 8-K and attached 2Q20 Release with the SEC announcing the Company's financial results for its second quarter of 2020.  In the 2Q20 Release, Defendant Hennessy again touted Vroom's market position and the Company's purported ability to grow by capitalizing on increasing demand for online used car sales through an increase in inventory.  Specifically, Defendant Hennessy stated:

> I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment.  During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. ***As demand increased and pricing became more stable through the second half of the quarter,***

56

*we pivoted to start rebuilding inventory and continue to do so. These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce*.

124.    Later that day, Vroom hosted a conference call with analysts and investors to discuss the Company's second quarter 2020 financial results, where Defendants Hennessy and Jones continued to represent to the market that more inventory, or capacity, for Vroom would lead directly to more sales, or revenue, and that any capacity restraints as a result of Vroom's earlier sell-down of inventory in response to the pandemic had been resolved moving into the Company's third quarter.  Specifically, Defendant Hennessy explained during the call that "*[c]ontent begets [sales] conversion*," and that Vroom was in the midst of a "V-shaped recovery" where, after selling down its inventory in April 2020, the Company "spen[t] every day since May trying to build back [its] inventory" and had experienced "strong monthly sequential increases in unit sales in June and July."  Later, in response to an analyst question, Defendant Hennessy stated:

> *[W]e've got capacity…lined up not only in Q3 to match our guidance*, but now and then, I call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. *So we believe that we're almost out of this capacity constraint issue in this quarter.*

Defendant Jones similarly stressed on the call that "*[w]e're confident that we can currently have the capacity to meet our Q3 targets, and we believe our utilization will continue to increase* and we work with our reconditioning partners to continue expanding our reconditioning network."  In response to an analyst question concerning any capacity bottleneck due to reconditioning of used vehicles to prepare them for sale, Defendant Jones represented that Vroom was "*not currently experiencing any significant capacity constraints*" in that area.

125.    In the Company's accompanying Form 10-Q (the "2Q20 Form 10-Q"), Defendants made representations similar to the representations they made in the IPO Offering Documents

concerning the Company's Customer Experience and asset-light business strategy. Specifically, Defendants represented to Vroom investors that they were "***deeply committed to creating an exceptional experience for [Vroom's] customers***" and that Vroom "***offer[ed] an exceptional ecommerce experience for [its] customers***." Further, Vroom stated that its asset-light business strategy "***optimizes a combination of ownership and operation of assets by [Vroom] with strategic third-party partnerships***."

126.    Defendants' representations in announcing Vroom's second quarter 2020 financial results were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales. As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

**D.    Vroom's September 2020 SPO Offering Materials**

127.    As described further in this Complaint, the SPO Offering Materials, including the SPO Registration Statement filed on September 8, 2020, and the SPO Prospectus filed on September 11, 2020, contained many false and misleading statements, and omitted to state other material facts, relating to Vroom's Customer Experience, asset-light business strategy, and position to capitalize on a thriving market for online used car sales. Among other things, the Company and

the Individual Defendants that signed the SPO Offering Materials and/or controlled the statements made in the SPO Offering Materials misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.  In addition, the SPO Offering Materials represented that consumer complaints on platforms such as the BBB "could" diminish consumer confidence in Vroom, while failing to disclose that the BBB had initiated proceedings to revoke the Company's BBB accreditation and had done so by a vote of the BBB Board of Directors on September 2, 2020. In this regard, Lead Plaintiff incorporates by reference paragraphs 192-206 below, as if repeated in full here.

### E.   Vroom's September 8, 2020 Form 8-K

128.   On September 8, 2020, in conjunction with the filing of the SPO Registration Statement, Vroom filed with the SEC a current report on Form 8-K providing an update on Vroom's operational and financial results intended to spur purchases of shares in the September 2020 SPO closing only a few days later.  In the September 8, 2020 Form 8-K, Defendants told Vroom investors, ***only three weeks from the close of its third quarter***, that the Company's post-pandemic build-up of inventory was translating to continued growth in ecommerce units sold,

portraying the Company's Growth Flywheel as churning out higher sales conversion than ever, and as such that Vroom was making substantial positive adjustments to the third quarter 2020 guidance it had issued only a month earlier.  Specifically, the September 8, 2020 Form 8-K stated:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and **we have continued to scale our inventory levels in the third quarter of 2020**. **As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold**. As well, **the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit**. **As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic. Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows**:
>
> - Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).
>
> *     *     *
>
> - Total revenue of $290 million – $310 million (from $268 million – $290 million).
>
> - Total gross profit of $21 million – $23 million (from $16 million – $18 million).
>
> - Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).

129.    Defendants' representations in the September 8, 2020 Form 8-K were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term

profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

## VIII.   PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD

130.    The truth about Vroom's disastrous Customer Experience and asset-light business strategy was revealed in two corrective disclosures.

131.    *First*, after the close of trading on November 11, 2020, Vroom issued the 3Q20 Release, telling investors that Vroom expected to suffer sharply higher losses in the fourth quarter of 2020 with adjusted EBITDA losses projected to increase from $36 million in the third quarter of 2020 to a loss range of $44 million to $52 million for the Company's fourth quarter, a 33% sequential increase at the midpoint.  During Vroom's accompanying earnings call held the same day, Defendants revealed that Vroom was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks in order to avoid constrained growth, despite the favorable market environment.

