UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: VROOM, INC. SECURITIES
LITIGATION

MEMORANDUM
OPINION & ORDER

21 Civ. 2477 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a consolidated class action brought on behalf of purchasers of Defendant

Vroom, Inc.'s common stock between June 9, 2020 and March 3, 2021 (the "Class Period").

The Consolidated Amended Complaint ("Amended Complaint") alleges that Vroom and certain

of its senior officers and directors issued false and misleading statements during the Class Period

regarding Vroom's "true financial prospects and operating condition." (Am. Cmplt. (Dkt. No.

60) ¶ 1) According to the Amended Complaint, Vroom was "plagued by a lack of adequate sales

and support staff[,] resulting in degraded customer experiences, lost sales opportunities, and

liquidation of inventory at fire sale prices." (Id.)

The Amended Complaint asserts claims under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange

Commission ("SEC") Rule 10b-5 in connection with several of Defendants' public statements

during the Class Period. The Amended Complaint also asserts claims under Sections 11,

12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") in connection with a

September 2020 offering of Vroom common stock. (Id. ¶¶ 177, 186, 208, 220, 226)

Defendants have moved to dismiss the Amended Complaint pursuant to Rules

9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation

Reform Act of 1995 (the "PSLRA"). (Dkt. No. 92) Defendants contend that (1) the Section

10(b), Section 11, and Section 12(a)(2) claims should be dismissed for failure to plead facts

showing that they made false or misleading statements (Def. Br. (Dkt. No. 93) at 21-24, 30)[1]; (2) the Section 10(b) claims should be dismissed for failure to plead facts establishing a strong inference of scienter (id. at 16-21); (3) the Section 11 and 12(a)(2) claims should be dismissed for failure to plead standing (id. at 30-32); and (4) the Section 20(A) and Section 15 claims should be dismissed for failure to plead a primary violation of either the Exchange Act or the Securities Act.  (Id. at 32-33)

For the reasons stated below, Defendants' motion will be granted, and the Amended Complaint will be dismissed in its entirety.

## BACKGROUND

I.    **FACTS**[2]

A.    **The Parties**

Lead Plaintiff Rhondda Cynon Taf Pension Fund is an "occupational pension fund[] in Wales" that "purchased or otherwise acquired 125,027 shares of Vroom stock during

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  Although the Court's factual statement is drawn primarily from the allegations in the Amended Complaint, in deciding a motion to dismiss, a court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  Here, "the Amended Complaint quotes and relies upon statements made during . . . analyst calls."  Given these circumstances, "the Court may properly consider the full transcripts of those calls . . . in connection with the Rule 12(b)(6) motion without converting it to one for summary judgment." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232 n.2 (S.D.N.Y. 2009).  And in the event that documents on which the Amended Complaint relies "contradict the allegations of the . . . [Amended Complaint], the documents control."  In re Elan Corp. Sec. Litis., 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

the Class Period." (Am. Cmplt. (Dkt. No. 60) ¶ 24) Lead Plaintiff purchased 3,294 of its shares in a September 2020 offering of Vroom stock. (Id.)

Defendant Vroom (the "Company") is a Delaware corporation headquartered in New York City that provides an "ecommerce platform that buys and sells used vehicles." On Vroom's platform, consumers can "research and select from thousands of reconditioned vehicles." (Id. ¶ 25) Vroom's common stock trades on the NASDAQ exchange under the symbol "VRM." (Id.)

Defendant Paul J. Hennessy was Vroom's Chief Executive Officer ("CEO") at all relevant times, while Defendant David K. Jones served as the Company's Chief Financial Officer ("CFO"). (Id. ¶¶ 26-27)

Defendants Robert J. Mylod, Jr., Scott A. Dahnke, Michael J. Farello, Laura W. Lang, Laura G. O'Shaughnessy, and Adam Valkin were members of Vroom's board of directors. (Id. ¶ 29)

Defendants Goldman Sachs & Co. LLC, BofA Securities, Inc., Allen & Company LLC, and Wells Fargo Securities, LLC served as underwriters in connection with Vroom's September 2020 stock offering. (Id. ¶¶ 34-37)

## B.    Pre-Class Period Events

### 1.    Vroom's History and Business Strategy

Vroom was launched in 2013 under the name "Auto America." (Id. ¶ 39) In 2014, the Company hired Allon Bloch as its CEO. The Company then "transitioned into a technological platform and changed its name to Vroom." (Id.) In December 2015, Vroom acquired the Texas-based firm Texas Direct Auto Inc. (Id.)

Defendant Paul Hennessy replaced Bloch as Vroom's CEO on June 8, 2016. (Id. ¶ 40)

3

The Amended Complaint alleges that Vroom operates in three business segments:

> (i) Ecommerce, which represents retail sales of used vehicles through Vroom's ecommerce platform; (ii) Texas Direct Auto . . . , which represents retail sales of used vehicles from the Company's physical location located in Stafford, Texas, which is near Houston; and (iii) Wholesale, which represents sales of used vehicles through wholesale auctions.

(Id. ¶ 41)  For the year ending on December 31, 2020, "Vroom's Ecommerce segment accounted for 67.4% of the Company's revenues, while its Wholesale and [Texas Direct Auto] segments represented 18.1% and 14.5% of its total revenues, respectively."  (Id.)

The Company conducted an initial public offering ("IPO") in June 2020.  During the period leading up to the IPO, Vroom employed what it referred to as an "asset-light" business strategy.  The Company "eschewed its need for ownership of assets in favor of a business model that relied heavily on contracts with third-party service providers to assist in facilitating functions that would typically be controlled in-house."  (Id. ¶ 42)  Pursuant to this strategy, Vroom

> outsourced portions of its critical functions, including its:  (a) reconditioning facilities, which performed reconditioning of vehicles in Vroom's inventory to prepare them for sale; (b) logistics operations, which handled delivery of Vroom's cars in inventory to customers throughout the United States; (c) customer financing, which provided vehicle financing to Vroom's customers; and (d) Customer Experience team, which operated Vroom's primary call center and performed most every action necessary to consummate the sale of a car to a Vroom customer.

(Id. ¶ 45)

Vroom's "customer experience" team "handles customer questions about vehicle selection, financing, and the purchase or sale process."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 77)  In its June 2020 IPO Prospectus, the Company states that "the substantial majority of inquiries, sales, purchases and financings of [Vroom's] vehicles in our ecommerce business are conducted through a third-party customer experience center located

in Detroit, Michigan." (Id. at 19). The Company also represents that "the customer experience center is fundamental to the success of [Vroom's] business." (Id.)

### 2.    Vroom's Partnership with Rock Connections LLC

In August 2017, Vroom announced that Detroit-based Rock Connections LLC would "handle Vroom's Customer Experience function." (Am. Cmplt. (Dkt. No. 60) ¶ 47) The founder and chairman of Rock Connections is Dan Gilbert, who was "one of Vroom's most high-profile investors since 2015." (Id. ¶ 48) Gilbert is the "founder and chairman of Quicken Loans and majority owner of the NBA's Cleveland Cavaliers." (Id.) Gilbert had "invested in Vroom's 2017 $76 million Series F round of funding that had raised Vroom's total equity funding to $295 million since inception." (Id.)

In April 2020, two months before Vroom's June 2020 IPO, the Company entered into a new "Customer Experience Management Agreement" with Rock Connections. (Id. ¶ 49) The new agreement

> a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's [customer relationship management ("CRM")] system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom, its senior executives, and management unfettered access to monitor the customer support being provided to potential Vroom customers, including but not limited to monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom, and a requirement for weekly meetings between representatives of Rock Connections and Vroom.

(Id.)

The new agreement also requires Rock Connections to "notify Vroom promptly in writing upon its receipt or knowledge of any complaint from any person, including a Customer, or entity regarding any Services provided [under the Agreement], and . . . provide reasonable

assistance in researching, investigating and responding to such complaints." (Id. ¶ 52)

(alterations in original) Pursuant to the new agreement, Vroom's management also "had access

to Vroom's [Customer Relationship Management] system and all of the granular information it

contained for each Vroom transaction and customer service interaction, by customer, during the

Class Period." (Id. ¶ 53)

As to Rock Connections' staffing levels, the new agreement provides that

> Rock Connections and Vroom would "create, mutually agree upon and maintain a
> staffing plan … to adjust staffing levels for [customer service] Agents from time
> to time as needed." As part of this staffing plan, Rock Connections and Vroom
> would both "review hiring levels and needs on a rolling three-month basis . . . and
> otherwise ensure adequate staffing of [customer service] Agents to provide the
> Services throughout the Term," with the parties also working together to develop
> a training program for these customer service agents. Vroom had the right to
> monitor this training program, and the scripts developed and used by the customer
> service agents were to be "mutually develop[ed]" by Vroom and Rock
> Connections, with Vroom being "responsible for the compliance of all Scripts
> with applicable law and regulation."

(Id. ¶ 54) (alterations in original)

### 3. Events Preceding Vroom's June 2020 IPO

In March 2020, Vroom "significantly reduced its used vehicle inventory in an

effort to limit its exposure to an expected drop in demand as a result of the COVID-19

pandemic." (Id. ¶ 57) "[I]n late March and into the first half of the second quarter," the

Company "stopped buying new inventory" and began "pric[ing] [its] inventory to move very

quickly." (Id.) As a result, the Company moved from a "peak" of "over $200 million in

inventory" in March, to a "low watermark of approximately $70 million" in inventory in the

second quarter. (Id.)

During this same time, Vroom "reduced its employee headcount" by instituting

"emergency furloughs and salary reductions." (Id. ¶ 58) Indeed, "[e]ffective May 3, 2020,

approximately one-third of [Vroom's] workforce was placed on furlough. The majority of

employees furloughed were in reconditioning, logistics, acquisitions and [Texas Direct Auto] sales, which were the positions most affected by the reduction in unit volume." (Id.)

Beginning in May 2020, however, "the market for used car sales began to boom due to a confluence of factors, including dealer shortages of new vehicles and a changing consumer sentiment favoring ownership of a car over riding mass transit or use of a ride-share company." (Id. ¶ 59) Vroom "sought to capitalize on this soaring consumer demand for used vehicles beginning in May 2020 by building back inventory," and by taking steps toward entering the public markets through a June 2020 IPO. (Id. ¶ 60)

In connection with Vroom's June 2020 IPO, the Company represented to investors that it had "resumed [its] vehicle sourcing and acquisition processes and [is] currently building [its] inventory to take advantage of [its] position and value proposition in the used automotive market." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 59)

C.    **Public Disclosures During the Class Period**

1.    **Vroom's June 2020 IPO**

On June 9, 2020 – the first day of the Class Period – Vroom filed a prospectus with the SEC in connection with its IPO. (Am. Cmplt. (Dkt. No. 60) ¶ 112) The prospectus touts Vroom's prospects for growth, using a "Growth Flywheel":

> Our business has grown significantly as we have scaled our operations. Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage.

Growth Flywheel



(Id.)  The prospectus states that "[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel."  (Id.) (quotation marks omitted) (alterations in original)

With respect to Vroom's partnership with Rock Connections, the prospectus states that,

> [i]n addition to our in-house customer support personnel, we have partnered with a leading customer experience management provider to operate our primary call center.  This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies.

(Id. ¶ 116) (alterations in original)  The prospectus also states that "[t]he quality of the customer experience on [Vroom's] ecommerce platform is critical to [its] ability to attract new visitors to [its] platform, convert such visitors into customers and increase repeat customers."  (Id. ¶ 113) (quotation marks omitted) (alterations in original)  In the prospectus, Vroom emphasized its "deep[] commit[ment] to creating an exceptional experience for [its] customers."  (Id.)

In connection with the "[e]xceptional customer support" and "exceptional customer experience" Vroom represented that it offers, Vroom states that its

> "professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed. In all of our customer interactions, our goal is to ensure that every customer is a delighted customer."

(Id.)

In addition to providing these positive assessments of the Company's growth prospects and its customer experience team, Vroom identifies a number of risk factors, including the following:

- "Our recent, rapid growth has placed and may continue to place significant demands on our management and our operational and financial resources. We have experienced significant growth in the number of customers on our platform as well as the amount of data that we analyze. We have hired and expect to continue hiring additional personnel to support our rapid growth. . . . If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' experience and/or the quality of the vehicles we sell, our business, financial condition and results of operations could be materially and adversely affected." (June 8, 2020 IPO Prospectus, Hammel Decl. Ex. 2 (Dkt. No. 94-2) at 18-19)

- "Our high rate of growth makes maintaining the quality of our customer experience more difficult." (Id. at 22)

- "Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center. . . . If the third party's systems and operations fail or if the third party is otherwise unable to perform its sales function, we may be unable to complete customer transactions, which would prevent us from selling vehicles and value-added products through our platform. In addition, if such third party is unable to perform to our standards or to provide the level of service required or expected by our customers, . . . our business, financial condition and results of operations may be harmed[.] . . ." (Id. at 19)

### 2. Hennessy's Interview with *The Street*

On June 10 and 11, 2020, The Street – a business news website – interviewed Defendant Paul Hennessy about the Company's IPO. (Am. Cmplt. (Dkt. No. 60) ¶ 120)

During the June 10, 2020 interview, Hennessy stated that Vroom "saw an opportunity to move forward" with the IPO when "the market stabilized and the world stabilized a little bit" following the onset of the COVID-19 pandemic. (June 10, 2020 The Street Interview Tr., Hammel Decl., Ex. 3 (Dkt. No. 94-3) at 3)  Hennessy reported that "customers are now twice as likely to consider an online used vehicle purchase compared to where they were just three months ago," and as a result "the market's coming [Vroom's] way." (Id. at 3-4)

During the June 11, 2020 interview, Hennessy stated that "with the growth that we've had and now the continued tailwinds that we're seeing in our business, all I can say is that Vroom is in an excellent position to . . . enter . . . the public markets." (June 11, 2020 The Street Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-4) at 4)  As to job furloughs at the Company earlier in 2020, Hennessy stated that "[w]e are thrilled to have the furlough just about in our rearview window," and "now we're back to work and scaling the business." (Id. at 5-6)

### 3.    August 12, 2020 Announcement of Second Quarter Results

On August 12, 2020, Vroom filed a Form 10-Q with the SEC announcing the Company's financial results for the second quarter of 2020. (Am. Cmplt. (Dkt. No. 60) ¶ 123)  In an accompanying Form 8-K, Hennessy stated that he was "pleased with [Vroom's] results for the second quarter, in which we performed substantially ahead of our growth plan." (Id.)  Hennessy also stated that

> [a]s demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so.  These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter.  We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce.