132.    Defendants, however, continued to mislead investors concerning the negative impact Vroom's Customer Experience was having on the Company's ability to capitalize on a booming market for online used car sales, insisting that Vroom was well-positioned to achieve fourth quarter guidance metrics contained in the 3Q20 Release.  As Defendant Hennessy stated on Vroom's third quarter 2020 earnings call:

> As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that [CFO Jones] talked about in terms of e-commerce growth on a year-over-year basis. It's just – it's strong. So we're feeling really good.

Defendant Hennessy also again told investors that the Company's Growth Flywheel continued to spin based on "increased inventory driv[ing] increased demand and increased conversion."  And with respect to the "bottleneck" in the Customer Experience spoke of Vroom's Growth Flywheel, CEO Hennessy assured the market that Defendants were "working through the backlogs of things," were "very-very focused on getting the customer experience right," and would have the issue "rectified in Q4."  As such, Defendant Hennessy portrayed any issues as temporary, stating that "right now we are investing in our sales, sales support, sales experience, sales ops to help facilitate those sales and that's really the last bit of investment around this constraint if you will," and "we think that does open up continued growth."

133.    In the Company's accompanying Form 10-Q (the "3Q20 Form 10-Q"), Defendants made representations similar to the representations they made in the IPO Offering Materials and SPO Offering Materials concerning the Company's Customer Experience and asset-light business strategy.  Specifically, Defendants represented to Vroom investors that they were "deeply committed to creating an exceptional experience for [Vroom's] customers" and that Vroom "offer[ed] an exceptional ecommerce experience for [its] customers."  Further, Vroom stated that its asset-light business strategy "optimizes a combination of ownership and operation of assets by [Vroom] with strategic third-party partnerships."

134.    Defendants' representations in announcing Vroom's third quarter 2020 financial results were materially false and misleading because Defendants misrepresented and/or failed to disclose that, contrary to increased inventory driving increased demand and sales conversion, Vroom's increased inventory was only exacerbating a bottleneck in Vroom's Customer Experience caused by a lack of adequate sales and support staff that was resulting in a degraded Customer Experience and lost sales opportunities.  Further, unbeknownst to the market, this issue had existed at Vroom from as early as January 2020, and could not be rectified in a single quarter.  Rather, due

to this bottleneck in the Customer Experience spoke of its Growth Flywheel, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.

135.    On this news the price of Vroom stock fell $5.31 per share, or 13%, from a close of $40.80 per share on November 11, 2020 to a close of $35.49 per share on November 12, 2020, on abnormally heavy volume of over 9.2 million shares traded.

136.    *Second*, after the close of the market on March 3, 2021, Vroom issued the 4Q20 Release, revealing operational issues and financial results far worse than previously disclosed to investors.  Vroom's fourth financial results disappointed in a number of areas, including Vroom suffering a net loss of $60.7 million, a 42% year-over-year increase, representing a loss per share 20% worse than the midpoint of Defendants' prior guidance.

137.    During Vroom's accompanying earnings call held the same day, Defendant Hennessy indicated that Vroom was suffering from severe sales backlogs due to inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. These backlogs, along with a degraded Customer Experience, had operationally constrained Vroom's business and forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable market for online used car sales.  Even worse, Defendant Hennessy admitted that these deficiencies would continue to constrain the Company's profits into the first quarter of 2021, stating: "***we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1.***"

138.    On this news, the price of Vroom stock plummeted $12.29 per share, or 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021, on abnormally heavy trading volume of 19.6 million shares traded.

139.     All told, following the disclosures of the fraud, Vroom's stock price declined **over 42%** from the price at which it sold shares in the September 2020 SPO and **over 57%** from its Class Period high.

## IX.    SUMMARY OF SCIENTER ALLEGATIONS

140.     Each of the Officer Defendants acted with scienter in that, as set forth herein, each knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

141.     As set forth herein, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, receipt and/or modification of Vroom's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Vroom, participated in the fraudulent scheme alleged herein.

142.     Defendant Hennessy was, at all times during the Class Period and continuing to the present, the CEO of the Company and a member of Vroom's Board.  Similarly, Defendant Jones was, at all times during the Class Period and continuing to September 12, 2021, the CFO of the Company.  As alleged in greater detail above, these Officer Defendants made affirmative statements in press releases, interviews, and/or earnings calls concerning the Company's business plans and operations, its competitive environment, its financial results and its future prospects, which included the Company's asset-light business strategy, provision of Customer Experience, and inventory.

143.    The Officer Defendants' knowledge of the importance of Vroom's Customer Experience to the Company's Growth Flywheel and its financial results supports a strong inference of scienter.  As acknowledged in Vroom's public filings throughout the Class Period, Vroom's Customer Experience, outsourced to Rock Connections through Vroom's asset-light business strategy, was "fundamental to the success of [its] business" given that a "substantial majority of inquiries, sales, purchases and financings of [Vroom's] vehicles in [its] ecommerce business" were conducted through Rock Connections, and customers who wished to trade in a vehicle had to "interact with [Vroom's] customer experience team in order to complete their transaction."  As such, the Officer Defendants knew that any "bottleneck" in Vroom's Customer Experience would essentially bring Vroom's business to a halt, that Vroom's increasing inventory had created just such a bottleneck, and that Vroom was losing sales and being forced to liquidate inventory at fire sale prices as a result.