(Id.)

That same day, Hennessy and Defendant David Jones, Vroom's CFO, participated in an earnings call with analysts and investors to discuss the Company's second quarter financial results.  (Id. ¶ 124)  During the earnings call, Hennessy stated that the Company "spent every day since May trying to build back our inventory," and that "[w]e've got capacity . . . lined up not only in Q3 to match our guidance, but now – and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan.  So we believe that we're almost out of this capacity constraint issue in this quarter."  (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 5, 8-9)  Hennessy also stated that the Company had seen "strong monthly sequential increases in unit sales in June and July," and had experienced "a classic example of a V-shape recovery."  (Id. at 5)  Jones reported that "[w]e're confident that we can – currently have the capacity to meet our Q3 targets, and we believe our utilization will continue to increase."  (Id. at 6)

The Company's 10-Q also disclosed several risk factors related to Vroom's customer experience team; these risk factors are identical to those disclosed in Vroom's IPO prospectus.  (See, e.g., Aug. 12, 2020 Vroom Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 13 ("If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' experience and/or the quality of the vehicles we sell, our business, financial condition and results of operations could be materially and adversely affected."); id. at 16 ("Our high rate of growth makes maintaining the quality of our customer experience more difficult."))

### 4.    Vroom's September 2020 Offering

Vroom's stock price "climbed from its IPO price of $22.00 per share on June 9, 2020, to close at a class period high of $73.87 on September 1, 2020" – a "staggering 235% price increase."  (Am. Cmplt. (Dkt. No. 60) ¶ 74))

On September 8, 2020, Vroom – "seeking to capitalize on [the Company's] soaring stock price" – announced an additional offering of common stock. (Id. ¶ 75) The prospectus filed with the SEC in connection with the September 2020 offering repeats verbatim many of the statements in Vroom's June 2020 IPO prospectus concerning the Company's "use of its Growth Flywheel to generate sales growth[,] and its asset-light business approach to simultaneously reduce risk." (Id.) The prospectus for the September 2020 offering likewise touts the Company's "growth attributable to its Growth Flywheel as well as [Vroom's] '[e]xceptional customer support,' 'exceptional customer experience,' and 'exceptional ecommerce experience.'" (Id. ¶ 76) (second alteration in original)

In a Form 8-K filed in connection with the September 2020 offering, Vroom stated that its

> inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold. As well, the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit. As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic.

(Id. ¶ 79) The Company's 8-K also presented revised, upward adjustments of, inter alia, the Company's estimates for total revenue and gross profit in the third quarter of 2020. (Id.)

The September 2020 prospectus includes risk disclosures identical to those set forth in the June 2020 IPO prospectus and in Vroom's August 12, 2020 Form 10-Q. (See Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 20, 24)

### D.    Better Business Bureau Complaints

Contrary to Vroom's positive statements during the Class Period, the Amended Complaint alleges that the Company "was actually in no position to take advantage of a thriving

market for online used car sales." (Am. Cmplt. (Dkt. No. 60) ¶ 119) According to Plaintiffs, Vroom's "touted Customer Experience" function was "broken," which "prevented Vroom from capitalizing on a robust market for online used car sales" and "forced Vroom to sell off the excess inventory it had amassed at fire sale prices." (Id. ¶ 12)

The Amended Complaint further alleges that in January 2020 the Better Business Bureau of Greater Houston and South Texas (the "BBB") – located in "the centralized location for Vroom's business" –

> "began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns," including complaints from Vroom customers asserting that: (a) "the vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, [the] interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were left in a parking lot or driveway at night with the keys left in them." Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns" and "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in."

(Id. ¶ 82) (footnote omitted)

The BBB also found that, "'[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased,' with 'new patterns of complaints' in June 2020," when Vroom's IPO occurred. Customer complaints "focused on 'warranty issues, deceptive Carfax issues and/or wrecked cars being sold.'" (Id. ¶ 83)

As a result of "the overwhelming multitude and type of customer service issues being reported to the BBB," the BBB "initiated proceedings to revoke Vroom's BBB accreditation." (Id. ¶ 84) On September 2, 2020 – a few days before Vroom announced the secondary offering of its shares – "the BBB Board of Directors revoked Vroom's accreditation

due to its failures to adhere to and abide by BBB standards." (Id.)  In revoking Vroom's

accreditation, the BBB cited, inter alia, its

> failure to (a) "honestly represent products and services, including clear and
> prominent disclosures of all material terms;" (b) "[a]ddress disputes forwarded by
> BBB quickly and in good faith;" (c) "[a]pproach all business dealings,
> marketplace transactions and commitments with integrity, good faith and intent to
> do what is reasonably expected;" and (d) "[c]ooperate with BBB in efforts to
> eliminate the underlying cause of patterns of customer complaints that are
> identified by BBB."

(Id.)

The Amended Complaint also cites two 2021 news reports reflecting similar

complaints:  (1) a February 21, 2021 article in Torque News describing the experience of a

consumer who did not complete a planned "purchase [of] a $63,000 BMW i8 from Vroom . . .

because Vroom misplaced the cashier's check that the consumer sent to pay for the car" (id.

¶ 94); and (2) a September 13, 2021 story from an NBC affiliate in Houston, Texas recounting

that after a consumer "purchased a car from Vroom in February 2021, she was . . . unable to

drive the car she purchased because 'a lack of paperwork' inhibited her from 'register[ing] the

car or get[ting] insurance.'"  (Id. ¶ 92)

According to the Amended Complaint, Vroom's "undisclosed inability to

consummate transactions and deliver cars to consumers throughout 2020 and its need to process

returns for damaged and otherwise defective cars during the same period" impacted Vroom's

"bottom line," because – as set forth in the Company's 2020 SEC filings – Vroom "recognizes

revenue upon transfer of control of goods or services to customers."  (Id. ¶ 95)  In other words,

"Vroom is unable to recognize revenue from sales where consumers do not receive the car they

purchased[,] . . . are experiencing 'delayed delivery in receiving their car,' [or] . . . are

experiencing 'issues concerning their trade-in.'"  (Id.) (footnote omitted)

Despite this "trend of increasing consumer complaints about Vroom's Customer Experience" during the Class Period, Vroom "did not disclose in the IPO Offering Materials or the [September] Offering Materials any then-occurring adverse issues or trends related to . . . its Customer Experience function." (Id. ¶ 85) Vroom also did not disclose the September 2, 2020 "revocation of its BBB accreditation" in the September offering materials that were publicly released a few days later. (Id.)

Moreover, while Vroom was "increas[ing] its inventory" during the Class Period with the intent to convert that inventory into sales revenue, Defendants "misrepresented and/or failed to disclose" that

> (a) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (b) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (c) as a result of (a)-(b) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; and (d) as a result of (a)-(c) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market.

(Id.)

Vroom "remains unaccredited by the BBB." Indeed, the BBB "lists Vroom as having an 'F' BBB rating" based on "information independently gathered by the BBB about the business." (Id. ¶¶ 86-87)

### E.   The Corrective Disclosures

#### 1.   November 11, 2020 Announcement of Third Quarter Results

On November 11, 2020, Vroom announced its financial results for the third quarter of 2020 and released an estimate of the Company's expected fourth quarter earnings. These disclosures "ma[de] it clear that Vroom expected to suffer sharply higher losses moving

forward." (Id. ¶ 98)  During an earnings call with investors and analysts that day, Defendants

Jones and Hennessy "revealed that Vroom was suffering from a 'bottleneck' in its sales support

and needed to invest heavily in building out the Company's sales support and logistics networks

in order to avoid constrained growth, despite the favorable market environment." (Id.)

During the call Hennessy also stated, however, that "increased inventory drives

increased demand and increased conversion"; that the Company "stands by [its] guidance" as to

"how we are doing intra-quarter"; and that the Company was "very-very focused on getting the

customer experience right," and would have the issue "rectified in Q4." (Id. ¶ 99)

On this news, "the price of Vroom stock fell $5.31 per share, or 13%, from a close

of $40.80 per share on November 11, 2020 to a close of $35.49 per share on November 12,

2020." (Id. ¶ 100)

### 2. **March 3, 2021 Announcement of Fourth Quarter Results**

After the close of trading on March 3, 2021 – the last day of the Class Period –

Vroom announced its 2020 fourth quarter results, which "revealed operational issues and

financial results far worse than previously disclosed to investors." (Id. ¶ 101)  Vroom disclosed

that the Company had "suffer[ed] a net loss of $60.7 million, a 42% year-over-year increase,

representing a loss per share 20% worse than the midpoint of Defendants' prior guidance." (Id.)

Vroom's fourth quarter "EBITDA loss"[3] and "total gross profit per unit" also missed the range

provided by Defendants in November 2020.  (Id.)

On an earnings call with analysts and investors later that day, Hennessy stated that

> Vroom was suffering from severe sales backlogs due to inadequate sales and
> support staff, which had materially impaired the Company's ability to sell existing
> inventory.  These backlogs, along with a degraded Customer Experience, had

---

[3] EBITDA refers to "earnings before interest, taxes, depreciation, and amortization." Lickteig v.
Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 312 (S.D.N.Y. 2022).

operationally constrained Vroom's business and forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable market for online used car sales. Even worse, Defendant Hennessy admitted that these deficiencies would continue to constrain the Company's profits into the first quarter of 2021, stating: "we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1."

(Id. ¶ 102)

After Vroom announced its fourth quarter earnings, "the price of Vroom stock plummeted $12.29 per share, or 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021," which "represented a 42% decline from the price at which Vroom shares were sold in the September 2020 [public offering] less than six months earlier and a decline of over 57% from Vroom's class period high." (Id. ¶ 104)

## II.    PROCEDURAL HISTORY

On March 22, 2021, the first of three putative securities fraud class action lawsuits was filed on behalf of those who held Vroom common stock during the Class Period. (Dkt. No. 1)  On August 5, 2021, this Court consolidated the three actions and appointed Lead Plaintiff and Lead Counsel.  (Dkt. No. 52)

Lead Plaintiff filed the Amended Complaint on October 4, 2021.  (Dkt. No. 60)

Defendants moved to dismiss the Amended Complaint pursuant to Rule 9(b), Rule 12(b)(6), and the PSLRA on December 20, 2021.  (Dkt. No. 92)  Lead Plaintiff filed an opposition brief on February 22, 2022 (Dkt. No. 97), and Defendants filed a reply brief on March 23, 2022.  (Dkt. No. 96)

## DISCUSSION

## I.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),

and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v.

Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle N.E., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" to

establish entitlement to relief.  Iqbal, 556 U.S. at 678.

## II.    SECTION 10(b) CLAIMS

### A.    Section 10(b) of the Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any

person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of

any security, . . . any manipulative or deceptive device or contrivance."  15 U.S.C. § 78j.

Pursuant to SEC Rule 10b–5, it is unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material
fact necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person, in connection with the purchase or
sale of any security.

17 C.F.R. § 240.10b-5.

To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Comme'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)).

"'A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards.'" In re Cannavest Corp. Sec. Litigs., 307 F. Supp. 3d 222, 236 (S.D.N.Y. 2018) (quoting In re Gen. Elec. Co. Sec. Litigs., 857 F. Supp. 2d 367, 383 (S.D.N.Y 2012)). "First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" Id. (quoting Fed. R. Civ. P. 9(b)). This requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Comme'ns, 493 F.3d at 99. Accordingly, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Second, the complaint must meet the pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b). The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2)(A); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)

("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged

violation, and the facts evidencing scienter, i.e., the defendant's intention to 'deceive,

manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12

(1976))).  "To qualify as 'strong' within the intendment of [the PLSRA], . . . an inference of

scienter must be more than merely plausible or reasonable – it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see

also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold

inspection for sufficiency, a court governed by [the PLSRA] must engage in a comparative

evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing

inferences rationally drawn from the facts alleged.").  As discussed above, "[a] complaint will

survive . . . only if a reasonable person would deem the inference of scienter cogent and at least

as compelling as any opposing inference one could draw from the facts alleged." Id. at 324

### B.     Alleged Fraudulent Statements

The Amended Complaint alleges that Defendants issued more than fifty false

statements or misleading omissions during the Class Period.  Those statements at issue are

contained in (1) Vroom's June 2020 IPO prospectus; (2) Hennessy's June 2020 interview with

The Street; (3) the August 2020 announcement of Vroom's second quarter results and the

accompanying SEC filings and earnings call; (4) the September 2020 offering materials; and (5)

the November 2020 announcement of the Company's third quarter results and the accompanying

SEC filings and earnings call.  (Am. Cmplt. (Dkt. No. 60) ¶¶ 111-134, 194-201)

The Amended Complaint alleges that the June 2020 IPO prospectus and

Hennessy's interview statements are materially false or misleading because Vroom

"misrepresented and/or failed to disclose" that

Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities . . . ; (b) as a result of this degraded Customer Experience and lost sales opportunities, Vroom needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (c) as a result of (a)-(b) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.