144.    Vroom's 2020 Customer Experience Agreement with Rock Connections, which was signed by Defendant Hennessy, supports a strong inference of scienter because it allowed the Officer Defendants total control, access and visibility into the Customer Experience being provided to Vroom's customers.  As alleged above at paragraphs 49-56, the 2020 Customer Experience Agreement, among other things, (a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's CRM system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom, its senior executives, and management unfettered access to monitor the customer support being provided to potential Vroom customers, including but not limited to monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to

Rock Connections' facility, the provision of weekly reports to Vroom, and a requirement for weekly meetings between representatives of Rock Connections and Vroom.

145.    As is evident from the 2020 Customer Experience Agreement, Defendants Hennessy and Jones had access to Vroom's CRM system and all of the granular information it contained for each Vroom transaction and customer service interaction, by customer, during the Class Period.  Further, in addition to being able to access recordings of all calls between Rock Connections and Vroom customers in Vroom's CRM system, Rock Connections provided "Vroom with monitoring capabilities for both voice and data concerning Calls" and Vroom had "the right, as often as it desires, to monitor, without Rock's knowledge, the calls being performed by Rock on behalf of Vroom."  Vroom was also authorized under the Agreement to "log into Rock's Five9 system (or any replacement system)" which allowed the Company "to view the current status of the team working on Vroom's account, run reports specific to the Services, or listen to recorded or real-time calls."

146.    Defendants Hennessy and Jones were also aware of the problems with Vroom's Customer Experience through weekly meetings between Vroom and Rock Connections and periodic reports including data related to Rock Connections' provision of Vroom's Customer Experience.  Specifically, the 2020 Customer Experience Agreement mandated that:

> *representatives of Rock and Vroom shall meet on a weekly basis*, at times and locations to be agreed upon, *to review reports and matters relevant to the transactions contemplated by this Agreement*, including, without limitation, *Rock's performance of the Services, sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, the Staffing Plan, Cohort training and scripts*.

Additionally, Rock Connections was required to "transmit to Vroom weekly data and reports relating to the provision of the Services" under the Agreement "in a form to be mutually agreed by the Parties…."  Through these mandated weekly meetings as well as the transmission of weekly

data and reports, the Officer Defendants were provided with real-time information concerning the Company's Customer Experience, and as such were aware that Vroom's disastrous Customer Experience was having an increasingly negative effect on the Company's margins and sales growth as Vroom grew its inventory.

147.    The Officer Defendants were also aware of the inadequacies of Vroom's Customer Experience team by virtue of the increasing volume of customer complaints before and during the Class Period.  Vroom's Customer Experience Agreement with Rock Connections required Rock Connections to ***"notify Vroom promptly in writing upon its receipt or knowledge of any complaint from any person, including a Customer, or entity regarding any Services provided [under the Contract], and … provide reasonable assistance in researching, investigating and responding to such complaints."***  Thus, the Officer Defendants had real-time access to information that would have documented significant customer complaints about being sold cars that were different from what was depicted in photos, cars being delivered at night and/or in a damaged condition, delays in vehicle delivery and delays in receiving vehicle titles, among other issues.

148.    Vroom's management, including the Officer Defendants, also were aware of the inadequacy of Vroom's Customer Experience team by virtue of repeated efforts by the BBB to contact the Company to resolve issues on behalf of customers who lodged complaints.  In addition, in advance of the BBB's actual revocation of Vroom's accreditation, the BBB notified Vroom that its accreditation had been suspended and that it was undertaking proceedings to revoke its BBB accreditation.  The BBB also provided the Company with the opportunity to appeal that decision. The BBB further duly notified Vroom that the BBB Board of Directors voted to revoke Vroom's accreditation on September 2, 2020.

149.    Defendants also had a powerful personal motive not to disclose the truth concerning the disastrous Customer Experience being provided to Vroom's customers by Rock Connections,

since the founder and chairman of Rock Connections was Dan Gilbert.  Gilbert had been one of Vroom's most high-profile investors since 2015, and his Rock Connections firm had originally been retained to provide Vroom's Customer Experience in 2017.  In fact, in Vroom's 2017 press release regarding its first contract with Rock Connections, Vroom noted that Gilbert had recently invested in Vroom's 2017 $76 million Series F round of funding which had raised Vroom's total equity funding at that time to $295 million since inception.

150.    Given the relationship between Vroom and Dan Gilbert, Defendants had a strong motive not to publicly disclose any of the Customer Experience issues that had developed through the provision of services under the 2020 Customer Experience Agreement.  To do so would have likely put a significant strain on the relationship between Vroom and Gilbert and caused negative attention to be cast upon one of Vroom's most prominent early investors.  Any public disclosure of problems with Vroom's Customer Experience would not only have had a negative financial impact on Vroom, but could also have had a negative financial impact on Rock Connections.

151.    Defendant Jones also had a personal, monetary interest in maintaining the fraudulent conduct.  Specifically, while he was in possession of adverse material non-public information concerning Vroom's Customer Experience and its negative impact on Vroom's margins and sales growth, Jones sold 100,000 of his personally held Vroom shares at artificially inflated prices for proceeds of over $4.4 million in a series of transactions from December 7, 2020 through February 10, 2021, only three weeks before the Company's March 3, 2021 revelation of the full scope of the fraud.