(Id. ¶¶ 119, 122)

The Amended Complaint further alleges that Defendants' August 2020 statements concerning Vroom's second quarter earnings and the September 2020 offering materials are materially false or misleading (1) for the same reasons; and (2) because Vroom "misrepresented and/or failed to disclose that . . . Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows." (Id. ¶¶ 126, 201)

The Amended Complaint alleges that Defendants' November 2020 statements concerning the Company's third quarter results are materially false or misleading because Defendants

misrepresented and/or failed to disclose that, contrary to increased inventory driving increased demand and sales conversion, Vroom's increased inventory was only exacerbating a bottleneck in Vroom's Customer Experience caused by a lack of adequate sales and support staff that was resulting in a degraded Customer Experience and lost sales opportunities.

(Id. ¶ 134)

In moving to dismiss, Defendants contend that none of the more than fifty statements cited in the Amended Complaint is false or misleading. (Def. Br. (Dkt. No. 93) 16-17, App'x A) According to Defendants, many of the statements cited by Plaintiffs are opinions, forward-looking statements, or puffery, and the Amended Complaint does not plead facts demonstrating that any statement is actionable. (Id. at 18-24)

1.    **Alleged False Statements and Misleading Omissions**

a.    **Applicable Law**

Rule 10b-5 makes it unlawful for any person to make an "untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b-5(b).

"A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co., No. 15 CIV. 5999 (PGG), 2017 WL 4403314, at *11 (S.D.N.Y. Sept. 30, 2017) (internal quotation marks and citation omitted).  "In general[,] there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks and citations omitted).  "[D]isclosure is required," however, "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Id. (internal quotation marks and citations omitted).  In other words, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Id.

"'That duty is not boundless,' however." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citation omitted). "'[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject.'" Id. (quoting Richman v. Goldman Sachs Group, Inc., 868 F.Supp.2d 261, 274 (S.D.N.Y. 2012)). "'[T]he proper inquiry requires an examination of defendant's representations, taken together and in context.'" Meyer, 761 F.3d at 250-51 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)).  "In other words, [courts] look to the total mix of

available information." <u>Plumbers & Steamfitters Local 137 Pension Fund</u>, 2017 WL 4403314, at

*13 (internal quotation marks and citation omitted).

        **b.**      <u>**Analysis**</u>

              **i.**      <u>**Statements About Vroom's Sales Performance,**</u>
                          <u>**Vehicle Inventory, and Staffing "Bottleneck"**</u>

        The Amended Complaint challenges several statements Defendants made in SEC

filings and during earnings calls between June 2020 and September 2020.  In these statements,

Defendants assert that Vroom's increased inventory of vehicles will lead to increased sales

conversion and revenue growth:

- "Sales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 9, 71; Am. Cmplt. (Dkt. No. 60) ¶ 112; <u>see</u> Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 10, 74; Am. Cmplt. (Dkt. No. 60) ¶ 194)[4]

- "Our business has grown significantly as we have scaled our operations. Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 8, 78; Am. Cmplt. (Dkt. No. 60) ¶ 112; <u>see</u> Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 9, 27; Am. Cmplt. (Dkt. No. 60) ¶ 194)

- "[F]or us, the more content that we have, the better our ability to line up the specific customer who is looking for that specific content. And therein

---

[4] When quoting the alleged false or misleading statements, this Court cites to language in the underlying document, with a parallel cite to the relevant paragraph of the Amended Complaint. Many of the alleged misstatements are repeated verbatim in Vroom's various SEC filings between June 2020 and November 2020.  When the challenged language is repeated in additional SEC filings, this Court includes an additional parallel cite to the relevant section of those documents.

is how a digital flywheel is born. Content begets conversion." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 124)

- "Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold. As well, the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit. As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic." (Sept. 8, 2020 Form 8-K, Hammel Decl., Ex. 8 (Dkt. No. 94-8) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 128)

The Amended Complaint also challenges certain statements from the same time period addressing (1) the timing of Vroom's renewed acquisition of vehicle inventory in 2020; (2) conditions in the used car market in mid-2020; and (3) the end of the Company's early 2020 staffing furloughs:

- "On April 20, 2020, we began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models . . . ." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 57; Am. Cmplt. (Dkt. No. 60) ¶ 114; <u>see</u> Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 9, 60; Am. Cmplt. (Dkt. No. 60) ¶ 196)

- "We have resumed our vehicle sourcing and acquisition processes and are currently building our inventory to take advantage of our position and value proposition in the used automotive market." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 59; Am. Cmplt. (Dkt. No. 60) ¶ 114)

- "[W]e saw an opportunity to move forward [with Vroom's IPO]. And the market stabilized and the world stabilized a little bit. . . ." (June 10, 2020 <u>The Street</u> Interview Tr., Hammel Decl., Ex. 3 (Dkt. No. 94-3) at 3; Am. Cmplt. (Dkt. No. 60) ¶ 120)

- "Interesting fact, customers are now twice as likely to consider an online used vehicle purchase compared to where they were just three months ago." (June 10, 2020 <u>The Street</u> Interview Tr., Hammel Decl., Ex. 3 (Dkt. No. 94-3) at 4-5; Am. Cmplt. (Dkt. No. 60) ¶ 120)

24

- "And so I think there is a real move to car ownership and using personal cars until they get a level of comfort.  And that's obviously a positive tailwind in our own business as people start to use more used vehicles and, by the way, then replace them." (June 11, 2020 <u>The Street</u> Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-4) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 121)

- "We are thrilled to have the furlough just about in our rearview window.  And now we're back to work and scaling the business." (June 11, 2020 <u>The Street</u> Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-4) at 6-7; Am. Cmplt. (Dkt. No. 60) ¶ 121)

- "During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic.  In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter.  As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so.  These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter." (Aug. 12, 2020 Form 8-K, Hammel Decl., Ex. 6 (Dkt. No. 94-6) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 123)

- "[W]e spent every day since May trying to build back our inventory, all while our customers prevent us from doing so to the degree that we want and with the speed that we want because demand has been so robust.  From a sales perspective, we have been a classic example of a V-shape recovery. . . . We've rebounded rapidly off of the May lows, with strong monthly sequential increases in unit sales in June and July." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 124)

As an initial matter, the Amended Complaint pleads no facts contradicting the Company's public narrative that – after reducing inventory and furloughing employees early in 2020 in response to the COVID-19 pandemic – it began aggressively re-acquiring inventory in late April 2020 to meet an unexpected surge in consumer demand.  Nor have Plaintiffs pled facts contradicting Hennessy's statements in June 2020 that (1) "customers are now twice as likely to consider an online used vehicle purchase"; and (2) "there is a real move to car ownership and using personal cars . . . that's obviously a positive tailwind in [Vroom's] business." (June 11,

25

2020 The Street Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-4) at 4)  And the consumer

complaints made to the BBB in 2020 have no bearing on the truth or falsity of these assertions.

Moreover, the corrective disclosures in November 2020 and March 2021 – which disclosed the

growth "bottleneck" caused by inadequate staffing of Vroom's customer experience function –

note in this regard the Company's acquisition of additional inventory in mid-2020 – more

inventory than it could readily sell.  In sum, Plaintiffs have not pled facts showing that any of

these statements was false or misleading.

   Plaintiffs have likewise not pled facts showing that Defendants' assertions that

"higher inventory levels lead to higher conversion," and that "[c]ontent begets conversion" – i.e.,

that increased vehicle inventory will lead to a higher sales conversion rate and therefore

increased revenue – were untrue or misleading.  (Aug. 12, 2020 Earnings Call Tr., Hammel

Decl., Ex. 5 (Dkt. No. 94-5) at 5)  In other words, the Amended Complaint does not allege facts

showing that Vroom's business model – represented in part by the "Growth Flywheel" – was

fundamentally flawed or that the "Growth Flywheel" was not capable of functioning as

represented to investors.  Instead, the Amended Complaint alleges that statements such as

"[c]ontent begets conversion" were false or misleading because – during the Class Period –

"Vroom's inventory growth had far outpaced the capabilities of its existing sales and support

personnel, creating a logistical bottleneck," and "Vroom's lack of adequate sales and support

staff had resulted in a degraded Customer Experience and lost sales opportunities."  (Am. Cmplt.

(Dtk. No. 60) ¶ 129)

   But these allegations – which rely primarily on the BBB complaints and a handful

of news reports regarding disgruntled customers – do not plausibly demonstrate that Vroom was

aware that it was suffering from a "logistical bottleneck" and a "lack of adequate sales and

support staff" at a time earlier than these issues were disclosed by the Company to the market. (Id. ¶ 85)

As an initial matter, Plaintiffs do not disclose the number of consumer complaints filed with the BBB during the Class Period, or how the number of complaints compares with Vroom's sales during this time. Given the absence of such information, the handful of complaints cited by Plaintiffs cannot be regarded as a reliable indication of the internal functioning of Vroom's sales and support staff.

Moreover, consumer complaints to the BBB span much of 2020, running from January 2020 – before the COVID-19 pandemic altered Vroom's business operations – continuing into March and April 2020, when Vroom was reducing its inventory and furloughing staff in response to the pandemic, and continuing into late April 2020 and beyond, when Vroom began re-acquiring inventory in response to a surge in consumer demand. (Id. ¶ 82) The staffing "bottleneck" that the Company identified in November 2020 and March 2021 in connection with earnings calls regarding its third quarter and fourth quarter financial results is allegedly the result of the last development – i.e., the Company's acquisition of more inventory in mid-2020 than it had the capacity to sell. In sum, the BBB complaints cited by Plaintiffs do not readily correlate with the alleged emergence of the "bottleneck" in sales and customer support staff.

Finally, while some of the BBB complaints relate to customer service – including complaints about delays in providing documents necessary for car registration (id. ¶¶ 81-83) (ellipsis added) (footnote omitted) – other BBB complaints concern the delivery and marketing of vehicles:

> (a) "the vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were

left in a parking lot or driveway at night with the keys left in them." . . .
[Customers] were experiencing "delayed delivery in receiving their car[]" . . . .
[and] "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."

(Id.) (second alteration added) (footnote omitted)

Vroom has represented to investors that its "Customer Experience" team – the primary source of the alleged "logistical bottleneck" in "sales and support staff" that the Company disclosed in November 2020 and March 2021 – "handles customer questions about vehicle selection, financing, and the purchase or sale process." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 77) By contrast, Vroom uses "third-party carriers" and "regional transport partner[s]" to deliver vehicles. (Id. at 10, 75) Accordingly, to the extent that the BBB complaints relate to the delivery of vehicles, they fall outside the responsibilities of Vroom's "Customer Experience Team."

Similarly, in deciding to revoke Vroom's accreditation "due to its failures to adhere to and abide by BBB standards," the BBB cites several issues unrelated to the alleged staffing "bottleneck" and "degraded Customer Experience," including the following:

> Vroom's failure to (a) "honestly represent products and services, including clear and prominent disclosures of all material terms;" (b) "[a]ddress disputes forwarded by BBB quickly and in good faith;" (c) "[a]pproach all business dealings, marketplace transactions and commitments with integrity, good faith and intent to do what is reasonably expected;" and (d) "[c]ooperate with BBB in efforts to eliminate the underlying cause of patterns of customer complaints that are identified by BBB."