152.    While Jones sold these shares pursuant to a Rule 10b5-1 trading plan, the reports on Form 4 for these transactions filed with the SEC indicate that this trading plan was enacted by Jones on September 14, 2020, nearly three months before Vroom's lock-up period ended on December 7, 2020.  The enactment and timing of this 10b5-1 plan themselves provide indicia of

Jones's scienter given (a) the proximity of the enactment of the 10b5-1 plan to the September 2020 SPO; (b) the artificially-inflated level at which Vroom's stock was trading at the time the 10b5-1 plan was enacted; and (c) the terms of the 10b5-1 plan, structured to sell Vroom stock on the first day that Vroom's IPO lock-up period expired and to continue selling Vroom stock in multiple transactions in each of the next three months, which allowed Jones as much time as possible after Vroom's IPO lock-up period to offload as much Vroom stock as possible at artificially inflated prices before the full truth about the Company's operations became known to the market.

## X.   LOSS CAUSATION

153.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This fraudulent course of conduct artificially inflated the price of the Company's common stock during the Class Period.  When the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market on November 11, 2020 and March 3, 2021, the price of Vroom common stock declined in statistically significant amounts as the artificial inflation dissipated over time.

154.   As a result of their purchases of Vroom common stock during the Class Period at artificially inflated prices, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, when subsequent disclosures removed the inflation from the price of the stock.  Had the full truth been disclosed to the market at or before the time of its ultimate disclosure, Lead Plaintiff would not have purchased the Company's stock at the prices then being offered in the market.

### A.   November 11, 2020 Disclosures

155.   After the close of trading on November 11, 2020, Vroom issued the 3Q20 Release. The Release included guidance indicating that Vroom expected to suffer sharply higher losses in

the fourth quarter of 2020, with adjusted EBITDA losses projected to increase from $36 million in the third quarter of 2020 to a range of $44 million to $52 million in the fourth quarter.  Vroom also disclosed projected ecommerce unit sales that were lower than expected.

156.    ***During Vroom's earnings call held the same day, Defendant Hennessy, in sharp contrast to Defendants' prior statements about Vroom's "exceptional" Customer Experience, acknowledged that the Company was suffering from a "bottleneck" in its sales support and had "fallen down" on Customer Experience, with customers experiencing delays in the delivery of their cars and in receiving title to them***:

Q.    It's just simply catching up in the sales support, is it all you need is … people on the phone to be able to answer questions.  So does that mean bottleneck?

A.    I would say that's today's bottleneck …

***

Q.    My question is first around the bottlenecks in the customer experience that you're talking about currently as it relates to sales and customer support. Can you give us some sense of whether or not you've fallen down in your opinion on the customer experience in those areas … ?

A.    Yes, I certainly would say fallen down.  I think … when we talk in the third quarter, we talked about some of the carrier issues and … anything that costs the customer a delivery delay has a negative impact on their experience.

Defendant Hennessy also acknowledged on the earnings call that Vroom was "working through the backlogs of things like titles…."

157.    Despite these acknowledgements, Defendants continued to mislead the market by portraying any issues as temporary.  Defendant Hennessy stated on the third quarter earnings call, for example, that "right now we are investing in our sales, sales support, sales experience, sales ops to help facilitate those sales and that's really the last bit of investment around this constraint if you will," and "we think that does open up continued growth…."  He further asserted that "whether

it's the delivery issue or whether it's a paperwork issue, … those investments are underway now, and we obviously take that very seriously and believe we're going to have that rectified in Q4."

158.    Picking up on Defendant Hennessy's remarks, analysts took note of Vroom's lower-than-expected fourth quarter guidance, but nevertheless expressed the view that constraints on the Company's growth were likely to be temporary.  For example, on November 11, 2020, Piper Sandler issued a report noting that Q4 EBITDA guidance "fell shy of our expectations," but that "[m]ost of the lower EBITDA guidance can be attributed to factors that, in our view, are inconsequential in the long term."  The report further noted that most of projected fourth quarter spending increase "reflects proactive measures that should improve the customer experience and, ultimately, support more vehicle deliveries."  Similarly, on November 12, 2020, JMP Securities noted that "4Q eCommerce units guidance came in below our expectations as Vroom builds back up its sales and support team and improves its user experience…."  The JMP report further stated that "we believe these operational challenges are largely temporary."

159.    In response to the Company's November 11, 2020 disclosures, the price of Vroom common stock dropped more than 13% from its close of $40.80 per share on November 11, 2020, to close at $35.49 per share on November 12, 2020, on unusually high volume of over 9.2 million shares traded.

**B.    March 3, 2021 Disclosures**

160.    After the close of trading on March 3, 2021, Vroom issued the 4Q20 Release.  For the fourth quarter, Vroom reported a net loss of $60.7 million, a 42% year-over-year increase.  Vroom also reported a $55.9 million adjusted EBITDA loss, greater than the high end of the range of the Company's prior guidance and $8 million worse than the midpoint.

161.    On the same day, Vroom held its earnings call and Defendant Hennessy admitted as follows:

71

It is important to note that ***as we experienced exceptional growth in the second half of 2020 backlogs in our business formed as there was more volume to process than our capacity could deliver. The result meant that our customers had to wait. When customers have to wait for us to complete a transaction or deliver a car, pick up a car, complete financial arrangements or register their vehicle their experience is degraded***.

***

***The demand arrived as expected but due to the constraints in sales personnel and sales support personnel we were unable to convert and process the sales associated with that demand.  The result is that our inventory aged. That aged inventory needed to be discounted to move through our retail channel or liquidated in our wholesale channel. Said another way we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1.***

162.    Defendant Jones further explained:

***I think the more significant impact on our gross profit per unit in Q4 was really from the bottlenecks, which caused our inventory to age a bit and then causes us to have to lower prices on that inventory to get it to move, or take it to wholesale auction.***

So that's really where we found the downward pressure on gross profit per unit in the quarter.