(Am. Cmplt. (Dkt. No. 60) ¶ 84) As discussed above, the Amended Complaint does not allege that Vroom's public disclosures were false or misleading in that the Company did not "honestly represent products and services" during the Class Period. Nor does the Company's failure to

"[c]ooperate with the BBB" imply the existence of a staffing "bottleneck" or "degraded Customer Experience" that was undisclosed to investors. (Id. ¶ 85)[5]

In sum, (1) the emergence of the consumer complaints in January 2020 does not correlate with Vroom's accelerated acquisition of vehicle inventory in mid-2020; (2) many of the BBB consumer complaints do not relate to Vroom's "sales and support staff"; and (3) the Amended Complaint does not disclose the number of consumer complaints concerning Vroom and how the number of these complaints compares to Vroom's sales. Given these circumstances, the BBB complaints are not sufficient to plausibly demonstrate that Vroom suffered from a "logistical bottleneck" and a "lack of adequate sales and support staff" that inhibited sales revenue at a point earlier than these issues were disclosed to the market. (Id. ¶ 85) At bottom, Plaintiffs' core factual allegation – that the BBB complaints are evidence of an undisclosed "logistical bottleneck" within Vroom – is speculative.[6]

Accordingly, the Amended Complaint does not adequately allege that Vroom's public statements between June 2020 and September 2020 – when the Company was telling the

---

[5] The news reports from Torque News and the Houston NBC affiliate do not assist Plaintiffs in showing that Vroom's public disclosures were false or misleading. The NBC story was issued on September 13, 2021 – well after the end of the Class Period – and describes the experience of one consumer who purchased a car in February 2021. (Am. Cmplt. (Dkt. No. 60) ¶ 92) And while the NBC piece discusses Vroom's issues with the BBB, the Amended Complaint does not provide a timeline for when these events took place. (Id. ¶ 93) The Torque News report also involves a single consumer, and the Amended Complaint does not specify the timing of that consumer's issues. (Id. ¶ 94)

[6] In concluding that the Amended Complaint's factual allegations are insufficient, the Court has not relied on Defendants' argument that the BBB complaints were "publicly disclosed as far back as January 2020" on the BBB's website. (Def. Br. (Dkt. No. 93) at 18) The Amended Complaint does not state whether or when individual consumer BBB complaints were posted on the BBB's website during the Class Period. The Amended Complaint only cites to the presence of consumer complaints on the BBB's website during the period between July and September 2021, well after the end of the Class Period. (See Am. Cmplt. (Dkt. No. 60) ¶¶ 82-85 (citing https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633)

market that "higher inventory levels lead to higher conversion" (Sept. 8, 2020 Form 8-K,

Hammel Decl., Ex. 8 (Dkt. No. 94-8) at 3) – were materially false or misleading.

As to the Company's statements in November 2020, the Amended Complaint

cites the following excerpts from the November 11, 2020 earnings call concerning Vroom's third

quarter results:

- "[A]s the DMV closures have now reopened, we're working through the backlogs of things, like titles. Again, very, very focused on getting the customer experience right, whether it's a delivery issue or whether it's a paperwork issue, and those investments are underway now." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 8; Am. Cmplt. (Dkt. No. 60) ¶ 132)

- "Right now, we are investing in our sales, sales support, sales experience, sales ops to help facilitate those sales." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 7; Am. Cmplt. (Dkt. No. 60) ¶ 132)

- "[I]ncreased inventory drives increased demand and increased conversion, which spins our growth flywheel. . . ." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 132)

The Amended Complaint does not allege facts suggesting, however, that – as of

November 2020 – Vroom was not "investing in [its] sales, sales support, [and] sales experience

[staff]," was not "working through the backlogs of things," and was not "very focused on getting

the customer experience right." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt.

No. 94-10) at 7-8)

Nor was Defendant Hennessy's statement that "increased inventory drives

increased demand and increased conversion" misleading in light of his disclosure – on that same

earnings call – that Vroom was experiencing a growth-inhibiting "bottleneck" related to the

Company's need to "invest[] in [its] sales, sales support, sales experience, sales ops to help

facilitate those sales" – the same issue that Plaintiffs allege that Defendants hid from the market

during the Class Period.  The Amended Complaint does not contain factual allegations

demonstrating that – as of November 11, 2020 – the "bottleneck" issue disclosed by Hennessy on

the earnings call was more dire than he represented.

Accordingly, none of the statements identified above are materially false or

misleading.

### ii.  Statements About Vroom's Business Model

The Amended Complaint challenges the following statements in Vroom's June

2020 IPO prospectus and its September 2020 offering prospectus concerning Vroom's "asset-

light" business model and the operation of its ecommerce platform:

- "We employ a hybrid approach across our business combining ownership and operation of assets by us, with strategic third-party partnerships.  Our strategy provides flexibility, agility and speed as we scale our business, without taking on the unnecessary risk and capital investment inherent in direct investment."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 8; Am. Cmplt. (Dkt. No. 60) ¶ 115; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 8; Am. Cmplt. (Dkt. No. 60) ¶ 197)

- "Our Competitive Strengths. . . . An asset-light strategy is fundamental to our business model. . . ."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 67; Am. Cmplt. (Dkt. No. 60) ¶ 115; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 70; Am. Cmplt. (Dkt. No. 60) ¶ 19)

- "Our platform provides prospective purchasers of vehicles a differentiated buying experience compared to traditional auto dealers and the peer-to-peer market."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 73; Am. Cmplt. (Dkt. No. 60) ¶ 113; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 76; Am. Cmplt. (Dkt. No. 60) ¶ 196)

The Amended Complaint does not allege facts demonstrating that these

statements are false or misleading.  For example, the 2020 BBB customer complaints have no

bearing on whether Vroom engaged in third-party partnerships; whether those partnerships were

"fundamental" to Vroom's business model; whether the partnerships provided Vroom with

"flexibility, agility and speed . . . without taking on the unnecessary risk and capital investment inherent in direct investment"; or whether Vroom's ecommerce platform provided consumers with a "differentiated" buying experience.

Accordingly, the statements quoted above are not false or misleading.

### iii.    Statements About Vroom's Customer Experience

The Amended Complaint challenges certain of Defendants' statements regarding how Vroom's customer experience team operates and the importance of the customer experience function to the business:

- "Customer Experience Team. In addition to our in-house customer support personnel, we have partnered with a leading customer experience management provider to operate our primary call center. This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 68; Am. Cmplt. (Dkt. No. 60) ¶ 116; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 71; Am. Cmplt. (Dkt. No. 60) ¶ 198)

- "At any point in the buying or selling process, our customers may encounter questions or challenges they are not equipped to or comfortable with resolving online. Our customer experience team provides human support to our customers in these situations. Our customer experience team handles customer questions about vehicle selection, financing, and the purchase or sale process. The team has been trained on our sale process and our core values of transparency and high customer satisfaction." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 77; Am. Cmplt. (Dkt. No. 60) ¶ 116; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 80; Am. Cmplt. (Dkt. No. 60) ¶ 198)

- "Our professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 66; Am. Cmplt. (Dkt. No. 60) ¶ 113; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 66; Am. Cmplt. (Dkt. No. 60) ¶ 195)

- "The quality of the customer experience on our ecommerce platform is critical to our ability to attract new visitors to our platform, convert such

visitors into customers and increase repeat customers." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 60; Am. Cmplt. (Dkt. No. 60) ¶ 113; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 63; Am. Cmplt. (Dkt. No. 60) ¶ 195)

The Amended Complaint does not dispute, however, that Vroom "partnered with a leading customer experience management provider," nor do Plaintiffs take issue with the Company's strategy in doing so. The Amended Complaint likewise does not plead facts disputing, as a general matter, that Vroom's customer service team "handles customer questions about vehicle selection, financing, and the purchase or sale process"; that team members are "trained on [Vroom's] sale process and [its] core values of transparency and high customer satisfaction"; or that team members "accompan[y] the buyer through every step of the process." The BBB consumer complaints, of course, have no bearing on the internal workings of the Company's customer experience function and whether team members are "trained on . . . Vroom's core values."

Finally, the Amended Complaint does not contest the Company's claim that "[t]he quality of the customer experience on [Vroom's] ecommerce platform" is critical to Vroom's business. Indeed, the Amended Complaint relies on this point in asserting that Defendants' failure to disclose Vroom's "degraded Customer Experience" during the Class Period was materially misleading.

The Court concludes that the Amended Complaint does not plead facts demonstrating that the statements listed above are false or misleading.

### iv.    Vroom's Risk Disclosures

The Amended Complaint also alleges that several risk disclosures in the Company's June 2020 prospectus and September 2020 prospectuses are false or misleading. The risk disclosures are as follows[7]:

- "Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit, Michigan, and customers who wish to trade in a vehicle currently must interact with our customer experience team in order to complete their transaction. Thus, the customer experience center is fundamental to the success of our business. As a result, the success of our business and our customer experience is partially dependent on a third party over which we have limited control. If the third party's systems and operations fail or if the third party is otherwise unable to perform its sales function, we may be unable to complete customer transactions, which would prevent us from selling vehicles and value-added products through our platform. In addition, if such third party is unable to perform to our standards or to provide the level of service required or expected by our customers, or we are unable to renegotiate the agreement with the third party on attractive terms or at all, or if we are unable to contract with an alternative third-party provider, our business, financial condition and results of operations may be harmed and we may be forced to pursue alternatives to provide these services, which could result in delays, interruptions, additional expenses and loss of potential and existing customers and related revenues." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 19; Am. Cmplt. (Dkt. No. 60) ¶ 117)

- "Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit, Michigan, and customers who wish to trade in a vehicle currently must interact with our customer experience team in order to complete their transaction. Thus, the customer experience center is fundamental to the success of our business. As a result, the success of our business and our customer experience is partially dependent on a third party over which we have limited control. If the third party's systems and operations fail or if the third party is otherwise unable to perform its sales function, <u>we would be limited in our ability to complete customer transactions, which would make it more difficult to sell vehicles and value-added products through</u>

---

[7] The September 2020 risk disclosures differ slightly from those in June 2020. Language added in the September 2020 prospectus is indicated by underlining.

our platform.  In addition, if such third party is unable to perform to our standards or to provide the level of service required or expected by our customers, or we are unable to renegotiate the agreement with the third party on attractive terms or at all, or if we are unable to contract with an alternative third-party provider, our business, financial condition and results of operations may be harmed and we may be forced to pursue alternatives to provide these services, which could result in delays, interruptions, additional expenses and loss of potential and existing customers and related revenues." (Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 20-21; Am. Cmplt. (Dkt. No. 60) ¶ 199) (emphasis added)

- "Our business model is primarily based on our ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction.  If consumers fail to perceive us as a trusted brand with a strong reputation and high standards, or if an event occurs that damages our reputation, it could adversely affect customer demand and have a material adverse effect on our business, revenues and results of operations.  Even the perception of a decrease in the quality of our customer experience or brand could impact results.  Our high rate of growth makes maintaining the quality of our customer experience more difficult.  Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, irrespective of their validity.  The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged.  If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 22; Am. Cmplt. (Dkt. No. 60) ¶ 118)

- "Our business model is primarily based on our ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction.  If consumers fail to perceive us as a trusted brand with a strong reputation and high standards, or if an event occurs that damages our reputation, it could adversely affect customer demand and have a material adverse effect on our business, revenues and results of operations.  Even the perception of a decrease in the quality of our customer experience or brand could impact results.  Our high rate of growth makes maintaining the quality of our customer experience more difficult.  Complaints or negative publicity about our

business practices, marketing and advertising campaigns, vehicle quality, <u>customer service, delivery experience</u>, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, <u>including on consumer platforms such as the Better Business Bureau, consumer facing blogs and social media websites</u>, could diminish consumer confidence in our platform and adversely affect our brand, irrespective of their validity. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations." (Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 24; Am. Cmplt. (Dkt. No. 60) ¶ 200)

The Amended Complaint does not plead facts demonstrating that the various factual statements in these risk disclosures – including that "the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit"; that "the customer experience center is fundamental to the success of [Vroom's] business"; or that "[Vroom's] business model is primarily based on [its] ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction" – are false or misleading.

Plaintiffs contend, however, that several of the conditional "if" statements set forth above are misleading in that they portray the associated risks as "theoretical" concerns "that could only harm Vroom's business in the future." (Am. Cmplt. (Dkt. No. 60) ¶ 200) Plaintiffs also argue that the statements are misleading in that they "portray any negative complaints about the Company['s] [Customer Experience] as 'misinformation' that needed to be 'correct[ed]' or 'mitigate[d].'" (<u>Id.</u> ¶ 78)

The Amended Complaint does not allege, however, that any of the conditional statements are false.  In other words, Plaintiffs do not contend that it was factually incorrect for Vroom to say that "if the third party [customer experience center] is . . . unable to perform its sales function, [Vroom] would be limited in [its] ability to complete customer transactions," or that "[i]f [Vroom] fail[s] to correct or mitigate misinformation or negative information about [the Company], [its] platform, [its] vehicle inventory, [its] customer experience, [its] brand or any aspect of [its] business, including information spread through social media or traditional media channels, it could materially and adversely affect our business."  (Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 24)  Plaintiffs instead argue that these statements are misleading because they present the risk as conditional, when in fact the risk had already materialized.

As discussed above, however, the BBB complaints are not sufficient to demonstrate that Vroom suffered from a "logistical bottleneck" or a "lack of adequate sales and support staff" at the time that the Company's risk disclosures were presented in the June 2020 prospectus and the September 2020 prospectus.  (See Am. Cmplt. (Dkt. No. 60) ¶ 201)  And the Amended Complaint does not allege facts showing that "the third party [customer experience center] [was] . . . unable to perform its sales function," thereby harming Vroom's business, as of June 2020 or September 2020.  (Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 24)

The Amended Complaint alleges that the Company received at least some "[c]omplaints . . . about [its] business practices, marketing and advertising campaigns, vehicle quality, customer service, delivery experience . . . on consumer platforms such as the Better Business Bureau" by June and September 2020.  (Id.)  But the challenged risk disclosure

describes the harm associated with consumer complaints as their tendency to "diminish consumer confidence in [Vroom's] platform and adversely affect [its] brand." (Id.) And the Amended Complaint does not contend that the BBB complaints tarnished Vroom's reputation with consumers such that the Company experienced decreased demand which ultimately damaged the Company's financial prospects. The Amended Complaint instead alleges that the 2020 BBB consumer complaints – culminating in the revocation of Vroom's BBB accreditation – are evidence of a "logistical bottleneck" in the Company's sales and customer service function that was not adequately disclosed to the market prior to November 2020 and March 2021. For the reasons discussed above, however, the Amended Complaint does not contain facts plausibly demonstrating that the alleged "logistical bottleneck" existed earlier than that condition was disclosed to the market. Accordingly, the Amended Complaint does not adequately allege that the 2020 BBB consumer complaints had "diminish[ed] consumer confidence in [Vroom's] platform and adversely affect[ed] [Vroom's] brand" at the time of the Company's disclosures in June and September 2020. (Id.)