163.    In response to this negative news, Piper Sandler explained:

VRM shares were indicated lower by 13% after-hours, due largely to self-inflicted execution issues that impacted gross profitability.  Like [Carvana], Vroom experienced no shortage of used car demand in Q4, and due to an ample supply of outsourced reconditioning capacity, Vroom had no trouble processing used cars to meet this demand.  However, ***due to persistent understaffing in the company's sales/support organization, it took Vroom an average of 77 days to move used cars through the sales process (vs. a normal target of 60-70 days).  As a result, gross profit per unit (GPU) suffered from higher-than-normal depreciation***, causing the company to miss guidance.

164.    Another analyst, Wedbush, commented on the negative news:

***VRM continues to encounter operational challenges*** in scaling its business. Most pointedly in recent months have been ***issues with post-sales service (e.g., vehicle registrations, proof of documentation for financing) that we have called out, leading to bottlenecks that are causing delivery delays and constraining sales*** …. VRM planned for higher demand than it even guided, but ***operational bottlenecks restricted its ability to sell many of the vehicles it acquired to resell. Issues were most poignant with post-sales service (e.g., registering vehicles), creating***

72

*bottlenecks to complete transactions that led to led to [sic] extended sales times. This forced VRM to realize outsized depreciation and markdowns in addition to the excess seasonal depreciation expected in 4Q …. Going forward VRM is still combating the challenge of a sub-scale salesforce*, and while the company has dobuled [sic] the number of people in the sales organization and added third-party resources to assist with post-sales service when necessary, *VRM still outsized depreciation expense and markdowns to impact the top and bottom lines of the business in 1Q21; notably, its VRM's inventory valuation reserve rate did not increase sharply in 4Q20, meaning markdown pressure associated with inventory sold in 1Q21 will be recognized largely in 1Q21….*

***

**Sales capacity constraints force wholesale liquidations.** With the salesforce subscale VRM purchased more cars in the quarter than it could sell through its retail channel and VRM opted to liquidate the excess inventory through the wholesale channel.

165.     On the news reflecting the fourth quarter 2020 results, the price of Vroom common stock dropped nearly 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021, on unusually high volume over 19.6 million shares traded.

166.     The stock price declines, detailed above, were directly related to the disclosures that corrected over time Defendants' previously issued materially false and misleading statements and omissions.  Accordingly, the conduct of the Defendants as alleged in this Complaint directly and proximately caused damages to Lead Plaintiff and members of the Class.

## XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

167.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this complaint. Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In particular, the knowledge that the Company and Officer Defendants had about the disastrous Customer Experience at Vroom and its

73

deleterious effect on the Company's growth and financial results, something that has since been confirmed by the BBB and through Defendants' own admissions, was not disclosed to investors through meaningful cautionary language.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Vroom who knew that those statements were false or misleading when made.

## XII.  PRESUMPTION OF RELIANCE

168.    At all times relevant to this Complaint, the market for Vroom common stock was an efficient market for the following reasons, among others:

(a)    Vroom stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Vroom filed periodic public reports with the SEC and the NASDAQ;

(c)    Vroom regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, conference calls with analysts and investors, and other similar reporting services; and

(d)    Vroom was followed by securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Among the securities firms that provided research coverage for

Vroom are BofA Securities, Wells Fargo Securities, Piper Sandler, Wedbush Securities, J.P. Morgan, and William Blair.  Reports issued by the analyst firms, either in full or summarized versions, were publicly available and entered the public marketplace.

169.    As a result of the foregoing, the market for Vroom securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of its stock, including but not limited to the market's reactions to the November 11, 2020 and March 3, 2021 disclosures discussed above.  Under these circumstances, purchasers of Vroom common stock during the Class Period suffered similar injury through their purchases of Vroom common stock at artificially inflated prices and the presumption of reliance applies.

170.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Vroom's business operations – including but not limited to the existence of Vroom's disastrous Customer Experience and its impact on Vroom's growth and financial results – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Vroom's financial performance, as set forth above, that requirement is satisfied here.

## XIII.   CLAIMS BROUGHT PURSUANT TO SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

171.    The claims set forth below, pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §

240.10b-5, sound in fraud and are based on knowing or reckless misconduct by Vroom and the

Officer Defendants (collectively, the "Section 10(b) Defendants").  These claims are independent

of any other claims asserted in this Complaint and the allegations of fraud pertaining to these claims

under Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief

asserted herein.

172.     As part of the claims for violations of Sections 10(b) and 20(a) of the Exchange

Act, Lead Plaintiff asserts that the Section 10(b) Defendants violated Items 303(a) and 105 of SEC

Regulation S-K.   Item 303(a) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires

issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations."

173.     In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive

Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties
> that are reasonably expected to have material effects*, such as: A reduction in the
> registrant's product prices; erosion in the registrant's market share; changes in
> insurance coverage; or the likely non-renewal of a material contract. …
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and reasonably likely to have material
> effects on the registrant's financial condition or results of operation.