The Court concludes that Plaintiffs have not pled facts demonstrating that the cited risk disclosures are false or misleading.

## 2. **Opinion**

### a. **Applicable Law**

Statements of opinion "include subjective statements that reflect judgments as to values that [are] not objectively determinable." In re Gen. Elec. Co. Sec. Litig., 856 F.Supp.2d 645, 653 (S.D.N.Y. 2012). For example, "[s]tatements that 'express expectations about the future rather than presently existing, objective facts' are . . . statements of opinion." In re Aratana Therapeutics Inc. Sec. Litis., No. 17 CIV. 880 (PAE), 2018 WL 2943743, at *15 (S.D.N.Y. June 11, 2018) (quoting Fialkov v. Alcobra Ltd., No. 14 CIV. 09906 (GBD), 2016

WL 1276455, at *6 (S.D.N.Y. Mar. 30, 2016)). "Such statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." Id. (citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1332 (2015)).

To adequately allege that a statement of opinion was misleading because of the omission of material information,

> [t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (quoting Omnicare, 135 S. Ct. at 1332).

The Supreme Court has made clear, however, that establishing liability on such a theory "'is no small task.'" Id. (quoting Omnicare, 135 S. Ct. at 1332). "'[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts'"; therefore, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" Id. at 210 (quoting Omnicare, 135 S. Ct. at 1329). Moreover, "'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" Id. (quoting Omnicare, 135 S. Ct. at 1330). "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id. (quoting Omnicare, 135 S. Ct. at 1329).

### b. **Analysis**

The Amended Complaint challenges the following statement in the Company's June 2020 IPO prospectus and September 2020 offering prospectus:

- "On April 20, 2020, we began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that we believe will convert at target margins." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 11; Am. Cmplt. (Dkt. No. 60) ¶ 114; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 9, 60; Am. Cmplt. (Dkt. No. 60) ¶ 196)

As an initial matter, Plaintiffs have not pled facts demonstrating that the portion of the statement that refers to historical fact – "[o]n April 20, 2020, we began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models" – is false or misleading. Indeed, the Amended Complaint pleads no facts contradicting the Company's narrative that it began re-acquiring vehicle inventory in April 2020.

The final clause in the statement – beginning with the words "we believe" – constitutes an opinion, because it "express[es] expectations about the future." In re Aratana Therapeutics, 2018 WL 2943743, at *15. And the Amended Complaint alleges no facts suggesting that Defendants did not subjectively believe that the newly acquired inventory would "convert at target margins." Nor do the Amended Complaint's allegations regarding the BBB complaints establish that – as of June or September 2020 – it was misleading to state that the Company's vehicle inventory would "convert at target margins."

The Amended Complaint also challenges two statements by Hennessy in his June 2020 interview with The Street and in the Company's August 12, 2020 Form 8-K:

- "We are thrilled to have the furlough just about in our rearview window. And now we're back to work and scaling the business." (June 11, 2020 The Street Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-4) at 6-7; Am. Cmplt. (Dkt. No. 60) ¶ 121)

- "I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment." (Aug. 12, 2020 Form 8-K, Hammel Decl., Ex. 6 (Dkt. No. 94-6) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 123)

Hennessy's assertions that he is "thrilled," "pleased" or "encouraged" turn on his subjective reaction to the events he discusses. They therefore constitute opinions. And the Amended Complaint pleads no facts suggesting that Hennessy was not in fact "pleased" or "encouraged," or that it was factually incorrect to say that Vroom "ha[d] the furlough just about in [its] rearview window" in June 2020, or that the Company had "performed substantially ahead of [its] growth plan" at the time of the August 2020 announcement. The BBB consumer complaints once again have no bearing on whether Vroom "performed substantially ahead of [its] growth plan," such that this performance "validat[ed] the Vroom model."

The Amended Complaint also challenges the following statements by Hennessy during the August 12, 2020 earnings call:

- "So we believe that we're almost out of this capacity constraint issue in this quarter." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 8-9; Am. Cmplt. (Dkt. No. 60) ¶ 124)

- "I think we're not currently experiencing any significant capacity constraints in any of [the vehicle-reconditioning centers]." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 10; Am. Cmplt. (Dkt. No. 60) ¶ 124)

These statements – prefaced by "we believe" or "I think" – likewise constitute opinion. As to the first statement, Hennessy's reference to being "almost out of this capacity constraint issue" was in response to an analyst's question about Vroom's "constraints around acquiring [vehicle] inventory." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 8-9) In responding to the analyst's question, Hennessy alludes to Vroom's renewed efforts to acquire vehicle inventory in mid-2020, after significantly reducing its inventory early in the COVID-19 pandemic. The Amended Complaint pleads no facts suggesting that Hennessy did not believe – as of August 12, 2020 – that the capacity constraints regarding vehicle inventory were ending at Vroom. And, as discussed above, the Amended Complaint does not

plead facts plausibly contradicting the Company's publicly disclosed timeline as to when the "capacity constraint" in vehicle inventory from early in the COVID-19 pandemic ended, and when the "logistical bottleneck" related to insufficient sales and customer service personnel began.

As to the second opinion statement – "I think we're not currently experiencing any significant capacity constraints in any of [the vehicle-reconditioning centers] – Hennessy made this remark in response to an analyst's question about whether the vehicle-reconditioning centers constituted a "bottleneck." (Id. at 10) The Amended Complaint alleges that Vroom – as part of its "asset light" strategy – "outsourced portions of . . . [its] reconditioning facilities, which performed reconditioning of vehicles in Vroom's inventory to prepare the[] [cars] for sale." (Am. Cmplt. (Dkt. No. 60) ¶ 45) The Amended Complaint pleads no facts suggesting that the Company's disclosures regarding vehicle reconditioning centers were materially false or misleading, or that Hennessy actually believed that there were capacity issues at the vehicle-reconditioning centers.

The Amended Complaint also challenges the following statements made by Hennessy during the Company's November 11, 2020 earnings call:

- "Right now, we are investing in our sales, sales support, sales experience, sales ops to help facilitate those sales. And that's really the last bit of investment around this constraint, if you will, that we're putting forward, and we think that, that does open up continued growth." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 7; Am. Cmplt. (Dkt. No. 60) ¶ 132)

- "And as the DMV closures have now reopened, we're working through the backlogs of things, like titles. Again, very, very focused on getting the customer experience right, whether it's a delivery issue or whether it's a paperwork issue, and those investments are underway now. And we, obviously, take that very seriously and believe we're going to have that rectified in Q4." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 8; Am. Cmplt. (Dkt. No. 60) ¶ 132)

As this Court stated earlier, those portions of the November 11, 2020 earnings call that constitute statements of present fact – i.e., "[r]ight now, we are investing in our sales, sales support, sales experience, sales ops to help facilitate those sales"; "as the DMV closures have now reopened, we're working through the backlogs of things, like titles" – are not false or misleading. The Amended Complaint pleads no facts suggesting that these statements are false.

As to the opinion statements – i.e., "we think that . . . does open up continued growth" and "we . . . believe we're going to have that rectified in Q4" – the Amended Complaint pleads no facts suggesting that Hennessy subjectively disbelieved in November 2020 that the Company's investments in "sales, sales support, sales experience, sales" would facilitate the Company's growth, or that Vroom would not "rectify" the "backlog of things, like titles" in the fourth quarter of 2020. Nor do the BBB complaints demonstrate that the Company was not in fact (1) investing in sales staff as of November 11, 2020, (2) "working through the backlogs of things, like titles," or (3) intending that customer service issues would be "rectified" in the fourth quarter of 2020.

In sum, none of the opinion statements cited above are false or misleading.

### 3.    Puffery

#### a.    Applicable Law

Puffery encompasses "statements [that] are too general to cause a reasonable investor to rely upon them," ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009), and thus "cannot have misled a reasonable investor." San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996). They are statements that "lack the sort of definite positive projections that might require later correction." Id. (quoting In re Time Warner, 9 F.3d at 259, 267 (2d Cir. 1993)). It is well-settled that

> "expressions of puffery and corporate optimism do not give rise to securities
> violations.  Up to a point, companies must be permitted to operate with a hopeful
> outlook:  People in charge of an enterprise are not required to take a gloomy,
> fearful or defeatist view of the future; subject to what current data indicates, they
> can be expected to be confident about their stewardship and the prospects of the
> business that they manage."

Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) (quoting

Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004)).

"On the other hand, pollyannaish statements couched as rosy corporate-speak may

be actionable if they contradict facts known to a defendant," id., "if they are worded as

guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or

reasonably believe them."  IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.

Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015) (internal quotation marks

and citations omitted).  Although there is no definitive test to determine how vague a statement

must be to qualify as puffery, "statements expressing a general view that 'things are going well,'

that the company is 'well positioned,' or that a year was 'successful' are generally not

actionable."  In re Nevsun Res. Ltd., No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *10

(S.D.N.Y. Sept. 27, 2013).

      **b.**    **Analysis**

      **i.**    **Statements Concerning Vroom's "Exceptional"**
                  **Customer Support and Ecommerce Platform**

The Amended Complaint challenges repeated statements in Vroom's SEC filings

during the Class Period that the Company offers "exceptional" customer support:

- "[e]xceptional customer support," "exceptional customer experience," and
  "exceptional ecommerce experience."  (June 8, 2020 IPO Prospectus,
  Hammel Decl., Ex. 2 (Dkt. No. 94-2) at passim; Am. Cmplt. (Dkt. No. 60)
  ¶ 113; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-
  9) at passim; Am. Cmplt. (Dkt. No. 60) ¶ 195)

- "We offer an exceptional ecommerce experience for our customers."
  (Aug. 13, 2020 Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 4;
  Am. Cmplt. (Dkt. No. 60) ¶ 125; see Nov. 12, 2020 Form 10-Q, Hammel
  Decl., Ex. 11 (Dkt. No. 94-11) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 133)

The term "exceptional" – as used in the SEC filings to describe the Company's customer support and customer ecommerce "experience" – is too vague and too aspirational to give a reasonable investor meaningful information upon which to rely.  See In re Xinhua Fin. Media, Ltd. Sec. Litig., No. 07 CIV. 3994 LTS/AJP, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (statement that management team was "strong," "experienced" and "capable" was puffery); Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc., No. 1:12-CV-00993, 2015 WL 3833849, at *30 (M.D. Pa. June 22, 2015) (statement that management team was "deep and experienced," "strong," and had a "proven track record" was puffery).

Plaintiffs argue, however, that "Defendants' repeated representations of Vroom's exceptional Customer Experience cannot be deemed puffery," because "[a] reasonable investor would believe from these representations that this lynchpin of Vroom's business model" – i.e., the Company's customer experience team – "was functioning well and constituted a competitive advantage."  (Pltf. Opp. (Dkt. No. 97) at 23); see also In re Signet Jewelers Ltd. Sec. Litig., No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018) ("While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." (citation and quotation marks omitted)); Arkansas Teacher Ret. Sys. v. Bankrate, Inc., 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless. . . .").

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." In Petrobras Sec. Litig., 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015). Here, while a handful of references to Vroom's "exceptional customer support" in the Company's SEC filings relate to the Company's Customer Experience Team (see, e.g., June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 66 ("Exceptional Customer Support. Our professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed. In all of our customer interactions, our goal is to ensure that every customer is a delighted customer.")), the vast majority of references to Vroom's "exceptional customer support" are not associated with any particular area of Vroom's business. (See, e.g., id. at 5 (listing "[e]xceptional customer support" as one in a list of bullet points describing Vroom's overall business); Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 7, 68, 73 (listing "[e]xceptional customer support" as a reason to choose Vroom over competitors); Aug. 13, 2020 Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 4 (describing the "exceptional customer experience" under an overview of the company); Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) (same)) Read in context, these assertions regarding "exceptional customer service" are simply generic, positive descriptions about Vroom's business and its alleged approach to customer service. And Plaintiffs have alleged no facts suggesting that Vroom repeated its claims of "exceptional customer service" as part of "an effort to reassure the investing public" about the performance of Vroom's Customer Experience Team. See In re Signet, 2018 WL 6167889, at *11.

The Court concludes that Vroom's statements regarding its allegedly "exceptional" customer support, customer experience, and ecommerce platform are too general

to cause a reasonable investor to rely upon them.  The statements are therefore non-actionable puffery.