174.     Furthermore, the 1989 Interpretive Release set forth the following test to determine

if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management
> must make two assessments:
>
> (1)     Is the known trend, demand, commitment, event or uncertainty likely to
> come to fruition?  If management determines that it is not reasonably likely to occur,
> no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.   Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

175.     Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  Specifically, Item 105 requires the issuer to "[e]xplain how the risk affects the registrant or the securities being offered" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

176.     Vroom's disastrous Customer Experience, as described herein, constituted a known risk or uncertainty under Item 303, and otherwise required disclosure under Item 105, because it had an increasingly negative material impact on Vroom's growth and financial results. Accordingly, even if Vroom's management could not reasonably estimate or quantify the manner in which Vroom's disastrous Customer Experience was impacting the Company's growth or financial results, disclosure was required.

## FIRST CLAIM FOR RELIEF

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Section 10(b) Defendants

177.     Lead Plaintiff repeats, incorporates and re-alleges each and every allegation set forth above as if fully set forth herein.

178.     During the Class Period, the Section 10(b) Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause

Lead Plaintiff and other members of the Class to purchase Vroom common stock at artificially inflated prices.

179.    The Section 10(b) Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Vroom common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

180.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

181.    During the Class Period, the Section 10(b) Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    The Section 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Section 10(b) Defendants engaged in this misconduct to conceal Vroom's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

183.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vroom common stock.  Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they

paid, or at all, had they been aware that the market prices for Vroom common stock had been artificially inflated by the Section 10(b) Defendants' fraudulent course of conduct.

184.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

185.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## SECOND CLAIM FOR RELIEF

### For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants

186.    Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

187.    As alleged above, the Officer Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this complaint.

188.    The Officer Defendants acted as controlling persons of Vroom within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Vroom, the Officer Defendants had the power and ability to control the actions of Vroom and its employees.

189.    By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV.   ALLEGATIONS RELATING TO CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2) AND 15 OF THE SECURITIES ACT

190.    In this part of the Complaint, Lead Plaintiff asserts strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of Class members who acquired shares of the common stock of Vroom in the September 2020 SPO.  These claims are not based on any knowing or reckless misconduct on behalf of the Defendants – *i.e.*, they do not allege, and do not sound in, fraud – and expressly disclaim any allegations of fraud or intentional misconduct in connection with the claims that are pleaded separately in this Complaint under Sections 10(b) and 20(a) of the Exchange Act, except that any challenged statements of opinion or belief made in connection with the SPO Offering Materials are alleged to have been knowingly misstated statements of opinion or belief when made and at the time of the September 2020 SPO.

191.    To avoid any argument that Defendants may put forward that the claims below somehow "sound in fraud," the facts pertinent to these claims are primarily stated in paragraphs 192 to 206 below.  However, in order to provide a fuller factual basis for the Securities Act claims, the factual allegations in paragraphs 10-14, 25-27, 29, 34-37, 76-78 and 81-85, above, are also incorporated by reference in this section of the Complaint.

### A.    The SPO Offering Materials

192.    On September 8, 2020, Vroom filed the SPO Registration Statement, which was declared effective by the SEC on September 10, 2020.  The Individual Defendants named herein each signed and/or authorized their signature on the SPO Registration Statement.  On September 11, 2020, Vroom filed the SPO Prospectus with the SEC.

193.    As detailed below, the SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and otherwise failed to disclose information required under the rules and regulations

governing its preparation.  Specifically, the SPO Offering Materials contained misrepresentations and omissions concerning Vroom's Customer Experience, its asset-light business strategy, and its ability to capitalize on a booming market for online used car sales.

**B.      The SPO Offering Materials Contained Untrue Statements and Material Omissions**

194.    The SPO Offering Materials contained materially false and misleading statements concerning Vroom's Customer Experience, its asset-light business strategy, and its ability to capitalize on a booming market for online used car sales.  With respect to Vroom's ability to drive growth, Defendants touted Vroom's Growth Flywheel in the SPO Offering Materials, stating:

> Our business has grown significantly as we have scaled our operations. ***Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage***.

**Growth Flywheel**



As Defendants explained, "***[s]ales conversion drives revenue growth and is an output of the***

*acceleration of every point on the growth flywheel*."

195.    In the SPO Offering Materials, Defendants stated that "[t]he quality of the customer experience on [Vroom's] ecommerce platform is critical to [its] ability to attract new visitors to [its] platform, convert such visitors into customers and increase repeat customers."  To that end, Defendants stated in the SPO Offering Materials that they were "*deeply committed to creating an exceptional experience for our customers*."   To emphasize this commitment, Defendants repeatedly represented throughout the SPO Offering Materials that Vroom provided "*[e]xceptional customer support*," an "*exceptional customer experience*," and an "*exceptional ecommerce experience*."  As part of the exceptional Customer Experience it offered, Vroom stated that "*[o]ur professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed. In all of our customer interactions, our goal is to ensure that every customer is a delighted customer*."

196.    Defendants stated that this high-quality Customer Experience purportedly set Vroom apart from "traditional auto dealers and the peer-to-peer market," asserting in the SPO Offering Materials that Vroom was able to bring "*together all phases of the vehicle buying and selling process in a seamless, intuitive and convenient way*" and "*create a climate of trust*" through "*an exceptional experience with complete transparency" that eliminates "friction and sales pressure*."  Based on the "exceptional" Customer Experience it purportedly provided as a key component of its Growth Flywheel, Vroom stated that in April 2020 it had begun "to acquire new inventory, with a primary focus on high-demand models" and that it would "*continue to build [its] inventory levels strategically.*"