The result is the same even if the cited statements are analyzed as opinions.  The Amended Complaint does not allege any facts suggesting that Defendants did not believe that Vroom's customer support and ecommerce platform were "exceptional."  Nor do the statements contain any false or misleading supporting facts.  Indeed, the Amended Complaint alleges no facts whatsoever regarding the quality of Vroom's ecommerce platform – i.e., the website and mobile platform consumers use to "research and select from . . . vehicles."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 54)

As with other statements cited by Plaintiffs, the 2020 BBB consumer complaints and Vroom's loss of its BBB accreditation in September 2020 are not sufficient to convert these statements of puffery and opinion into actionable falsehoods.  As stated above, the BBB consumer complaints are not sufficient to plausibly allege that Vroom suffered from a "logistical bottleneck" or a "lack of adequate sales and support staff" that inhibited sales conversion and revenue growth, and that these circumstances existed at a time earlier than that disclosed to the market.  (Am. Cmplt. (Dkt. No. 60) ¶ 85)  Opinion statements regarding Vroom's "exceptional customer support" or "exceptional ecommerce experience" cannot be misleading due to a failure to disclose problems with Vroom's customer experience team that are not plausibly alleged to have existed at the relevant time in the first place.

The Court acknowledges that the BBB complaints suggest that some consumers had problems with Vroom's customer service in mid-2020.  As discussed above, however, "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  Omnicare, 575 U.S. at 189.  "Reasonable investors understand

that opinions sometimes rest on a weighing of competing facts." Id. at 189-90.  Here, the fact

that some unknown number of "disgruntled customer[s]" complained to the BBB about aspects

of Vroom's customer service "makes it no different from most companies, for whom some level

of customer discontent is a fact of life." In re IAC/InterActiveCorp Sec. Litig., 695 F. Supp. 2d

109, 120 (S.D.N.Y. 2010).  And the mere existence of some unknown number of BBB

complaints regarding Vroom's customer service – which the Company allegedly failed to

"[a]ddress . . . quickly and in good faith" (Am. Cmplt. (Dkt. No. 60) ¶ 84 (alteration in original))

– is not sufficient to render misleading various opinion statements about the Company's

"exceptional" customer support.

The Court concludes that none of Defendants' statements regarding Vroom's

"exceptional" customer experience, customer support, or ecommerce platform are actionably

false or misleading.

### ii.    Statements About Vroom's Business Model and "Commitment" to Customers

The Amended Complaint challenges several statements related to Vroom's

business model and its overall "commitment" to serving customers:

- "We take a vertically integrated, asset-light approach that is reinventing all phases of the vehicle buying and selling process, from discovery to delivery and everything in between."  (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 3, 54, 63; Am. Cmplt. (Dkt. No. 60) ¶ 115; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 3, 57, 66; Am. Cmplt. (Dkt. No. 60) ¶ 197)

- "We deploy an asset-light strategy that optimizes a combination of ownership and operation of assets by us with strategic third-party partnerships."  (Aug. 13, 2020 Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 125; see Nov. 12, 2020 Form 10-Q, Hammel Decl., Ex. 11 (Dkt. No. 94-11) at 6; Am. Cmplt. (Dkt. No. 60) ¶ 133)

- "Our platform brings together all phases of the vehicle buying and selling process in a seamless, intuitive and convenient way.  We create a climate

of trust and provide an exceptional experience with complete transparency by eliminating friction and sales pressure." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 65; Am. Cmplt. (Dkt. No. 60) ¶ 114; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 7, 68; Am. Cmplt. (Dkt. No. 60) ¶ 196)

Assertions that Vroom is "reinventing all phases of the vehicle buying and selling process", "optimiz[ing] a combination of ownership and operation of assets by us with strategic third-party partnerships"; employing a "seamless, intuitive and convenient" buying process; establishing a "climate of trust"; and offering "complete transparency" are too vague and general to convey specific, verifiable claims about the state of Vroom's business.

The Amended Complaint also challenges statements regarding Vroom's "commitment" to serving its customers:

- "We are deeply committed to creating an exceptional experience for our customers." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 3, 54, 63; Am. Cmplt. (Dkt. No. 60) ¶ 113; see Aug. 13, 2020 Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 125; Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 3, 57, 66; Am. Cmplt. (Dkt. No. 60) ¶ 195; Nov. 12, 2020 Form 10-Q, Hammel Decl., Ex. 11 (Dkt. No. 94-11) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 133)

- "In all of our customer interactions, our goal is to ensure that every customer is a delighted customer." (June 8, 2020 IPO Prospectus, Hammel Decl., Ex. 2 (Dkt. No. 94-2) at 66; Am. Cmplt. (Dkt. No. 60) ¶ 113; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 68; Am. Cmplt. (Dkt. No. 60) ¶ 195)

Statements of this sort are aspirational claims that are likewise too vague to convey any verifiable information about the nature of Vroom's business. See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' . . . . This is particularly true where . . . the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'").

In sum, these statements are "too general to cause a reasonable investor to rely upon them." ECA v. JP Morgan Chase, 553 F.3d 187, 206 (2d Cir. 2009).

### iii.    Defendant Hennessy's Interview and Earnings Call Statements

The Amended Complaint also challenges certain optimistic statements made by Defendant Hennessy in his June 2020 interview with The Street, in Vroom's August 2020 Form 8-K, and in the November 11, 2020 earnings call:

- "[W]e really [see] the market's coming our way." (June 10, 2020 The Street Interview Tr., Hammel Decl., Ex. 3 (Dkt. No. 94-3) at 5; Am. Cmplt (Dkt. No. 60) ¶ 120)

- "[W]ith the growth that we've had and now the continued tailwinds that we're seeing in our business, all I can say is that Vroom is in an excellent position to kind of enter not only the public markets, but continue to serve our customers well in an unstable macro-environment" (June 11, 2020 The Street Interview Tr., Hammel Decl., Ex. 4 (Dkt. No. 94-3) at 4; Am. Cmplt (Dkt. No. 60) ¶ 121)

- "We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce." (Aug. 12, 2020 Form 8-K, Hammel Decl., Ex. 6 (Dkt. No. 94-6) at 4; Am. Cmplt. (Dkt. No. 60) ¶ 123)

- "As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that [Vroom CFO] Dave [Jones] talked about in terms of e-commerce growth on a year-over-year basis. It's just – it's strong. So we're feeling really good." (Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 6; Am. Cmplt. (Dkt. No. 60) ¶ 132)

Assertions that the market is "coming our way"; that Vroom is in an "excellent position" to enter public markets; that the Company is "well positioned" to navigate the COVID-19 pandemic; and that Hennessy "stand[s] by," regards as "strong," and "feel[s] great" about the Company's financial performance constitute the kind of statements that "lack the sort of definite

positive projections that might require later correction," and thus "cannot have misled a reasonable investor." San Leandro, 75 F.3d at 811; see Billhofer v. Flamel Techs., S.A., No. 07 CIV. 9920 (RWS), 2012 WL 3079186, at *9 (S.D.N.Y. July 20, 2012) ("The phrase 'moving forward well' conveys no meaningful, objective data that an investor would rely upon. It is simply an assertion that courts have found to be immaterial."); In re GPC Biotech AG Sec. Litig., No. 07–06728 (DC), 2009 WL 5125130, at *4-5 (S.D.N.Y. Dec. 29, 2009) (statement that clinical "trial was going well" was immaterial puffery); Pollio v. MF Global, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statement that "the franchise is performing well" was optimistic puffery).

The Court concludes that none of the statements quoted above is actionable.

### 4.    Forward-Looking Statements

#### a.    Applicable Law

##### i.    Forward-Looking Statements

"The PSLRA established a statutory safe-harbor for forward-looking statements." Slayton v. Am. Exp. Co., 604 F.3d 758, 765 (2d Cir. 2010). Under the PSLRA, where a

> private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a [defendant] shall not be liable with respect to any forward-looking statement . . . if and to the extent that –
>
> (A) the forward-looking statement is –
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> >
> > (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement –
>
> > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was –

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

Under the PSLRA's safe harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (quoting Slayton, 604 F.3d at 766) (alterations in original). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." Id. (quoting Slayton, 604 F.3d at 766).

The PSLRA defines "[t]he term 'forward-looking statements'" broadly to include, inter alia, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items"; "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management."  15 U.S.C. §§ 78u-5(i)(1)(A), (B), (C).  "Forward-looking statements" also include "any statement of the assumptions underlying or relating to any statement described" in the definition.  15 U.S.C. § 78u-5(i)(1)(D).  A "statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-

forward-looking elements." Vivendi, 838 F.3d at 246 (internal quotation marks and citations omitted).

### ii.    **Mixed Statements**

"Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." Maverick Fund, L.D.C. v. Comverse Tech., Inc., 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011) (citing, inter alia, Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.")); see also Vivendi, 838 F.3d at 246. "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." Maverick Fund, 801 F. Supp. 2d at 59 (citing Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255-56 (3d Cir. 2009) (holding that a company's statement that it was "on track" to meet a future projection did "not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor"). This is because "'[s]uch an assertion is necessarily implicit in every future projection.'" Id. (quoting Avaya, 564 F.3d at 255); see also Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'") (quoting Avaya, 564 F.3d at 255).

### iii.    <u>Meaningful Cautionary Language</u>

"The safe harbor protects forward-looking statements that are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" <u>Slayton</u>, 604 F.3d at 770 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "'To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.'" <u>In re Vivendi</u>, 838 F.3d at 247 (quoting <u>Slayton</u>, 604 F.3d at 772). Moreover, "[t]he cautionary language must be 'extensive and specific' and 'tailored to the specific future projections, estimates, or opinions' in the statements that plaintiffs challenge." <u>Bettis v. Aixtron SE</u>, No. 16 CIV. 00025 (CM), 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016) (quoting <u>Slayton</u>, 604 F.3d at 772). "'Vague' disclaimers are inadequate." <u>Vivendi</u>, 838 F.3d at 247 (quoting <u>Slayton</u>, 604 F.3d at 772).

At the same time, "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." <u>Slayton</u>, 604 F.3d at 773. To be meaningful, cautionary language need only "identif[y] with specificity the types of risks that might lead [ ] estimates to be inaccurate." <u>In re Barrick Gold Sec. Litig.</u>, No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015); <u>see also</u> <u>In re IAC/InterActiveCorp Sec. Litig.</u>, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) ("[A] projection may benefit from the PSLRA safe harbor for forward-looking statements so long as defendants also 'point[ed] to the principal contingencies that could cause actual results to depart from the projection.'") (quoting <u>Asher v. Baxter Int'l Inc.</u>, 377 F.3d 727, 734 (7th Cir. 2004)).

Where, as here, Defendants' earnings calls refer to SEC filings containing cautionary statements,[8] the statements in the earnings calls may qualify for protection under the safe harbor based on the contents of the corporate filings.  See In re Avon Prods., Inc. Sec. Litig., No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at *18 (S.D.N.Y. Feb. 23, 2009) ("[O]ral statements . . . will come within the safe harbor provision if cautionary language is found in a 'readily available written document,' 15 U.S.C. § 78u–5(c)(2), [such as] 'SEC filed documents, annual reports and other widely disseminated materials, such as press releases,' H.R. Rep. 104–369, at 45 (1995) (Conf. Rep.)."); Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232-33 (S.D.N.Y. 2009) (holding that forward-looking statements made during conference calls with analysts were protected under the first prong of the safe harbor because, during these calls, a corporate representative referred investors to meaningful cautionary language included in a press release).

### b.    **Analysis**

#### i.    **Forward-Looking Statements**

The Amended Complaint challenges two September 2020 forward-looking statements related to the Company's financial guidance and operational strategy:

- "[W]e are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows:
    - Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).
    - [Texas Direct Auto] unit sales of 1,400 – 1,600 (unchanged), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,700 – $1,800 (from $1,000 – $1,100).

---

[8]  During each of the earnings calls at issue here, Vroom referred investors to the risk factors set forth in its SEC filings.  (See Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 4; Nov. 11, 2020 Earnings Call Tr., Hammel Decl., Ex. 10 (Dkt. No. 94-10) at 3)

> • Wholesale unit sales of 4,500 – 5,000 (from 3,500 – 4,500), average total revenue per unit of $10,000 (unchanged) and average gross profit per unit of $500 – $600 (from $100 – $200)
> • Total revenue of $290 million – $310 million (from $268 million – $290 million).
> • Total gross profit of $21 million – $23 million (from $16 million – $18 million).
> • Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).”
> (Sept. 8, 2020 Form 8-K, Hammel Decl., Ex. 8 (Dkt. No. 94-8) at 5; Am. Cmplt. (Dkt. No. 60) ¶ 128)

- “We intend to continue to build our inventory levels strategically.” (Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 11; Am. Cmplt. (Dkt. No. 60) ¶ 196)

The first statement constitutes a forward-looking statement in that it contains a “projection of revenues, income . . . , earnings . . . [and] other financial items,” 15 U.S.C. § 78u-5(i)(1)(A). The second statement contains “a statement of the plans and objectives of management for future operations” involving the acquisition of vehicle inventory. Id. § 78u-5(i)(1)(B).