197.    With respect to Vroom's "asset-light" business approach, Vroom stated in the SPO Offering Materials that it took "a vertically integrated, asset-light approach that is reinventing all phases of the vehicle buying and selling process, from discovery to delivery and everything in

between."  Vroom described this asset-light approach as "a hybrid approach across [its] business combining ownership and operation of assets…with strategic third-party partnerships" that provided "*flexibility, agility and speed as [Vroom] scale[d] [its] business…without taking on the unnecessary risk and capital investment inherent in direct investment.*"  Vroom characterized its asset-light business strategy as "*fundamental to [its] business model*" and as one of its "*Competitive Strengths.*"

198.    In the SPO Offering Materials, Vroom stated that it employed this hybrid asset-light approach across several areas of its business, including with respect to "customer experience."  Vroom represented that its asset-light approach to its "Customer Experience Team" allowed it to "ensure consistency in customer interactions, increase conversion and maximize operating efficiencies," as follows:

> [i]n addition to our in-house customer support personnel, *we have partnered with a leading customer experience management provider to operate our primary call center. This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies*.

Vroom further represented that, where "customers…encounter questions or challenges they are not equipped to or comfortable with resolving online," *Vroom's Customer Experience team "provides human support to [its] customers in these situations," handling "customer questions about vehicle selection, financing, and the purchase or sale process."*  Vroom told investors that its Customer Experience team "*has been trained on our sale process and our core values of transparency and high customer satisfaction.*"

199.    In the SPO Offering Materials, *Vroom did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function to Rock Connections as part of its asset-light business strategy*.  Rather, as part of the "Risk Factors" included in the SPO Offering Materials, Vroom portrayed any potential

problems with its Customer Experience function as purely theoretical, and in any event *as issues that could only harm Vroom's business in the future*. For example, with respect to the outsourcing of its Customer Experience function to Rock Connections (which Vroom described as a "third party"), Vroom stated:

> Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit, Michigan, and customers who wish to trade in a vehicle currently must interact with our customer experience team in order to complete their transaction. Thus, the customer experience center is fundamental to the success of our business. As a result, the success of our business and our customer experience is partially dependent on a third party over which we have limited control. *If* the third party's systems and operations fail or *if* the third party is otherwise unable to perform its sales function, we *would be* limited in our ability to complete customer transactions, which would make it more difficult to sell vehicles and value-added products through our platform. In addition, *if* such third party is unable to perform to our standards or to provide the level of service required or expected by our customers, or we are unable to renegotiate the agreement with the third party on attractive terms or at all, or *if* we are unable to contract with an alternative third-party provider, our business, financial condition and results of operations *may be* harmed and we *may be* forced to pursue alternatives to provide these services, which *could* result in delays, interruptions, additional expenses and loss of potential and existing customers and related revenues.

200. With respect to the quality of Customer Experience provided, Vroom similarly characterized any issues as theoretical at the time of the September 2020 SPO, and *as issues that could only harm Vroom's business in the future*. Additionally, rather than acknowledge the validity of any complaints about Vroom's Customer Experience, *Vroom portrayed any negative complaints about the Company's Customer Experience as "misinformation" that would need to be "correct[ed]" or "mitigate[d],"* as follows:

> Our business model is primarily based on our ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction. *If* consumers fail to perceive us as a trusted brand with a strong reputation and high standards, or *if* an event occurs that damages our reputation, it *could* adversely affect customer demand and have a material adverse effect on our business, revenues and results of operations. Even the perception of a decrease in the quality of our customer experience or brand *could* impact results.

Our high rate of growth makes maintaining the quality of our customer experience more difficult.

Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, customer service, delivery experience, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, ***including on consumer platforms such as the Better Business Bureau***, consumer facing blogs and social media websites, ***could*** diminish consumer confidence in our platform and adversely affect our brand, ***irrespective of their validity***. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. ***If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels***, it ***could*** materially and adversely affect our business, financial condition and results of operations.

201.    Defendants' representations in Vroom's SPO Offering Materials were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.  The SPO Offering Materials were also materially false and misleading because they failed to disclose that the BBB had initiated proceedings to revoke Vroom's BBB accreditation and had done so by a vote of the BBB Board of Directors on September 2, 2020.

C.   **The SPO Offering Materials Failed to Disclose the Information Required by Items 303 and 105 of Regulation S-K, and Did Not Otherwise Disclose Information Concerning Trends, Uncertainties, Events or Risks**

202.   Item 303(a) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

203.   In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *      *      *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

204.   Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)      Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)      If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.   Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

205.   Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a

discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  Specifically, Item 105 requires the issuer to "[e]xplain how the risk affects the registrant or the securities being offered" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

206.    Vroom's disastrous Customer Experience, provided largely by Rock Connections pursuant to Vroom's asset-light business strategy, constituted a known risk or uncertainty under Item 303, and otherwise required disclosure under Item 105, because it materially threatened the operations of Vroom.  Vroom faced the prospect of having negatively impacted sales and margins going forward due to its inability to consummate sales transactions and its resulting need to make sales at fire sale prices to reduce excess inventory.  Accordingly, even if the management of Vroom could not reasonably estimate or quantify the manner in which Vroom's disastrous Customer Experience might impact the Company, disclosure was required.

## XV.    CLAIMS BROUGHT PURSUANT TO SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT

207.    The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of any Defendant – *i.e.*, they do not allege, and do not sound in, fraud – and Lead Plaintiff specifically disclaims any allegations of fraud, scienter or recklessness in these non-fraud claims.

## THIRD CLAIM FOR RELIEF

### For Violations of Section 11 of the
### Securities Act Against All Defendants

208.    This Cause of Action is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the common stock of Vroom in the September 2020 SPO pursuant to the SPO Offering Materials.