The Amended Complaint also challenges two statements made by Hennessy and Defendant David Jones during the Company’s August 12, 2020 earnings call:

- “We’re confident that we can -- currently have the capacity to meet our Q3 targets, and we believe our utilization will continue to increase, and we work with our reconditioning partners to continue expanding our reconditioning network.” (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 6; Am. Cmplt. (Dkt. No. 60) ¶ 124)

- “But we’ve got capacity, as [Vroom CFO] Dave [Jones] articulated, lined up not only in Q3 to match our guidance, but now -- and then I’d call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan.” (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 8-9; Am. Cmplt. (Dkt. No. 60) ¶ 124)

In the first statement, Defendant Jones refers to the “capacity” of Vroom’s “[vehicle] reconditioning facilities around the country,” which he states are “currently operating at less than 100% capacity,” given that many are “newly opened facilities that are still ramping

up." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 6)  To the extent that Jones makes assertions about the present capabilities of Vroom's reconditioning facilities, those statements are not "too vague to be actionable apart from [Vroom's] future projection[s]" for the third quarter of 2020.  Maverick Fund, 801 F. Supp. 2d at 59.  But the Amended Complaint does not plead facts demonstrating that Jones' statements regarding Vroom's vehicle reconditioning facilities are false or misleading.

As to the second statement, Hennessy refers to Vroom's "capacity" of vehicle inventory, stating that "we've almost returned to the inventory levels that we were in pre-COVID." (Aug. 12, 2020 Earnings Call Tr., Hammel Decl., Ex. 5 (Dkt. No. 94-5) at 8)  As with the first statement, Hennessy's assertion about the Company's present level of vehicle inventory is not too vague to be actionable apart from the reference to the Company's third quarter guidance.  As discussed above, however, the Amended Complaint does not plausibly allege that any of Defendants' statements during the Class Period regarding its present levels of vehicle inventory are actionably false or misleading.

The remaining portions of the above statements refer to the "plans and objectives of management for future operations" with respect to the Company's vehicle reconditioning facilities and acquisition of automobile inventory, and thus constitute forward-looking statements.  15 U.S.C. § 78u-5(i)(1)(B).

### ii.    Cautionary Language

Each of the forward-looking statements discussed above was accompanied by a formidable array of cautionary language in Vroom's contemporaneous SEC filings.

Several of the disclosed risks relate directly to Vroom's ability to "maintain[] the quality of [it] customer experience" in light of the Company's growth and its reliance on third-party providers:

- "Our recent, rapid growth has placed and may continue to place significant demands on our management and our operational and financial resources. We have experienced significant growth in the number of customers on our platform as well as the amount of data that we analyze. We have hired and expect to continue hiring additional personnel to support our rapid growth. Our organizational structure is becoming more complex as we add staff, and we will need to continue to improve our operational, financial and management controls as well as our reporting systems and procedures. This will require significant capital expenditures and the allocation of valuable management resources to grow and adapt in these areas without undermining our corporate culture of teamwork. If we cannot manage our growth effectively to maintain the quality and efficiency of our customers' experience and/or the quality of the vehicles we sell, our business, financial condition and results of operations could be materially and adversely affected." (Aug. 12, 2020 Vroom Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 13; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 20)

- "Our high rate of growth makes maintaining the quality of our customer experience more difficult." (Aug. 12, 2020 Vroom Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 16; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 24)

- "Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center. . . . If the third party's systems and operations fail or if the third party is otherwise unable to perform its sales function, we would be limited in our ability to complete customer transactions, which would make it more difficult to sell vehicles and value-added products through our platform. In addition, if such third party is unable to perform to our standards or to provide the level of service required or expected by our customers . . . our business, financial condition and results of operations may be harmed." (Aug. 12, 2020 Vroom Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 13; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 20-21)

- "In addition to the COVID-19 disruptions adversely impacting our business and financial results, they may also have the effect of heightening many of the other risks described in 'Risk Factors,' including risks relating to changes in consumer demand; our limited operating history; our ability to generate sufficient revenue to generate positive cash flow; the operation of, and concentration of our revenues and gross profit from [Texas Direct Auto]; our relationships with third party customer experience teams; the operation of our [vehicle-reconditioning centers] by us and our third party service providers; the current geographic concentration of reconditioning services and store inventory; our level of indebtedness; our agreement with a single lender to finance our vehicle inventory purchases and the

expiration of such agreement; our access to desirable vehicle inventory; regulatory restrictions; and the shift by traditional dealers to online sales and deliveries." (Aug. 12, 2020 Vroom Form 10-Q, Hammel Decl., Ex. 7 (Dkt. No. 94-7) at 11; see Sept. 10, 2020 Prospectus, Hammel Decl., Ex. 9 (Dkt. No. 94-9) at 17)

In sum, Vroom's cautionary language warns that "the quality of [the Vroom] customer experience" may suffer if the Company is unable to "manage [its] growth effectively" or if third parties – such as Rock Connections – are "unable to perform to our standards or to provide the level of service required or expected by [Vroom] customers." Because these cautionary statements "did more than refer to the most general of economic risks," and "pointed to the principal contingencies that could cause actual results to depart from the projection[s]," they "effectively secure[ ] the protection of [the] safe harbor for [Defendants'] forward-looking statements." Gissin, 739 F. Supp. 2d at 509, 511 (internal quotation marks and citations omitted)

Even if Defendants' cautionary statements were not "meaningful," the forward-looking statements would be protected under the actual knowledge prong of the PSLRA's safe harbor, for reasons that are discussed below.

*    *    *    *

The Court concludes that none of the more than 50 alleged misstatements set forth in the Amended Complaint is actionably false or misleading. As discussed below, even if the alleged misstatements were actionably false or misleading, Plaintiffs' Section 10(b) claims would still fail, because Plaintiffs have not adequately pled scienter.

C.    **Scienter**

In connection with the Amended Complaint's Section 10(b) claims, Plaintiffs contend that Defendants Hennessy and Jones acted with scienter. (Am. Cmplt. (Dkt. No. 60) ¶¶ 140-52) Defendants contend that the Amended Complaint does not adequately plead scienter as to either Defendant. (Def. Br. (Dkt. No. 93) at 24-29)

1.    **Applicable Law**

The PSLRA requires that a plaintiff seeking to plead scienter "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); Slayton, 604 F.3d at 766. "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324). "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation"; instead, "the facts alleged must be 'taken collectively.'" Id. (quoting Tellabs, 551 U.S. at 322-23).

"The plaintiff may satisfy [this pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." ECA v. JP Morgan Chase, 553 F.3d 187, 198-99 (2d Cir. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

"Motive to commit fraud entails 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Cannavest, 307 F. Supp. 3d at 244 (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). In alleging motive, "[a] plaintiff may not rely on 'motives possessed by virtually all corporate insiders,' . . . [and] instead must allege 'that defendants benefitted in some concrete and personal way from the purported fraud.'" Id. (quoting Novak, 216 F.3d at 307-08). Generic motives, such as "'the desire for the

corporation to appear profitable,' as well as 'the desire to keep stock prices high to increase

officer compensation,' are 'insufficient[.]'" Id. (quoting Kalnit, 264 F.3d at 139)

> To adequately plead "conscious misbehavior or recklessness," Plaintiffs must

allege conduct that is, "at the least[,] . . . highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to

the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at

142 (internal quotation marks and citation omitted). "Although this is a highly fact-based

inquiry, . . . '[s]ecurities fraud claims typically have sufficed to state a claim based on

recklessness when they have specifically alleged defendants' knowledge of facts or access to

information contradicting their public statements.'" Id. (quoting Novak, 216 F.3d at 308).

### 2. Analysis

#### a. Motive and Opportunity

> The Amended Complaint alleges that Defendant Jones had a "personal, monetary

interest in maintaining the fraudulent conduct" because he "sold 100,000 of his personally held

Vroom shares . . . for proceeds of over $4.4 million in a series of transactions from December 7,

2020 through February 10, 2021," only three weeks before Vroom's March 3, 2021 final

corrective disclosure. (Am. Cmplt. (Dkt. No. 60) ¶ 151) Jones "sold these shares pursuant to a

Rule 10b5-1 trading plan . . . [that] was enacted by Jones on September 14, 2020, nearly three

months before Vroom's lock-up period ended on December 7, 2020." (Id. ¶ 152) The Amended

Complaint does not allege that Defendant Hennessy sold any Vroom shares during the Class

Period.

> "The mere fact that insider stock sales occurred does not suffice to establish

scienter," because a plaintiff "must establish that the sales were 'unusual' or 'suspicious.'" In re

Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (citation and

quotation marks omitted).  In determining whether stock sales are unusual or suspicious, courts

consider

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold;
> (3) the change in volume of [the] insider defendant's sales; (4) the number of insider
> defendants selling; (5) whether sales occurred soon after statements defendants are
> alleged to have known were misleading; (6) whether sales occurred shortly before
> corrective disclosures or materialization of the alleged risk; and (7) whether sales were
> made pursuant to trading plans such as Rule 10b5-1 plans.

Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750, 772-73 (S.D.N.Y. 2019) (citation and quotation

marks omitted).

Here, Jones sold 100,000 shares between December 7, 2020 and February 10,

2021 – during the Class Period – and retained 90,000 Vroom shares through March 31, 2024,

after the end of the Class Period.  (Apr. 29, 2021 Schedule 14A, Hammel Decl., Ex. 14 (Dkt. No.

94-14) at 3)  Jones' sale of Vroom stock during the Class Period amounted to just over 50% of

his Vroom holdings.  He received proceeds of $4.4 million.  (Am. Cmplt. (Dkt. No. 60) ¶ 151)

And while Jones sold these shares pursuant to a Rule 10b5-1 trading plan, where – as here –

"10b5–1 trading plans are entered into during the class period, they are not a cognizable defense

to scienter allegations on a motion to dismiss."  George v. China Auto. Sys., Inc., No. 11 CIV.

7533 KBF, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (internal quotations and citations

omitted).

Acknowledging that (1) Jones netted significant proceeds from his sale of Vroom

stock; and (2) his sales involved more than 50% of his holdings, the Amended Complaint does

not plead facts demonstrating that the timing of his trades is suspicious.  Indeed, as discussed

above, the Amended Complaint does not plead a single actionable misstatement during the Class

Period, whether by Jones, Hennessy, or the Company acting at their direction.  Accordingly,

Jones' decision to enter into a Rule 10b5-1 trading plan on September 14, 2020 – about a week

after the Company announced the September 2020 offering – did not precede or follow any actionable false statement.  Moreover, the Amended Complaint alleges that Hennessy made a partial corrective disclosure concerning Vroom's "bottleneck" in sales and support staff during a November 11, 2020 earnings call – a point in time before Jones's scheduled trades but after he had entered into the trading plan.  The alleged partial corrective disclosure caused Vroom's share price to "drop[] more than 13% from its close of $40.80 per share on November 11, 2020, to [a] close [of] $35.49 per share on November 12, 2020."  (Am. Cmplt. (Dkt. No. 60) ¶¶ 156, 159)  The timing of Hennessy's corrective disclosure undermines Plaintiffs' suggestion that there was an agreement among Vroom's officers to profit from the Company's artificially inflated share price.

And the fact that Hennessy is not alleged to have sold Vroom shares during the Class Period further undermines any inference of scienter from Jones' sales.  Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'" (quoting In re Cypress Semiconductor Sec. Litig., No. C-92-20048-RMW, 1992 WL 394927, at *2 (N.D. Cal. Sept. 23, 1992))); In re Gildan, 636 F. Supp. 2d at 271-72 ("Plaintiffs have alleged insider trading by only two Gildan insiders; the absence of any allegations of other insider trades before Gildan announced the impact of the issues . . . undercuts any finding of the requisite strong inference of scienter.").

For all of these reasons, the Amended Complaint does not adequately allege that Jones' stock sales are sufficiently suspicious or unusual to support a strong inference of scienter.

The Amended Complaint alleges, however, that Defendants Jones and Hennessy had a "powerful personal motive not to disclose the truth concerning the disastrous Customer Experience being provided to Vroom's customers by Rock Connections" – the third party responsible for Vroom's customer experience function – "since the founder and chairman of Rock Connections was Dan Gilbert." (Am. Cmplt. (Dkt. No. 60) ¶ 149). According to the Amended Complaint,

> Gilbert had been one of Vroom's most high-profile investors since 2015, and his Rock Connections firm had originally been retained to provide Vroom's Customer Experience in 2017. In fact, in Vroom's 2017 press release regarding its first contract with Rock Connections, Vroom noted that Gilbert had recently invested in Vroom's 2017 $76 million Series F round of funding which had raised Vroom's total equity funding at that time to $295 million since inception. Given the relationship between Vroom and Dan Gilbert, Defendants had a strong motive not to publicly disclose any of the Customer Experience issues that had developed through the provision of services under the 2020 Customer Experience Agreement. To do so would have likely put a significant strain on the relationship between Vroom and Gilbert and caused negative attention to be cast upon one of Vroom's most prominent early investors. Any public disclosure of problems with Vroom's Customer Experience would not only have had a negative financial impact on Vroom, but could also have had a negative financial impact on Rock Connections.

(Id. ¶¶ 149-50)

The alleged motive to avoid a "negative financial impact on Vroom" or a "negative financial impact on Rock Connections" is generic, however. Such a motive does not involve any "concrete and personal" benefit to either Hennessy or Jones. Novak, 216 F.3d at 307. This type of generic motive is indistinguishable from a generic desire "for the corporation to appear profitable" or "to keep stock prices high to increase officer compensation." Kalnit, 264 F.3d at 139.

The Court concludes that the Amended Complaint does not plead facts demonstrating that any Defendant had a motive to commit fraud. Accordingly – in order for

Plaintiffs to establish scienter through conscious misbehavior or recklessness – "the strength of [their] circumstantial allegations must be [ ] greater." Id. at 142.