209.    Lead Plaintiff incorporates by reference paragraphs 190-206, above, as if set forth here.  The allegations do not allege fraud, scienter or the intent of the Defendants to defraud Lead Plaintiff or members of the Class.  For the purposes of this Section 11 claim, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act.  This Cause of Action is predicated upon Defendants' liability for making false and materially misleading statements in the SPO Offering Materials.

210.    The SPO Offering Materials were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The misstatements and omissions set forth in paragraphs 194-201, above were material.

211.    Vroom is the registrant for the shares issued and distributed to the Class members pursuant to the September 2020 SPO.  The Defendants named in this Cause of Action were responsible for the contents and dissemination of the SPO Offering Materials.

212.    At a minimum, as the issuer of the shares, Vroom is strictly liable to Lead Plaintiff and the Class for the SPO Offering Materials' material misstatements and omissions.

213.    Due to their role as underwriters of the September 2020 SPO, the Underwriter Defendants were responsible for the contents and dissemination of the SPO Offering Materials and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions

contained therein.  The Underwriter Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the SPO Offering Materials were true and without omissions of any material facts and were not misleading.

214.    Indeed, none of the Defendants named in this Cause of Action, including the Officer Defendants and Director Defendants, made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Offering Materials were true and without omissions of any material facts and were not misleading.

215.    By reason of the conduct alleged herein, each of the Defendants violated Section 11 of the Securities Act.

216.    Lead Plaintiff and certain members of the Class purchased Vroom common stock in connection with the September 2020 SPO pursuant to the SPO Offering Materials.

217.    Lead Plaintiff and these members of the Class have sustained damages. The value of Vroom common stock has declined substantially since the September 2020 SPO and subsequent to the issuance and dissemination of the materially misleading SPO Offering Materials.

218.    At the time of their acquisition of Vroom common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged.

219.    This complaint is being filed on October 4, 2021, less than one year from the curative disclosure on March 3, 2021, that disclosed the full extent of the materially false and misleading statements in the SPO Offering Materials.  Further, less than one year elapsed from the time that any person who purchased Vroom stock in the September 2020 SPO discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that this complaint was filed.  Further, less than three years elapsed between the time that the securities

upon which this count is brought were offered to the public and the time that this complaint was filed.

## FOURTH CLAIM FOR RELIEF

### For Violations of Section 12(a)(2) of the Securities
### Act Against the Underwriter Defendants

220.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who acquired the common stock of Vroom in the September 2020 SPO pursuant to the SPO Offering Materials.

221.    Lead Plaintiff incorporates by reference paragraphs 190-206, above, as if set forth here.  For the purposes of this Section 12(a)(2) claim, Lead Plaintiff does not allege that the Underwriter Defendants acted with scienter or fraudulent intent.  This Cause of Action is predicated upon the Underwriter Defendants' liability for making false and materially misleading statements in the SPO Registration Statement and SPO Prospectus.

222.    By means of the defective SPO Prospectus and as otherwise detailed herein, each of the Underwriter Defendants offered, promoted and sold, for the benefit of themselves and their associates, Vroom common stock to Lead Plaintiff and other members of the Class.

223.    The SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  The Underwriter Defendants owed Lead Plaintiff and other members of the Class who acquired Vroom common stock pursuant to the SPO Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the SPO Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the SPO Prospectus as set forth above.  Lead

Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the SPO Prospectus at the time they purchased or otherwise acquired Vroom common stock.

224.    By reason of the conduct alleged herein, each of the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased Vroom common stock in the September 2020 SPO sustained substantial damages in connection therewith.  Accordingly, Lead Plaintiff and the other members of the Class who purchased and hold the common stock issued pursuant to the SPO Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Defendants sued herein.  Class members who have sold their Vroom common stock seek damages to the extent permitted by law.

225.    This claim is timely filed for the same reasons set forth in paragraph 219 of the Third Claim for Relief.

### FIFTH CLAIM FOR RELIEF

**For Violations of Section 15 of the Securities Act Against the Individual Defendants**

226.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants for Vroom's liability under the Third Claim for Relief.  This Cause of Action does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed. Lead Plaintiff incorporates by reference paragraphs 190-206 and 208-219 above, as if set forth here.

227.    The Individual Defendants each were control persons of Vroom by virtue of their positions as directors and/or senior executive officers of Vroom at the time of the September 2020

SPO. The Individual Defendants each had a series of direct and/or indirect relationships with Vroom, and were therefore control persons with respect to the materially false and misleading statements in the SPO Registration Statement and SPO Prospectus.

228.    This claim is timely filed for the same reasons set forth in paragraph 219 of the Third Claim for Relief.

229.    By reason of the conduct alleged herein, these Defendants violated Section 15 of the Securities Act and Lead Plaintiff and the members of the Class have suffered harm as a result.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: October 4, 2021                Respectfully submitted:

**BARRACK RODOS & BACINE**

*/s/ Michael A. Toomey*
Michael A. Toomey
Eleven Times Square
640 8th Avenue, 10th Floor
New York, NY 10036
Telephone:  212.688.0782
Facsimile:  212.688.0783

                        and

Robert A. Hoffman
Mark R. Rosen
Jeffrey B. Gittleman
Chad A. Carder
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  215.963.0600
Facsimile: 215.963.0838

*Attorneys for Rhondda Cynon Taf Pension Fund*
*and Lead Counsel for the Putative Class*