> **b.    Conscious Misbehavior and Recklessness**

The Amended Complaint alleges that Hennessy and Jones "knew that any 'bottleneck' in Vroom's Customer Experience would essentially bring Vroom's business to a halt, that Vroom's increasing inventory had created just such a bottleneck, and that Vroom was losing sales and being forced to liquidate inventory at fire sale prices as a result." (Am. Cmplt. (Dkt. No. 60) ¶ 143)

The Amended Complaint does not, however, "cite any internal documents or confidential witness statements tending to suggest that defendants knowingly deceived shareholders." In re Aratana Therapeutics, 315 F. Supp. 3d at 765. Moreover, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

In attempting to plead conscious misbehavior and recklessness, the Amended Complaint relies heavily on Vroom's 2020 "Customer Experience Agreement" with Rock Connections, which

> allowed the Officer Defendants total control, access and visibility into the Customer Experience being provided to Vroom's customers. . . . [T]he 2020 Customer Experience Agreement, among other things, (a) mandated that Rock Connections provide all customer service in accordance with Vroom's policies and procedures; (b) required that Rock Connections "enter and save all required information" in extraordinarily granular detail in Vroom's CRM system, making it accessible to Vroom's senior executives and management; (c) allowed Vroom control over Rock Connections' staffing and training of staff; and (d) allowed Vroom, its senior executives, and management unfettered access to monitor the customer support being provided to potential Vroom customers, including but not limited to monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Vroom personnel to Rock Connections' facility, the provision of weekly reports to Vroom, and a

requirement for weekly meetings between representatives of Rock Connections
and Vroom.

(Id. ¶ 144)

Although the Amended Complaint alleges that Vroom's contract with Rock
Connection permitted Vroom's senior executives to obtain "access" to "granular information"
about the then-current state of Vroom's customer experience team (id. ¶ 145), Plaintiffs provide
no further details as to the content of this "granular information" – i.e., what data was provided,
and what information was set forth in the "weekly reports." Nor do Plaintiffs explain how the
"granular information" that was allegedly provided contradicts Defendants' public statements
during the Class Period. Mere "access" to information does not "provide 'strong circumstantial
evidence' of recklessness" where "the complaint fails to specify exactly what information was
contained in [the data to which a defendant had access] or how said information 'contradicted
Defendants' public statements[.]'" Maloney v. Ollie's Bargain Outlet Holdings, Inc., 518 F.
Supp. 3d 772, 781 (S.D.N.Y. 2021) (quoting In re Adient PLC Sec. Litig., No. 18-CV-9116,
2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020)); see In re DraftKings Inc. Sec. Litig., 650 F.
Supp. 3d 120, 177 (S.D.N.Y. 2023) ("[W]here plaintiffs contend defendants had access to
contrary facts, they must specifically identify the reports or statements containing this
information. . . ." (citation and quotation marks omitted)); In re Barrick Gold Corp. Sec. Litig.,
341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) ("[B]road allegations regarding expense and capital
cost data are insufficient, as plaintiffs do not identify what specific facts these data would have
contained that contradicts [defendant's] statement. . . .").

The Amended Complaint alleges that Hennessy and Jones "were aware of the
inadequacy of Vroom's Customer Experience team" because of

repeated efforts by the BBB to contact the Company to resolve issues on behalf of
customers who lodged complaints. In addition, in advance of the BBB's actual

> revocation of Vroom's accreditation, the BBB notified Vroom that its
> accreditation had been suspended and that it was undertaking proceedings to
> revoke its BBB accreditation. The BBB also provided the Company with the
> opportunity to appeal that decision. The BBB further duly notified Vroom that
> the BBB Board of Directors voted to revoke Vroom's accreditation on September
> 2, 2020

(Am. Cmplt. (Dkt. No. 60) ¶ 148) As discussed above, however, the Amended Complaint's

allegations regarding the BBB are not sufficient to demonstrate that Vroom suffered from a

"logistical bottleneck" or a "lack of adequate sales and support staff" impacting sales revenue at

a time earlier than was disclosed to the market. Accordingly, Defendants' alleged awareness of

the BBB's actions cannot alone establish a strong inference of scienter.

Finally, Plaintiffs argue that Vroom's customer experience team is a "core

component of Vroom's business," and thus Defendants' knowledge may be inferred pursuant to

the "core operations" doctrine. (Pltf. Opp. (Dkt. No. 97) at 25-26 (citing Hawaii Structural

Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc., 422 F. Supp. 3d 821, 852 (S.D.N.Y.

2019))) "Under the core operations theory, a court may infer 'that a company and its senior

executives have knowledge of information concerning the core operations of a business,' such as

'events affecting a significant source of income.'" In re Supercom, 2018 WL 4926442, at *31

(quoting In re Express Scripts Holding Co. Sec. Litig., No. 16 CIV. 3338 (ER), 2017 WL

3278930, at *18 (S.D.N.Y. Aug. 1, 2017)) However, while "the core operations inference may

be considered as part of a court's holistic assessment of the scienter allegations, . . . it is not

independently sufficient to raise a strong inference of scienter." Id. (quoting In re Rockwell

Med., Inc. Sec. Litig., No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30,

2018)). Here, the "core operations inference" is of no assistance to Plaintiffs, because the

Amended Complaint does not explain what specific information – apart from the BBB

complaints – Hennessy and Jones would have had access to that contradicted their public statements during the Class Period.

In sum, none of the individual scienter allegations gives rise to a strong inference of scienter.

### c.    Holistic Assessment

Having determined that none of Plaintiffs' scienter arguments – when considered individually – gives rise to a strong inference of scienter, this Court must go on to consider whether these allegations "give rise to a strong inference of scienter" when "taken collectively." Tellabs, 551 U.S. at 322-23.  As noted above, Plaintiffs' Section 10(b) claim "will survive [Defendants' motion to dismiss] . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

As discussed above, Plaintiffs have not pled facts demonstrating that Defendants had a motive to commit fraud, and Plaintiffs' allegations of conscious misbehavior and recklessness are correspondingly meager.  Even when Plaintiffs' allegations are viewed collectively, they have failed to demonstrate that the inference of scienter is more cogent and compelling than the non-culpable inference – namely, that Vroom did not disclose issues regarding a "logistical bottleneck" or "lack of adequate sales and support staff" during the Class Period because those issues simply did not exist in a materially harmful way at the time of the Company's public disclosures.

Because the inference that Defendants acted recklessly is less plausible than the non-culpable inference, Plaintiffs have not sufficiently alleged scienter with respect to Defendants' statements.  Tellabs, 551 U.S. at 324.

d.     **Forward-Looking Statements**

The scienter requirement for forward-looking statements – actual knowledge – is "stricter than for statements of current fact.  Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon of proof of knowing falsity."  Slayton, 604 F.3d at 773 (internal quotation marks and citation omitted).  Because Plaintiffs have not established scienter with respect to Defendants' non-forward-looking statements, they a fortiori have not demonstrated scienter with respect to the forward-looking projections.

D.     **Regulation S-K**

The Amended Complaint alleges that Defendants violated Items 303 and 105 of Regulation S-K by failing to disclose Vroom's "disastrous Customer Experience" during the Class Period.  (Am. Cmplt. (Dkt. No. 60) ¶ 176)

1.     **Applicable Law**

Item 303 of Regulation S-K requires that certain SEC-mandated filings "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  The SEC's 1989 Interpretive Release concerning Item 303 sets forth a two-part inquiry:

(1) Is the known trend [or uncertainty] . . . likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend [or uncertainty] . . . on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 103 (2d Cir. 2015) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989), 1989 WL 1092885, at *6 [hereinafter "1989 SEC Release"]).

   In sum, unless management "determine[s] that [the known trend or uncertainty] is not reasonably likely to occur," disclosure is required.  And according to the SEC, the disclosure threshold "is lower than 'more likely than not.'"  Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8056, Exchange Act Release No. 45321, FR-61, 2002 WL 77153 at *4 (Jan. 22, 2002) [hereinafter, "2002 SEC Release"].  Item 303 "requires[, however, that] the registrant[] [have] actual knowledge of the relevant trend or uncertainty."  Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016).

   Item 105 of SEC Regulation S-K requires issuers to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  "To state a claim under Item 105, an issuer must know, at the time of the [issuance], about an undisclosed risk factor that could seriously affect its present or future business."  Wandel v. Gao, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022).

   Because "[p]ure omissions are not actionable" under Section 10(b) and Rule 10b-5, "the failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim

only if the omission renders affirmative statements made misleading." <u>Macquarie Infrastructure Corp. v. Moab Partners, L. P.</u>, 601 U.S. 257, 258 (2024).[9]

### 2.   **Analysis**

The Amended Complaint contends that Vroom's "disastrous Customer Experience . . . . constituted a known risk or uncertainty under Item 303, and otherwise required disclosure under Item 105." (Am. Cmplt. (Dkt. No. 60) ¶ 176)  According to Plaintiffs, this is so because the "disastrous Customer Experience"

> materially threatened the operations of Vroom.  Vroom faced the prospect of having negatively impacted sales and margins going forward due to its inability to consummate sales transactions and its resulting need to make sales at fire sale prices to reduce excess inventory.  Accordingly, even if the management of Vroom could not reasonably estimate or quantify the manner in which Vroom's disastrous Customer Experience might impact the Company, disclosure was required.

(<u>Id.</u> ¶ 206)

As discussed above, however, the Amended Complaint does not plead facts demonstrating that internal problems with Vroom's customer experience function – such as a staffing "bottleneck" or a "lack of adequate sales and support staff" – threatened the Company's financial performance earlier than was disclosed to the market.  And for the reasons stated above, the BBB consumer complaints and Vroom's loss of its BBB accreditation do not plausibly demonstrate the existence of a "logistical bottleneck" earlier than was referenced in the Company's public statements.  (<u>Id.</u> ¶ 85)

The Court concludes – for the same reasons discussed in connection with Plaintiffs' failure to adequately plead scienter and false or misleading statements – that the

---

[9] <u>Macquarie</u> does not address Item 105, but Plaintiffs agree that <u>Macquarie</u> "would presumably be applicable to analyzing whether such claims are actionable." (Pltf. Apr. 29, 2024 Ltr. (Dkt. No. 105) at 3)  This Court agrees.

Amended Complaint does not adequately allege the omission of information required by Items 303 and 105.[10]

*    *    *    *

For all of the reasons discussed above, the Amended Complaint's Section 10(b) claim will be dismissed.

## III.    SECTION 11 AND 12(A)(2) CLAIMS

The Amended Complaint alleges that Defendants violated Sections 11 and 12(a)(2) of the Securities Act in connection with the September 2020 offering.  (Am. Cmplt. (Dkt. No. 60) ¶ 190)

Section 11(a) of the Securities Act provides that "registration statements" filed with the SEC shall not contain any "untrue statement of a material fact" or "omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  "To state a claim under section 11, the plaintiff must allege that:  (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

Section 12(a)(2) "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions."

---

[10]  Moreover, because Defendants' alleged omissions under Items 303 and 105 do not "render[] [their] affirmative statements . . . misleading," and instead constitute at most "pure omissions," they are not independently actionable under Rule 10b-5.  Macquarie, 601 U.S. at 265.

Id. at 359. "[T]he elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" Id. (quoting 15 U.S.C. § 77l(a)(2)).

While "plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation," they must allege the existence of an actionable false statement, misleading omission, or – in the case of Section 11 – an omission of "a material fact required to be stated" in a registration statement. Id.

For all of the reasons discussed above in connection with Plaintiffs' Section 10(b) claims under the Exchange Act, the Amended Complaint does not allege any actionable false statements or misleading omissions with respect to Vroom's September 2020 offering. Moreover, Plaintiffs have not alleged an actionable omission of items required to be disclosed under Items 303 and 105 of Regulation S-K.[11]

Accordingly, Plaintiffs' claims under Section 11 and Section 12(a)(2) of the Securities Action will be dismissed.[12]

---

[11] While Macquarie does not address a Section 11 claim, the Supreme Court acknowledged in that case that – in contrast to Section 10(b) of the Exchange Act – "Congress imposed liability for pure omissions in § 11(a) of the Securities Act of 1933." Macquarie, 601 U.S. at 264.

[12] The Court does not reach Defendants' argument that Plaintiffs have failed to plead standing for purposes of these claims. (See Def. Br. (Dkt. No. 93) at 30-32)

## IV.    CONTROL PERSON LIABILITY

The Amended Complaint also asserts control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.  Such claims are "necessarily predicated on a primary violation of the securities laws." Rombach, 355 F.3d at 177-78. Because Plaintiffs have not adequately pled any underlying violation of the securities laws, these claims will likewise be dismissed.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Amended Complaint (Dkt. No. 93) is granted.

While the Court grants leave to move to amend, in any such motion Plaintiff will explain in detail how each defect cited in this Opinion has been satisfied by factual allegations in the proposed second amended complaint.  The proposed second amended complaint is to be attached as an exhibit to the motion.  Any motion for leave to amend is to be filed by **April 14, 2025.**

The Clerk of Court is directed to terminate the motion.  (Dkt. No. 93)

Dated: New York, New York
       March 18, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge